UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

TOTAL LIFE CHANGES, LLC;
TOTAL LIFE CHANGES-EXPORT,
INC.; JACK FALLON; JOHN
LICARI; SCOTT BANIA; and                    Case No.
NATALIE PARAMO.,                            Hon.

        Petitioners,

v.

TATIANA POPE,

        Respondent,

---

Sᴛᴀʀʀ, Bᴜᴛʟᴇʀ & Sᴛᴏɴᴇʀ, PLLC
Daniel C. Waslawski (P78037)
Attorneys for Petitioner
20700 Civic Center Dr., Ste. 290
Southfield, MI 48076
(248) 554-2700
dwaslawski@starrbutler.com

---

## **PETITION FOR ORDER COMPELLING ARBITRATION PURSUANT TO FEDERAL ARBITRATION ACT**

Pursuant to Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*., Petitioners Total Life Changes, LLC, Total Life Changes-Export, Inc., Jack Fallon, John Licari, Scott Bania, and Natalie Paramo (collectively, "Petitioners") hereby petition this Court for an order that Respondent Tatiana Pope ("Respondent"), pursuant to the agreement between the parties, arbitrate, on an individual basis, all claims alleged by Respondent in that certain lawsuit currently pending as Case No. 1:25−CV−00391−JLT−CDB in the United States District Court for the Eastern District of California.

In support of this Petition, Petitioners allege as follows:

## PARTIES

1.     Respondent is the plaintiff in a putative class action filed against Petitioners pending in the United States District Court for the Eastern District of California, which is styled *Tatiana Pope v. Total Life Changes, LLC, et al*, Case No. 1:25−CV−00391−JLT−CDB (E.D. Cal.) (hereinafter, the "California Action"). A true and correct copy of the Complaint in the California Action ("California Complaint") is attached as Exhibit 1 to the concurrently filed Declaration of Daniel C. Waslawski ("Waslawski Decl.").[1]

---

[1] The Waslawski Decl. is attached as Exhibit A to this Petition.

2.     Petitioner Total Life Changes, LLC ("TLC") is a limited liability company organized and existing under the laws of the State of Michigan with its headquarters in Fair Haven, Michigan. (Licari Decl., ¶ 5.)[2] TLC is a named defendant in the California Action. (Waslawski Decl., ¶ 2 and Exh. 1 to Waslawski Decl.) TLC's sole member is Jack Fallon, an individual who resides in the state of Michigan. (Licari Decl., ¶ 8.)

3.     Petitioner Total Life Changes-Export, Inc. ("TLC Export") is a corporation organized and existing under the laws of the State of Michigan with its headquarters in Fair Haven, Michigan. (Licari Decl., ¶ 9.) TLC Export is a wholly owned subsidiary of TLC. (*Id*.) TLC Export is a named defendant in the California Action. (Waslawski Decl., ¶ 2 and Exh. 1 to Waslawski Decl.)

4.     Petitioner Jack Fallon ("Fallon") is an individual and resident of the State of Michigan. (Licari Decl., ¶¶ 8, 11.) Mr. Fallon is the founder, Chief Executive Officer and Chief Visionary Officer of TLC. (Licari Decl., ¶ 10.) Fallon is a named defendant in the California Action. (Waslawski Decl., ¶ 2 and Exh. 1 to Waslawski Decl.)

5.     Petitioner John Licari ("Licari") is an individual and resident of the State of Michigan. (Licari Decl., ¶ 10.) Mr. Licari is the Chief Operating Officer of

---

[2] The Licari Declaration is attached as <u>Exhibit B</u> to this Petition.

TLC. (Licari Decl., ¶ 1.) Licari is a named defendant in the California Action. (Waslawski Decl., ¶ 2 and Exh. 1 to Waslawski Decl.)

6.     Petitioner Scott Bania ("Bania") is an individual and resident of the State of Michigan. (Licari Decl., ¶ 11.) Mr. Bania is the Chief Communication Officer of TLC. (Licari Decl., ¶ 10.) Bania is a named defendant in the California Action. (Waslawski Decl., ¶ 2 and Exh. 1 to Waslawski Decl.)

7.     Petitioner Natalie Paramo ("Paramo") is an individual and resident of the State of Michigan. (Licari Decl., ¶ 11.)  Ms. Paramo is the Director of Customer and User Experience of TLC. (Licari Decl., ¶ 10.) Paramo is a named defendant in the California Action. (Waslawski Decl., ¶ 2 and Exh. 1 to Waslawski Decl.)

8.     On information and belief, Respondent Tatiana Pope is an individual who resides in the State of California. In the Terms and Conditions (defined below) between TLC and Pope, Pope agreed that, subject to the Arbitration Agreement, proper jurisdiction and venue for any dispute between the parties shall be arbitration in Oakland County, Michigan.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this Petition based on 28 U.S.C. § 1332(a)(1) because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs, and based on 28 U.S.C. § 1367 because the state law claims alleged in the California Action arise from the

same case and controversy as Petitioners' instant claims. *See* 9 U.S.C. § 4 ("A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action . . . for an order directing that such arbitration proceed in the manner provided for in such agreement").

## GENERAL ALLEGATIONS

## I.    RESPONDENT EXPRESSLY AGREED TO TLC'S TERMS AND CONDITIONS, INCLUDING THE ARBITRATION PROVISION

10.    TLC is a network marketing company, founded in 2003, that focuses on developing and marketing systems and products for weight management, wellness, and skincare, which are promoted and sold by a network of tens of thousands of independent contractors ("Life Changers") worldwide.  (Licari Decl., ¶ 4.) TLC sells and ships products to customers in every U.S. state, in addition to shipping to customers internationally. (Licari Decl., ¶ 4.). TLC fulfills these orders through its distribution center in Michigan. (Licari Decl., ¶ 4.).

11.    Life Changers are independent contractors, not employees or agents of TLC. Each Life Changer interested in earning money through the TLC business opportunity can enroll other Life Changers and customers with TLC as part of their downline organization. (Licari Decl., ¶ 6.)  A Life Changer is eligible to earn money on sales of TLC products to Life Changers or customers he or she personally enrolls,

and to others within the Life Changer's TLC business organization. (Licari Decl., ¶ 6.) A Life Changer is eligible to earn direct commissions on the products that they sell, indirect commissions on products sold by persons in their downline organization, bonuses and other rewards according to the terms of TLC's compensation plan.

12.     To be eligible to become a Life Changer, an individual must review, complete, and accept the Terms and Conditions of all required materials and documents, including TLC's Policies & Procedures ("P&Ps"), the TLC Compensation Plan ("Compensation Plan"), TLC's Advertising Policy, and other applicable policies, agreements, or obligations (collectively the "LC Agreement") as they exist at the time of the Life Changer's enrollment.[3] By becoming a Life Changer, a Life Changer agrees to abide by the then current version of the LC Agreement. (Licari Decl., ¶ 17.)

13.     The LC Agreement consists of standard distributor contractual documents that are published online and updated from time to time. The use of standard documents is a practice that is prevalent and widely accepted in the network marketing industry and enables companies like TLC to maintain a level of

---

[3] TLC's Policies & Procedures contains a provision permitting the company, upon proper notification, to amend the terms of its contract with distributors in its discretion and provides that active Life Changers will be bound by the current version.

standardization in their distributor contracts, including with amended or supplemental contract terms which may be prompted by evolving regulatory requirements, or other business or legal considerations. This practice is generally accepted and used in the network marketing industry, by companies and distributors alike, and has been followed by TLC and its Life Changers for many years. Life Changers may access and  review the LC Agreement on TLC's website platform. (Licari Decl., ¶ 18.)

14.     If the Life Changer does not agree with an amendment to the Terms and Conditions or any other component of the LC Agreement, a Life Changer may, at any time and for any reason, discontinue their contractual relationship with TLC. (Licari Decl., ¶¶ 7, 22.)

## Respondent Tatiana Pope

15.     Respondent Tatiana Pope first opened a Life Changer account with TLC on or about February 26, 2020[4], but that account was only active for four months; that first account, which had become dormant, was suspended by TLC on October 12, 2020. (Licari Decl., ¶ 26.).  Subsequently, Ms. Pope opened a second Life Changer account on July 18, 2023, using a different tax identification number

---

[4] For some reason unknown to TLC, respondent Pope used the name "Tatiana Barnes" when she enrolled as a TLC Life Changer. For convenience sake, this Petition will refer to Respondent as Ms. Pope, since that is the name that she used when she filed the California Action.

than she had used to open her original account.  That second account is still carried

by TLC as an active Life Changer account. (Licari Decl., ¶ 27.)

16.    Before Life Changers can submit an application for enrollment to TLC,

they must first view and assent to the LC Agreement, which includes TLC's Terms

and Conditions containing the Arbitration Agreement. (Licari Decl., ¶ 20.)

17.    TLC's online enrollment system does not allow for a prospective Life

Changer to submit the LC Agreement without indicating acknowledgment and

affirmative assent. (Licari Decl., ¶¶ 20, 22.)

18.    There is no time limit or time restrictions for a prospective Life Changer

to complete their review of the LC Agreement, including the Terms and Conditions

containing the Arbitration Agreement, and the online system permits the applicant

to exit and reenter the program while completing the enrollment process. (Licari

Decl., ¶ 21.)

19.    As captured by TLC's online platform, Respondent affirmatively

marked the box confirming that she reviewed and agreed to TLC's Terms and

Conditions on January 12, 2024. (Licari Decl., ¶¶ 28-31.) She further signed her

name at the end of the document. (Licari Decl., ¶¶ 14, 31; Licari Decl., Exh. 1

(LC Agreement containing Ms. Pope's signature).)

20.    Respondent was the individual who marked the box and signed her

name on TLC's Terms and Conditions, indicating her acceptance. Without a Life

Changer's unique login credentials, this document cannot be either accepted or submitted. (Licari Decl., ¶¶ 18, 20.)  Furthermore, in her California Complaint, Respondent alleges that she herself accepted TLC's Terms and Conditions[5]. (Waslawski Decl. Ex. 1 at ¶ 102.)

## II.     THE AGREEMENT BETWEEN THE PARTIES CONTAINS AN ENFORCEABLE AND BINDING ARBITRATION PROVISION, WHICH INCLUDES A DELEGATION CLAUSE

21.    "[A]rbitration is simply a matter of contract between the parties." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Under Michigan law, courts consider four factors when assessing a petition to compel arbitration under the FAA: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in the action are subject to arbitration, whether to stay the remainder of the proceedings pending arbitration. *Glazer v. Lehman Brothers, Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citation omitted); *Fazio*, 340 F.3d at 392.

---

[5] Respondent alleges in the California Complaint that she accepted the Terms and Conditions when she first enrolled to become a Life Changer in 2020. Waslawski Decl. ¶ 3, Exh. 1 at ¶ 102. As part of re-enrolling as a Life Changer, Respondent was required to reaffirm her agreement to TLC's Terms and Conditions. (Licari Decl. ¶¶ 20, 22, 27.) Further, Respondent placed orders to the same home address after both her 2020 and 2024 signatures. (Licari Decl. ¶ 27, Exh. 1.)

22.    By agreeing to the Terms and Conditions, Respondent agreed to arbitrate any disputes arising out of or relating to the Terms and any of the relevant documents that make up the LC Agreement. Specifically, Section 8.2 of the P&Ps provide, in pertinent part:

> Except where prohibited by law, or unless otherwise provided in this Agreement, all Claims that fail to resolve in nonbinding mediation, as described above, shall be resolved by a final and binding arbitration.

> If the arbitration is between TLC and a US resident, the arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA") and will be administered by the AAA. The AAA Rules are available online at www.adr.org. Unless otherwise agreed to between the Parties, the arbitration shall take place in Oakland County, Michigan.

>                 * * *

> YOU AND TLC ACKNOWLEDGE AND AGREE THAT ANY SUCH CLAIMS SHALL BE BROUGHT SOLELY IN THE PARTY'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE PROCEEDING. YOU AND TLC FURTHER AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. YOU AND TLC VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL. ANY CONTROVERSY CONCERNING WHETHER A DISPUTE IS ARBITRABLE SHALL BE DETERMINED BY THE ARBITRATOR AND NOT BY THE COURT. JUDGMENT UPON ANY AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED BY A MICHIGAN STATE OR FEDERAL COURT HAVING JURISDICTION THEREOF. THIS

ARBITRATION CONTRACT IS MADE PURSUANT TO A
TRANSACTION IN INTERSTATE COMMERCE AND ITS
INTERPRETATION, APPLICATION, ENFORCEMENT AND
PROCEEDINGS HEREUNDER SHALL BE GOVERNED BY THE
FEDERAL ARBITRATION ACT ("FAA").

BY AGREEING TO THIS ARBITRATION AGREEMENT,
YOU ARE GIVING UP YOUR RIGHT TO GO TO COURT,
INCLUDING YOUR RIGHT TO A JURY TRIAL.

(Licari Decl., Exh. 1, Policies & Procedures, §§ 8.2 (d), (e), (g), (h); hereinafter

"Arbitration Agreement".)

23.     The Arbitration Agreement includes a further class action waiver which

states:

Separate and apart from the dispute resolution procedures
set forth above, you agree to waive any right to bring or
participate in any class action in any way related to, or arising
from, this Agreement.

You acknowledge that this class action waiver is material and
essential to the arbitration of any disputes between you and TLC,
and is non-severable from the Agreement to arbitrate claims.

YOU UNDERSTAND THAT BY AGREEING TO THIS
AGREEMENT, WHICH CONTAINS THIS CLASS ACTION
WAIVER, YOU MAY ONLY BRING CLAIMS AGAINST
TLC, ITS AGENTS, OFFICERS, SHAREHOLDERS,
MEMBERS, EMPLOYEES, SUBSIDIARIES, AFFILIATES,
PREDECESSORS IN INTEREST, SUCCESSORS AND/OR
ASSIGNS IN AN INDIVIDUAL CAPACITY AND NOT AS A
PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED
CLASS ACTION OR REPRESENTATIVE PROCEEDING. IF
YOU DO NOT AGREE TO THIS AGREEMENT AND CLASS
ACTION WAIVER, YOU MUST TELL US IN WRITING

AND NOT PARTICIPATE AS A CUSTOMER AND/OR
PURCHASE OUR PRODUCTS.

(Licari Decl., Exh. 1, Section 8.2 (k)).

24.     The parties to the contract have never agreed to arbitrate on a class basis and cannot be compelled to arbitrate any class claims. *See, Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 139 S.Ct. 1407 (2019) (Federal Arbitration Act does not permit a court to compel class arbitration when the agreement does not clearly provide for it); *Epic Systems Corporation v. Lewis,* 584 U.S. 497, 510-511, 138 S.Ct. 1612 (2018) (mandatory class action waivers in employment-related arbitration agreements are enforceable); *Stolt-Nielsen S.A., et al. v. AnimalFeeds International Corp.,* 559 U.S. 662, 684, 130 S.Ct. 1758 (2010) (class claims could not be compelled to arbitration when the parties had only agreed to arbitrate their individual claims).

25.     "Because arbitration agreements are fundamentally contracts, [courts] review the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Tillman v. Macy's, Inc*., 735 F.3d 453, 456 (6th Cir. 2013). The elements of an enforceable contract under Michigan law are: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v. Cannon Twp*, 265 Mich. App. 582, 592 (2005). Here, the Terms and Conditions between Petitioners and Respondent satisfies these factors.

26.     Under Michigan law, the fact that a provision in an agreement is not subject to negotiation between the parties at the onset of their relationship does not make that agreement invalid as a matter of unconscionability. In fact, there is no legal significance which attaches to contracts of adhesion and Courts are to enforce such contracts according to their plain language. *Rory v. Cont'l Ins. Co*, 473 Mich. 457, 489; 703 N.W.2d 23, 42 (2005).

27.     Moreover, as quoted above, section 8.2 of the Arbitration Agreement includes a delegation clause and expressly incorporates the American Arbitration Association (AAA) rules (Licari Decl., Exh. 1, Section 8.2 (e), (g).)

28.     "Delegation clauses delegate questions of arbitrability to the arbitrator." *Harrison v. Gen. Motors LLC*, 651 F. Supp. 3d 878, 884 (E.D. Mich. 2023) (Michelson, J.). Indeed, "questions pertaining to formation are reserved for the court's province, whereas those relating to enforceability and coverage are arbitrable in the presence of a valid delegation clause." *Becker v. Delek US Energy, Inc.,* 39 F.4th 351, 355 (6th Cir. 2022).

29.     Further, where an arbitration agreement incorporates and/or references the AAA rules, such reference and/or incorporation constitutes "clear and unmistakable evidence" that there was an agreement to delegate the issue of arbitrability to the arbitrator. *Harrison*, 651 F. Supp. 3d at 885 ("The Sixth Circuit has held that incorporation of or reference to the American Arbitration Association

(AAA) rules is 'clear and unmistakable evidence' that there was an agreement to delegate issues of arbitrability, as those rules 'clearly empower an arbitrator to decide questions of ''arbitrability.''") (*quoting Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845–46 (6th Cir. 2020)).

## III.   RESPONDENT FILED A LAWSUIT AGAINST PETITIONERS IN CALIFORNIA THAT ARISES OUT OF AND RELATES TO THE LIFE CHANGER AGREEMENTS

30.    In contravention of the clear and unambiguous Arbitration Agreement, and in derogation of the forum selection clause designating the arbitration in Oakland County, Michigan as the proper jurisdiction and venue for disputes between the parties, Respondent filed the California Action in California state court on February 27, 2025. (Subsequently, Petitioners removed the action from California state court to the United States District Court for the Eastern District of California.) (*See*, Waslawski Decl., ¶¶ 2-3.)

31.    The California Complaint alleges ten (10) causes of action against Petitioners in connection with the core allegation that Respondent was misclassified as an independent contractor: (1) failure to pay minimum wages; (2) failure to pay overtime wages; (3) failure to provide rest periods; (4) failure to provide meal periods; (5) failure to timely pay wages during employment; (6) failure to keep payroll records; (7) failure to provide accurate wage statements; (8) failure to

reimburse business expenses; (9) unfair competition; and (10) violations of the California Private Attorneys General Act. (*See*, Waslawski Decl., ¶¶ 2-3.)

32.    At present, Petitioners have not yet filed a responsive pleading to Respondent's Complaint in the California Action. Petitioners intend to inform the court in the California Action that they have filed this instant Petition and to ask that court to, *inter alia*, stay the California Action until this Court can decide on whether to grant this Petition and compel arbitration in the State of Michigan pursuant to the terms of the Arbitration Agreement.

## IV.   **THE ARBITRATION AGREEMENT IS VALID AND ENFORCEABLE, AND ALL QUESTIONS REGARDING ARBITRABILITY MUST BE ARBITRATED**

33.    The FAA evinces "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927 (1983). Under the FAA, agreements to arbitrate are uniformly enforced. *See AT&T Mobility*, 563 U.S. at 345. Absent the most forceful evidence of an intent to exclude a particular claim, arbitration clauses will be enforced. *Watson Wyatt & Co. v. S.B.C. Holdings, Inc.*, 513 F.3d 646, 649 (6th Cir. 2008). As mentioned, *infra*, Courts in the Sixth Circuit require the consideration of four factors: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if the court concludes that some, but not all, of the claims in

the action are subject to arbitration, whether to stay the remainder of the proceedings pending arbitration. *Glazer v. Lehman Brothers, Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citation omitted); *Fazio*, 340 F.3d at 392.

34.    Because of the strong public policy favoring arbitration, arbitration clauses are construed liberally and any doubts about whether a matter is subject to arbitration are resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24 (The FAA reflects a "liberal federal policy favoring arbitration agreements").

35.    As a written provision in a contract that involves interstate commerce, the Arbitration Agreement in TLC's Terms and Conditions is valid and enforceable against Respondent. *See* 9 U.S.C. § 2; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts[.]").

36.    The FAA mandates that an arbitration provision in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable," save only when grounds exist for revocation of the contract. 9 U.S.C. § 2. The LC Agreement is "a contract evidencing a transaction involving commerce" as envisioned by the FAA because Pope purchased TLC products, which were shipped from TLC's Michigan warehouse to Pope's home in California. (Licari

Decl., ¶¶ 4, 27); *see*, *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("We have interpreted the term 'involving commerce' in the FAA as . . . words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power.").

37.    Since the nature of TLC's business involves interstate commerce, the FAA applies. TLC advertises and sells products which it ships to customers in every U.S. State. (Licari Decl., ¶ 4). TLC sells its products through its network of independent contractors known as Life Changers, who are also located in every U.S. state. (*Id.*); Respondent herself dispatched occasional orders to customers in Nevada, Texas, and Mississippi. (Licari Decl., ¶ 27).

38.    Because of the delegation clause in the Arbitration Agreement, the only question that this Court must—or even can—decide is whether a properly formed arbitration agreement exists; all other questions regarding arbitrability must be arbitrated. *Becker*, 39 F.4th at 355 ("questions pertaining to formation are reserved for the court's province, whereas those relating to enforceability and coverage are arbitrable in the presence of a valid delegation clause."). *See also Ross v. Nissan of NA, Inc.*, 728 F. Supp. 3d 841, 846 (M.D. Tenn. 2024) (summarizing Sixth Circuit jurisprudence on delegation clauses).

39.    In any event, if this Court were to address the question of arbitrability despite the existence of the delegation clause, it is clear that Respondent's claims are

explicitly covered by the broad arbitration clause, in which Respondent agreed to arbitrate "any controversy or claim" arising out of, or relating to, the Life Changer's participation or the Life Changer relationship with TLC as follows:

> A "Claim" is any dispute or claim due to, related to, or arising out of your participation as an LC, any transaction or relationship between you and us resulting from your participation as an LC and/or purchase of products, including the purchase of TLC products as an LC, the information provided in connection with your participation as an LC, and including, without limitation, tort and contract claims, claims based on any international, federal, state, or local statute, law, order, ordinance, or regulation made between you and TLC against one another's agent, employee, subsidiary, affiliate, predecessor in interest, successor, assign, parent, affiliate, subsidiary, or related company.

(Licari Decl., Exh. 1, Section 8.2 (a).)

40. "[W]ith respect to agreements containing broadly-worded arbitration clauses, 'there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 395 (6th Cir. 2014) (*quoting Litton Financial Printing Division, Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 209 (1991)). Arbitration agreements containing broad language, which require that all claims "arising out of" a particular agreement be submitted to arbitration, have been held to cover and reach "all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or

performance of the contract per se." *Gore v. Alltel Commc'ns, LLC*, 666 F. 3d 1027, 1033 (7th Cir. 2012).

41.     The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, *id.*, 460 U.S. at 24–25. In the Sixth Circuit, arbitration clauses framed as "arising out of or relating to" a contract are to be construed broadly. *Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 395 (6th Cir. 2014) (*quoting Litton Financial Printing Division, Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 209 (1991)).

42.     Arbitration agreements containing broad language, which require that all claims "arising out of" a particular agreement be submitted to arbitration, have been held to cover and reach "all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se." *Gore v. Alltel Commc'ns, LLC*, 666 F. 3d 1027, 1033 (7th Cir. 2012). When determining whether a particular claim falls within the scope of an arbitration agreement, the Court's focus is on the factual underpinnings of the claim rather than the legal theories alleged in the complaint. *Gregory v. Electro-Mechanical Corp.,* 83 F.3d 382, 384 (11th Cir. 1996); *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 846 (2d Cir. 1987).

43.     Respondent's claims here arise out of, or at a minimum relate to, the Life Changer's relationship with TLC, and the Terms and Conditions. Specifically, Respondent's core allegation that she was misclassified as an independent contractor relates to the LC Agreement; and Respondent's wage and hour claims are inconsistent with the terms of TLC's Policies and Procedures. (*See, e.g.*, Licari Decl., Exh. 1 ("Section 2.4. All [Life Changers] are independent contractors regardless of rank or level within the compensation plan. There are no franchises, exclusive territories, exclusive distributorships, partnerships, joint ventures or strategic alliances created between any LC and TLC…").)

44.     Neither Plaintiff's legal theories under California law, nor any federal law, preempts enforcement of the arbitration agreement under the FAA.

45.     Petitioners anticipate that Respondent will argue that her claim under California's Private Attorneys General Act ("PAGA") is exempt from arbitration. However, there is no legal basis to support such an argument. Under *Viking River Cruises, Inc. v. Moriana*, (2022) 596 U.S. 639, Respondent is obligated to arbitrate the individual portion of her PAGA claim based on Petitioners alleged California Labor Code violations. *Id*. at p. 642. Further, the arbitrability of her claim is subject to the delegation clause, which requires the arbitrator to decide all issues of arbitrability.

46.     Aside from Plaintiff's representative PAGA claim, no other portion of the underlying controversy is exempt from arbitration. Because a valid arbitration agreement exists between the parties and Respondent's claims fall within the agreement, they must be compelled to arbitration on an individualized basis.

## V.     ALL OF THE PETITIONERS MAY COMPEL THE CALIFORNIA COMPLAINT TO ARBITRATION

47.     Despite not being a party to the LC Agreement, Petitioners TLC-Export, Jack Fallon, John Licari, Scott Bania, and Natalie Paramo are also entitled to enforce the Arbitration Agreement.

48.     Where an arbitration provision contains a valid delegation clause (such as here), district courts *must* delegate the issue of whether a non-signatory can compel arbitration of claims brought by a signatory to the arbitrator. *Harrison*, 651 F. Supp. 3d 878, 886 (E.D. Mich. 2023) (citing *Swiger v. Rosette*, 989 F.3d 501 (6th Cir. 2021)). Thus, this Court should order arbitration and delegate to the arbitrator the issue of whether the non-signatory petitioners can compel arbitration of claims brought by Respondent.

49.     Were this Court to address the substantive issue, state law governs the question of whether a non-party can enforce an arbitration clause against a party. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). Non-signatories to arbitration agreements can be bound to such agreements "pursuant to ordinary contract-related legal principles, including incorporation by reference, assumption,

agency, veil-piercing/alter ego, and estoppel." *Thomas v. Right Choice Staffing Group, LLC*, No. 15-10055, 2015 WL 4078173, at *6 (E.D. Mich. 2015) (quoting *AFSCME Council 25 v. Wayne Cnty.*, 292 Mich. App. 68, 81 (Mich. App. 2011).

50.    Under Michigan law, "a party to an arbitration agreement may be equitably estopped from litigating its claims against non-parties in court and may be ordered to arbitration 'when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract.'" *Thomas*, 2015 WL 4078173, at *6 (*quoting City of Detroit Police and Fire Ret. Sys. v. Gsc Cdo Fund, Ltd.,* No. 289185, 2010 WL 1875758, at *6 (Mich. Ct. App. May 11, 2010) (internal ellipses, additional quotations, and additional citation omitted)). "Several federal circuit courts have utilized this estoppel theory—termed 'alternative estoppel'—to bind a signatory to arbitrate with a non-signatory at the non-signatory's insistence because of the close relationship between the entities involved, the relationship of the alleged wrongs to the obligations and duties in the contract, and the fact that the signatory's claims were intimately founded in and intertwined with the underlying contract obligations." *Id.* (internal quotations and citations omitted).

51.    Here, Respondent alleges, in the California Complaint, interdependent conduct on the part of all Petitioners that she claims resulted in the purported California Labor Code violations. As executives, subsidiaries, and employees of

TLC, Petitioners are closely related to TLC, the party with which Respondent entered into the LC Agreement.  Further, Respondent alleges in the California Complaint that all of the Petitioners exercised control over the wages, hours and/or working conditions of Respondent. (Waslawski Decl. Ex. 1 at Complaint ¶ 18-22.).

52.    Finally, the plain language of the Terms and Conditions also supports the named Petitioners ability to enforce arbitration given that it covers claims between either Party's "employee, subsidiary, affiliate, predecessor in interest, successor, assign, parent, affiliate, subsidiary, or related company." (Licari Decl., Exh. 1, Section 8.2 (a).) As such, claims against all Petitioners should be compelled to arbitration.

## **CLAIM FOR SPECIFIC RELIEF**

### **Specific Performance of the Arbitration Agreement**

57.    Respondent breached the Arbitration Agreement by ignoring the Arbitration Agreement and filing the California Action. Pursuant to 9 U.S.C. § 4, Petitioners are entitled to an order requiring Respondent to comply with the Arbitration Agreement and directing that arbitration proceed on an individual basis in the manner provided for in the Arbitration Agreement.

WHEREFORE, Petitioners Total Life Changes, LLC, Total Life Changes-Export, Inc., Jack Fallon, John Licari, Scott Bania, and Natalie Paramo pray as follows:

1.     That Respondent be ordered to arbitrate on an individual basis all claims alleged against Petitioners in the California Action, *Tatiana Pope v. Total Life Changes, LLC, et al*, Case No. 1:25−CV−00391−JLT−CDB (E.D. Cal.).

2.     That Petitioners be awarded such other relief as the Court deems proper.

Respectfully submitted,

STARR, BUTLER & STONER, PLLC

By:    /s/ Daniel C. Waslawski
       Daniel C. Waslawski (P78037)
       Attorneys for Petitioner
       20700 Civic Center Dr., Ste. 290
       Southfield, MI 48076
       (248) 554-2700
       dwaslawski@starrbutler.com

Dated:  May 16, 2025

# EXHIBIT A

## DECLARATION OF DANIEL WASLAWSKI

I, Daniel Waslawski, make this declaration in support of Petitioners' Total Life Changes, LLC, Total Life Changes-Export, Inc., Jack Fallon, John Licari, Scott Bania, and Natalie Paramo (collectively, "Petitioners") Petition to Compel Arbitration. Further, I declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1.     I am an attorney at law duly licensed to practice before all courts in the State of Michigan. I am a partner of STARR, BUTLER & STONER, PLLC, attorneys herein for Petitioners. I make this declaration in support of the concurrently filed Petition for Order Compelling Arbitration.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify thereto.

2.     On February 27, 2025, Respondent Tatiana Pope filed a Class Action Complaint ("California Complaint") in Kern County, California state court, styled as *Tatiana Pope v. Total Life Changes, LLC, et al*.  Petitioners are named as defendants in the California Complaint.

3.     On April 4, 2025, Petitioners removed the California Complaint to the United States District Court for the Eastern District of California, where it is currently pending as Case No. 1:25−CV−00391−JLT−CDB (the "California Action"). Attached as Exhibit 1 is a true and correct copy of the Operative Complaint

{00136307.DOCX}                                    1

pending in the Eastern District of California.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 15, 2025, at Southfield, Michigan.

DANIEL WASLAWSKI

{00136307.DOCX}                    2

# EXHIBIT A-1

**CLARKSON LAW FIRM, P.C.**
Glenn A. Danas (State Bar No. 270317)
*gdanas@clarksonlawfirm.com*
Maxim Gorbunov (State Bar No. 343128)
*mgorbunov@clarksonlawfirm.com*
Cody Laux (State Bar No. 359748)
*claux@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050

Kristen G. Simplicio (State Bar No. 263291)
*ksimplicio@clarksonlawfirm.com*
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (202) 998-2299

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TATIANA POPE, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>TOTAL LIFE CHANGES, LLC; TOTAL LIFE CHANGES – EXPORT, INC.; JACK FALLON; JOHN LICARI; SCOTT BANIA; NATALIE PARAMO and DOES 1–50, inclusive,<br><br>Defendants. | Case No. 1:25-cv-00391-JLT-CDB<br><br>**FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT**<br><br>(1) Failure to Provide Meal Periods or Meal Premium Wages (Cal. Lab. Code §§ 226.7, 512(a), 1198; IWC Wage Order 4-2001);<br>(2) Failure to Provide Rest Periods or Rest Break Premium Wages (Cal. Lab. Code §§ 226.7, 558.1);<br>(3) Failure to Pay Minimum Wage and Liquidated Damages (Cal. Lab. Code §§ 1182.12, 1194, 1197, 1197.1, 1198; IWC Wage Order 4-2001);<br>(4) Failure to Pay Overtime Wages (Cal. Lab. Code § 510; IWC Wage Order 4-2001);<br>(5) Failure to Timely Pay Wages (Cal. Lab. Code § 204);<br>(6) Failure to Keep Requisite Payroll Records (Cal. Lab. Code § 1174(d));<br>(7) Failure to Provide Timely and Accurate Wage Statements (Cal. Lab. Code § 226(a), 226(e));<br>(8) Failure to Reimburse Business Expenses (Cal. Lab. Code §§ 450, 2802; IWC Wage Order 4-2001);<br>(9) Unfair Competition (Bus. & Prof. Code § 17200 et seq.)<br>(10) Violations of the Private Attorney General Act (Labor Code §§ 2698-2699.8)<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................1

II.   JURISDICTION AND VENUE ...................................................................4

III.  THE PARTIES...............................................................................................4

IV.   FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED
      EMPLOYEES ...............................................................................................6

      A.    TLC Is a Successful Multilevel Marketing Company That is Dependent on
            Its Life Changers to Engage in Social Media Marketing on Its Behalf.................6

      B.    TLC Life Changers Are Employees ........................................................9

            1.    Controlling Law.............................................................................9

            2.    Life Changers Are Not Free From TLC's Control ...................11

            3.    Life Changers' Work Is Not Outside TLC's "Usual Course of
                  Business".....................................................................................13

            4.    TLC Cannot Meet Its Burden to Show That Life Changers are
                  "Customarily Engaged" in a Separate Business .........................13

            5.    TLC Life Changers Are Not "Direct Sellers"...........................15

            6.    The Terms and Conditions in the Life Changer Agreement are
                  Unconscionable, Unfair, and Unlawful .....................................20

      C.    TLC's Misclassification of Plaintiff and Life Changers Was Willful ..................22

      D.    TLC's Misclassification of Life Changers and Unfair Business Practices
            Harm the California Public ...................................................................23

            1.    TLC Uses Widespread Advertising Practices Directed at the
                  General Public to Recruit New Life Changers ...........................23

            2.    TLC's Unfair and Unlawful Conduct Harms California in Other
                  Ways ...........................................................................................25

      E.    Plaintiff's Experiences as a TLC Life Changer ...................................26

V.    CLASS ALLEGATIONS ............................................................................28

VI.   FACTS RELATING TO PLAINTIFF AS A PRIVATE ATTORNEY GENERAL.........31

VII.  CAUSES OF ACTION ...............................................................................32

      FIRST CAUSE OF ACTION .......................................................................32

      SECOND CAUSE OF ACTION ..................................................................34

      THIRD CAUSE OF ACTION .......................................................................35

i

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

| | | |
|---|---|---|
| 1 | | FOURTH CAUSE OF ACTION ..................................................................................36 |
| 2 | | FIFTH CAUSE OF ACTION ....................................................................................38 |
| 3 | | SIXTH CAUSE OF ACTION ....................................................................................38 |
| 4 | | SEVENTH CAUSE OF ACTION ..............................................................................39 |
| 5 | | EIGHTH CAUSE OF ACTION .................................................................................41 |
| 6 | | NINTH CAUSE OF ACTION ...................................................................................42 |
| 7 | | TENTH CAUSE OF ACTION ...................................................................................45 |
| 8 | VIII. | PRAYER FOR RELIEF ...........................................................................................47 |
| 9 | IX. | DEMAND FOR TRIAL BY JURY ...........................................................................48 |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1         Plaintiff Tatiana Pope brings this action, individually, and behalf of a class of similarly

2   situated individuals, against TOTAL LIFE CHANGES, LLC, TOTAL LIFE CHANGES—

3   EXPORT, INC., JACK FALLON, JOHN LICARI, SCOTT BANIA, NATALIE PARAMO and

4   DOES 1–50, inclusive, (collectively, "Defendants" or "TLC"). Plaintiff's allegations against

5   Defendants are based upon investigation carried out by Plaintiff's counsel, except for allegations

6   pertaining specifically to Plaintiff, which are based upon Plaintiff's personal knowledge.

7   **I.    INTRODUCTION**

8         1.    TLC is a massively successful company that, for years, has exploited its California

9   salesforce by misclassifying its workers as independent contractors rather than as employees.

10  Plaintiff is a TLC's "Life Changer," one of the approximately 30,000 active "Life Changers,"[1]

11  primarily women-identified sales workers in the United States/worldwide who sell TLC products

12  through their online networks under TLC's strict direction and control.

13        2.    TLC is headquartered in Fair Haven, Michigan. TLC develops and sells a wide

14  range of health and wellness products, including supplements, teas, and beauty products. Pursuant

15  to TLC's business model, it establishes relationships with various individuals known as "Life

16  Changers" who market and sell TLC products. TLC has spent a great deal of time and resources

17  in implementing and managing a broad range of employment policies and procedures for these

18  "Life Changers." Despite calling these salespeople "Life Changers" but designating them

19  independent contractors, these "Life Changers" are in fact employees under California law. TLC

20  has violated numerous provisions of the California Labor Code and applicable IWC Wage Order

21  by denying its Life Changers the compensation, other benefits and statutory entitlements that they

22  are owed.

23        3.    TLC maintains a centralized, rigorous, and stringent sales policy to which each of

24  its Life Changers must rigidly adhere should they expect any commission for their sales of TLC

25

26  _____

27  [1] *2023 Income Disclosure Statement*, Total Life Changes (2023),
    https://totallifechanges.com/pages/income-disclosure-
    statement?srsltid=AfmBOoqxWXQWNZR8u9CEXoCQjtwSz3MjY_iZ1iA1lfuQqdbSgttnpNqN

28  &pws=TotalLifeChanges360 (last visited Feb. 27, 2025).

1  products. Even when these Life Changers do follow TLC's exacting direction to the tee, the
2  majority of Life Changers fail to even break even, having sunk substantial personal investment
3  into TLC inventory— business expenditures which TLC shifts onto their frequently financially
4  insecure, female workers and which TLC refuses to reimburse.

5      4.      Via its pervasive marketing and sales guidelines, TLC directed Life Changers to
6  market and sell a variety of consumer products, including supplements, teas, and beauty products.
7  In exchange for the Life Changers' work promoting the brand on social media, referring new
8  customers, providing customer service, and driving traffic to TLC's website, TLC pays Life
9  Changers at most a paltry commission.

10     5.      TLC's ability to avoid accountability to its employees thus far—turns on the fact
11  that it operates as multi-level marketing business ("MLM").[2] TLC's recruitment tactics
12  purportedly promise its Life Changers the opportunity to build a business; in reality, however, they
13  supply free marketing and sales support for TLC.

14     6.      California legislature's codification of the "ABC Test" in AB 5 did include a "direct
15  sales" exemption, which incorporated a definition appearing in a 40-year-old statute, California's
16  Unemployment Code § 610. Among other things, the exemption is expressly limited only to those
17  salespersons making "in person" sales, such as door-to-door salespeople and home "Tupperware
18  party" hosts. It does not cover TLC's modern, online business model, where Life Changers drive
19  social media engagement under TLC's guidance and direction, directing consumers to TLC -
20  controlled websites, where TLC accepts and processes the sales and fulfills the orders, while also
21  collecting and benefiting from the consumer data it acquires from these leads. The result is a
22  coordinated marketing campaign that increases exposure and awareness of the TLC products and
23  is essential to the company's ability to reach new customers.

24     7.      As articulated in TLC's own Policies & Procedures, "Outside of an LC's Replicated
25  Website, LCs may not list or sell TLC products or services on any online retail store, e-commerce
26  site, or online auction site." These "Replicated Websites" display the same TLC website as

27

28  [2] Gerald Albaum & Robert A. Peterson, *Multilevel (Network) Marketing: An Objective View*, 11
    Marketing R. 347, 347–61 (2011).

1    normally shown, but with "You are now shopping with [Life Changer's Name]" displayed in the

2    top left corner. Life Changers cannot edit the content, text, photos, prices, or any aspect of the

3    Replicated Website, which only serves to give them credit for sales.

4         8.    TLC strictly controls the work product of its Life Changers, in part by ensuring that

5    they follow its rigid guidelines for marketing content and recruiting materials. In recent years,

6    TLC's direction and control of its Life Changers work product has become all encompassing. TLC

7    developed strict marketing guidelines partially in response to being subjected to intense media

8    scrutiny after it surfaced that the company had tacitly encouraged its Life Changers to make false

9    and dangerous claims health claims that TLC offerings could hinder the transmissibility and/or

10   severity of COVID.

11        9.    Plaintiff was a victim of TLC's practices. Like all Life Changers, in accordance

12   with TLC's strict marketing and sales protocols, Plaintiff was trained by other Life Changers and

13   through TLC materials, and was required to market, distribute, and sell Products to the public in

14   accordance with TLC's instructions and parameters. And in return, Plaintiff was paid virtually

15   nothing, while incurring unreimbursed personal costs to perform the work on TLC's behalf.

16        10.    For these reasons, Plaintiff brings this action to recover unpaid wages, overtime

17   compensation, penalties, interest, injunctive relief, other equitable remedies, damages, and

18   reasonable attorneys' fees and costs under the California Labor Code, Cal. Lab. Code §§ 204,

19   226(a), 226.7, 226.8, 510, 512(a), 1174(d), 1194, 1197, 1197.1, 1198, 2800, and 2802, IWC Wage

20   Order 4 (8 Cal. Code Regs. § 11040), and California Unfair Competition Law (Cal Bus. & Prof

21   Code §§ 17200 *et seq.*). Plaintiff also alleges civil penalties under the Private Attorneys General

22   Act ("PAGA"). In addition, TLC's conduct violates various municipal and county codes in

23   California, including but not limited to City of L.A. Cal. Code art. 7-7.5; County of Los Angeles

24   Code § 8.100.040, *et seq.*, San Francisco Cal. Code 12R.

25        11.    Upon information and belief, TLC has not addressed and/or changed its unlawful

26   practices including failing to provide complaint meal and rest periods and has continued to deprive

27   employees of straight and overtime compensation. By bringing this action, Plaintiff intends to stop

28   this ongoing and unlawful practice and recover back wages and overtime to which she is rightfully

1    entitled.

2    **II.    JURISDICTION AND VENUE**

3      12.    The monetary damages, civil penalties, restitution, and equitable relief sought by

4    Plaintiff, the class members, and other aggrieved employees exceed the minimal jurisdiction limits

5    of the Superior Court and will be established according to proof at trial.

6      13.    This Court has jurisdiction over this action pursuant to the California Constitution,

7    Article VI, section 10. The statutes under which this action is brought do not specify any other

8    basis for jurisdiction.

9      14.    This Court has jurisdiction over all Defendants because, upon information and

10    belief, Defendants are citizens of California, have sufficient minimum contacts in California, or

11    otherwise intentionally avail themselves of the California market so as to render the exercise of

12    jurisdiction over them by California courts consistent with traditional notions of fair play and

13    substantial justice. Indeed, Total Life Change's "Home Office" (the Defendants' principal place

14    of business), is located in Fair Haven, Michigan. Moreover, the acts and omissions detailed herein

15    occurred in California.

16      15.    Venue is proper in this Court because a majority of the acts, events, and violations

17    occurred in Kern County. Plaintiff performed work for Defendants from her home in Taft,

18    California: within Los Angeles County. Defendants' acts and omissions in violation of the relevant

19    labor statutes are thus physically tied to Plaintiff's residential address in Taft, California.

20      16.    Upon information and belief, Defendants direct and control a large workforce of

21    "Life Changers" throughout California—and have agents, employ individuals, and/or transact

22    business in the State of California, county of Kern.

23    **III.    THE PARTIES**

24      17.    Plaintiff Tatiana Pope is an individual and resident of Taft, California.

25      18.    Total Life Changes, LLC and Total Life Changes—Export, Inc. are entities

26    incorporated under the laws of the State of Michigan, with principal places of business in Fair

27    Haven, Michigan. Total Life Changes and Total Life Changes—Export, Inc. hold themselves out

28    to the public as a single entity, known as Total Life Changes.

1       19.    Plaintiff is informed and believes and based thereon alleges that Jack Fallon is, and

2    at all times relevant hereto was, an individual residing in Grosse Pointe Shores, Michigan, as well

3    as Chief Vision Officer for TLC. Plaintiff is further informed and believes and based thereon

4    alleges that Jack Fallon, in his capacity as the Chief Vision Officer of TLC, exercised control over

5    the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including

6    by informing employees when to report to work and what work hours should actually be recorded,

7    violated, or caused to be violated, the above-referenced and below-referenced Labor Code

8    provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare

9    Commission ("IWC") Wage Orders.

10      20.    Plaintiff is informed and believes and based thereon alleges that John Licari is, and

11    at all times relevant hereto was, an individual residing in Ada, Michigan, as well as Chief

12    Operations Officer for TLC. Plaintiff is further informed and believes and based thereon alleges

13    that John Licari, in his capacity as the Chief Operations Officer of TLC, exercised control over

14    the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including

15    by informing employees when to report to work and what work hours should actually be recorded,

16    violated, or caused to be violated, the above-referenced and below-referenced Labor Code

17    provisions in violation of Labor Code section 558.1, and 1197.1 and the Industrial Welfare

18    Commission ("IWC") Wage Orders.

19      21.    Plaintiff is informed and believes and based thereon alleges that Scott Bania is, and

20    at all times relevant hereto was, an individual residing in Grosse Pointe Shores, Michigan, as well

21    as Chief Communications Officer for TLC. Plaintiff is further informed and believes and based

22    thereon alleges that Scott Bania, in his capacity as the Chief Communications Officer of TLC,

23    exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved

24    employees, including by informing employees when to report to work and what work hours should

25    actually be recorded, violated, or caused to be violated, the above-referenced and below-

26    referenced Labor Code provisions in violation of Labor Code section 558.1, and 1197.1 and the

27    Industrial Welfare Commission ("IWC") Wage Orders.

28      22.    Plaintiff is informed and believes and based thereon alleges that Natalie Paramo is,

1  and at all times relevant hereto was, an individual residing in Shelby Township, Michigan, as well

2  as Director of Customer and User Experience for TLC. Plaintiff is further informed and believes

3  and based thereon alleges that Natalie Paramo, in her capacity as the Director of Customer and

4  User Experience of TLC, exercised control over the wages, hours and/or working conditions of

5  Plaintiff and other aggrieved employees, including by informing employees when to report to

6  work and what work hours should actually be recorded, violated, or caused to be violated, the

7  above-referenced and below-referenced Labor Code provisions in violation of Labor Code section

8  558.1, and 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

9      23.    The true names and capacities of Defendants sued as DOES 1–50, inclusive, are

10  unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to

11  section 474 of the California Code of Civil Procedure. Plaintiff will seek leave to amend this

12  Demand when said true names and capacities have been ascertained.

13  **IV.    FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED**
      **EMPLOYEES**
14
          **A. TLC Is a Successful Multilevel Marketing Company That is Dependent on Its Life**
15        **Changers to Engage in Social Media Marketing on Its Behalf**

16      24.    TLC is a massively successful multi-level (network) marketing company that

17  serves both US and international markets with its portfolio of health and wellness supplements,

18  teas, and beauty products.[3] TLC was founded in 2003 by Jack Fallon, in Michigan.[4]

19      25.    TLC's success stems from its dependence on a massive network of Life Changers.

20  The organization's multi-level marketing or network marketing structure is the sole reason for

21  TLC's continued profitability.

22      26.    But TLC has for decades exploited its California salesforce of Life Changers by

23  misclassifying these so-called Life Changers as independent contractors rather than as employees.

24  In knowingly and willfully misclassifying these employees, TLC has been able to mine free

25  marketing and sales support from their Life Changers. The cost of sales and marketing that TLC

---

[3] *About Us*, Total Life Changes, https://totallifechanges.com/pages/about-us?pws=cholmantlc (last visited
27  Feb. 27, 2025).
[4] *TLC History*, Total Life Changes, https://totallifechanges.com/pages/tlc-history?pws=cholmantlc (last
28  visited Feb. 27, 2025).

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1    has thus far offloaded on its Life Changers is significant.

2         27.    This is particularly egregious as TLC's workforce is primarily comprised of

3    marginalized and financially insecure individuals. Indeed, MLMs target and recruit women who

4    are often shut out of traditional workplaces, such as women with childcare responsibilities[5] and

5    military wives.[6] Due to their alienation from traditional workplaces, those targeted by TLC tend

6    to be less familiar with their labor protections and with employment law generally. Unfortunately,

7    these women, already stretched thin energetically and financially, are less well-positioned to

8    understand their rights as workers, less likely to identify when their protections are violated, and

9    less able to seek recourse when such violations occur.

10        28.    Over the last decade, TLC sales have moved from in-person to primarily online.

11   This means that the lion share of TLC product sales would not be exempt under the AB 5 "direct

12   sales" exemption, California's Unemployment Code § 610. A confluence of factors precipitated

13   the shift of sales to the virtual realm. First and foremost, social media sites such as Facebook, X,

14   Instagram, and TikTok have evolved into powerful marketing tools, and the adoption of these

15   social media are now ubiquitous in the direct sales of TLC products. Social media platforms are

16   now the predominant way MLM sellers connect with both their potential clients and their

17   community of sellers.[7] In as early as 2019, nearly half of all Americans indicated being

18   "inundated" by social media connections who flooded their "feeds" with posts attempting to sell

19   MLM-affiliated products.[8] Where once direct sales required Life Changers to walk door-to-door

---

[5] Heather Marcoux, *How MLMs fail mothers*, Motherly (Feb. 24, 2020), https://www.mother.ly/life/how-mlms-fail-mothers/.

[6] Annie Blackman, *Regulating The Reluctant: Policies That Benefit Vulnerable Participants In Multi-Level Marketing*, 25 U. Pa. J.L. & Soc. Change 83, 83 (2021) ("The vast majority of people who join multi-level marketing companies do not earn a profit. Those people [] also tend to be women who seek additional income to support a family or to find community."); *see generally* Krista Marie Federico, Dissertation, *She Works Hard for No Money: Understanding Women's Participation in Multi-Level Marketing Organizations*, U. Ariz. Sch. Socio. (2020).

[7] Lindsay R. Maher, *Note: American Dream: Social Pressures and Lackluster Regulation Allow Multi-Level Marketing Companies to Function as De Facto Pyramid Schemes*, 108 Minn. L. Rev. 1587, 1622 (2024).

[8] Erika Giovanetti, *MLM Consultants Pressure Friends and Family to Overspend, And It's Straining Relationships*, LendingTree (Dec. 16, 2019), https://www.lendingtree.com/debt-consolidation/survey-mlm-consultants-pressure-spending/.

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1   or host "Tupperware parties," now all Life Changers have to do is "post their products on social

2   media to capture the attention of hundreds or thousands of people at once."[9]

3         29.    Secondly, COVID and associated lockdowns halted the ability of Life Changers to

4   perform in-person sales, while also accelerating the widespread adoption of video chatting

5   software like Zoom among their potential customer bases. This led Life Changers who had not yet

6   already adapted to fully-remote sales to do so in order to adhere to lockdown policy. And since the

7   initial draw for many Life Changers was TLC's promise of flexible, autonomous work, it can be

8   inferred that the flexibility that comes with online sales means that there will be no future

9   significant, de-transition to in-person sales by Life Changers.

10        30.    While some MLMs rely on home parties, door-to-door sales calls, and other forms

11   of in person selling, TLC's model is designed so that Life Changers can work online to solicit

12   leads and recruit new Life Changers. TLC acknowledges that its Life Changers are instrumental

13   to TLC's profits. When asked about the TLC's compensation plan for its direct sellers, Chief

14   Vision Officer and founder Jack Fallon stated that Life Changers "are the real force that drives

15   TLC . . . ."[10]

16        31.    Despite the pivotal role of its salesforce, TLC has never properly classified Life

17   Changers as employees. Rather, TLC adheres to a multi-level (network) marketing organization

18   structure, in which it offers people the purported "opportunity" to develop their own business

19   earning commission by selling TLC products and recruiting others to do the same, designating

20   them as "independent contractors."

21        32.    However, these Life Changers are not independent contractors under applicable

22   law. TLC instead chose to unlawfully secure an expansive marketing and sales network for

23   minimal to no cost. It has reaped enormous profits by deliberately avoiding paying wages and

24   benefits to those performing the sales work that forms the backbone of TLC's business. TLC

25   charges its Life Changers for access to the instrumentalities needed to sell products, further

26

27   ―――――――――――

    [9] *Id.*

28   [10]  *Jack Fallon—CEO Toal Life Changes Interview*, Business For Home (Aug. 22, 2012), https://www.businessforhome.org/2012/08/jack-fallon-ceo-total-life-changes-interview/.

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1   increasing its profits and decreasing Life Changers' pay, in violation of California law. The

2   intended result is for Life Changers to receive, at most, de minimis profit from their work, while

3   providing free labor and shouldering the costs of doing business that TLC should be bearing.

4       **B. TLC Life Changers Are Employees**

5           **1. Controlling Law**

6   33.     Companies like TLC were never supposed to be allowed to run an entire business

7   on the backs of independent contractors. People who work in a company's core line of business

8   are its "employees." *United States v. Silk*, 331 U.S. 704, 718 (1947).

9   34.     TLC claims an unprecedented portion of its workforce as "independent

10  contractors." In 2023, TLC disclosed that globally, it had over 30,000 active "Life Changers"[11]

11  and anywhere from 200 to 500 employees.[12] Thus, in 2023, even with 500 employees, TLC

12  claimed a mere 1.7% of its workforce as "employees."

13  35.     TLC employees perform a variety of roles: some work as human resources

14  specialists, service desk technicians, and others.

15  36.     But the Life Changers, who make up the bulk of TLC's workforce, are denied even

16  the most basic protections of federal and state labor laws. TLC does not pay them minimum wage;

17  it does not pay overtime; and it does not reimburse business expenses, such as internet connections,

18  laptops, smart phones, or post-promotion over Facebook, YouTube, and Instagram. Its

19  classification of its Life Changers also deprives them of basic protections against discrimination

20  and sexual harassment.

21  37.     By design, "independent contractors" are exempted from "nearly every" labor law,

22  but this classification was not meant to be a loophole for companies like TLC, whose Life

23  Changers are effectively modern day telemarketers.[13] "Historically, firms reserved the

24  independent contractor designation for entrepreneurial individuals whose skills demanded higher

25

---

26  [11] 2023 *Income Disclosure Statement*, *supra*, n.1.

27  [12] *Total Life Changes, LLC*, LinkedIn, https://www.linkedin.com/company/total-life-changes-llc/ (last visited Feb. 27, 2025).

28  [13] Keith Cunningham-Parmeter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U. L. Rev. 1673, 1683–84 (2016).

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1    pay in the open market."[14] With this in mind, "[l]egislatures rationalized excluding [independent
2    contractors] from most employment laws because these individuals did not require the same legal
3    protections as potentially more vulnerable, less-skilled 'employees.'"[15]

4        38.    Today, TLC preys upon many of the most vulnerable members of our society.
5    Despite being a $40 billion industry, "the vast majority of people involved in them don't make
6    money off of MLMs, and many people lose money."[16] TLC's Life Changers are no exception:
7    according to TLC's own Income Disclosure Statement, 76.8% percent of "active" Life Changers
8    received no commission payment in 2023.[17]

9        39.    MLMs like TLC have grown during the COVID-19 pandemic, recruiting
10   salespeople by promising remote work for the unemployed.[18] These are the precise individuals
11   that legislatures meant to shield with minimum wage and other workplace protections.

12       40.    In recent years, state legislatures have taken action to send a clear message that
13   most workers should be "employees."

14       41.    California has adopted the "ABC test" to determine whether a company, like TLC,
15   has misclassified its workers as "independent contractors." Because employee status was meant to
16   be the default, the ABC test "presumptively considers all workers to be employees and permits
17   workers to be classified as independent contractors only if the hiring business demonstrates that
18   the worker in question satisfies *each* of three conditions:

19          A. that the worker is free from the control and direction of the hirer in connection with
20             the performance of the work… ***and***

21          B. that the worker performs work that is outside the usual course of the hiring entity's

22
23   ───────────────
     [14] *Id.*
     [15] *Id.*
24   [16] Emily Stewart, *$5 Jewelry And An MLM Conference Gone Wrong: Multilevel Marketing
25   Companies Were the "Perfect" Pandemic Business*, Vox (Sept. 23, 2021),
     https://www.vox.com/the-goods/22688317/mlm-covid-19-pandemic-recruiting-sales-paparazzi
26   (citing study finding that 99 percent of MLM participants lose money).
     [17] *2023 Income Disclosure Statement*, Total Life Changes, *supra*, n.1.
27   [18] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Life
     Changers Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME (Jul.
28   9, 2020), https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1    business; *and*

2         C.   that the worker is customarily engaged in an independently established … business

3              of the same nature as that involved in the work performed."

4    *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903, 956–57 (2018) (emphasis in

5    original).

6                    **2.   Life Changers Are Not Free From TLC's Control**

7         42.    To engage in online marketing work for TLC, the company does not require Life

8    Changers to hold any special experience, skills, license, or education level. Rather, TLC requires

9    only that a prospective Life Changer purchase a "Business Starter Kit for $59.95, and using their

10   website, purchase one or more products for between $64.95 and $1349.95.[19]

11        43.    All Life Changers are then required to adhere to a series of terms and conditions

12   that TLC collectively refers to as the "Total Life Changes Policies and Procedures." A true and

13   correct copy of the operative, October 2022 "Total Life Changes Policies and Procedures" is

14   attached hereto as **Exhibit A** and provides that Life Changers are to be considered independent

15   contractors.

16        44.    The Policies alone are 39 pages long and set out most of the requirements of the

17   Life Changers, including compliance with section 3 "Responsibilities of a Life Changer," requiring

18   Life Changers to promise to market TLC and engage in customer service in accordance with TLC

19   directives. Ex. A, § 3.

20        45.    Once a prospective Life Changer has enrolled, they can begin selling. Because TLC

21   treats the Life Changers as independent contractors, it does not pay them any salary, wages, or

22   benefits. Rather, as is typical in the MLM industry, the TLC Compensation Plan provides for two

23   types of compensation: (1) for sales the Life Changer made to consumers, the Life Changer

24   receives a small percentage as a commission, 25-50% per product; and (2) if the Life Changer

25   builds a "downline," i.e., recruits other new Life Changers to market and sell TLC products and

26   recruit more Life Changers, then the "upline" Life Changer receives commissions for sales made

27   _____

28   [19]*Get Started*, Total Life Changes, https://totallifechanges.com/pages/get-started?pws=cholmantlc
     (last visited Feb. 27, 2025)

---
11

1   by those Life Changers in their downline.[20] TLC also offers special "bonuses" to those Life

2   Changers who hit certain sales and recruiting metrics in various time frames.

3        46.    Life Changers are responsible for all expenses. This includes the minimum monthly

4   "Personal Qualifying Volume" of sales, which may be made by recruited customers or the Life

5   Changers themselves. In addition, Life Changers do not receive products for free or even at a

6   discount, but must purchase them at customer price from TLC to create promotional posts and

7   testimonials on social media or to distribute samples. TLC does not reimburse Life Changers for

8   these purchases nor for the costs of a cell phone, internet, and other routine business expenses.

9        47.    In the Agreement, TLC gives itself broad rights to control Life Changers and

10   mandate conformance with its directives.

11        48.    TLC's reliance on an e-commerce platform limits Life Changers' discretion and

12   promotes online sales over in-person interactions. Life Changers' TLC-issued websites,

13   "Replicated Sites," are designed in a way that ensures that Life Changers operate in compliance

14   with TLC's marketing directives as laid out in its Agreement. Because the Replicated Site is not a

15   standalone website, but a portal by which the public can view the products on TLC's own website

16   in a way that gives credit to the Life Changer for the sale, the product pages and descriptions are

17   generated entirely and solely by TLC, with no option for the Life Changer to revise or supplement

18   either the language or photos of the products. Thus, the Life Changer is in effect selling products

19   using only TLC-approved marketing language and intellectual property, as required by the

20   Agreement.

21        49.    TLC sets the prices online and does not permit adjustments, nor is there a way for

22   a Life Changer to allow a customer to get a discount, receive a free gift, make a donation, or use

23   any other offer that is not available on TLC's main platforms and to all TLC customers. This

24

25   ───────────────
    [20] The "upline" and downline" concepts are the hallmark of the MLM structure. To illustrate, when
26   an established Life Changer, whom we will call "Amy," recruits a friend, whom we will call "Bill,"
    to be a Life Changer, Bill is in Amy's downline; and Amy is in Bill's upline. If Bill in turn recruits
27   a new Life Changer, whom we will call "Chris," then Bill has an upline (to Amy) and a downline
    (to Chris); the established Life Changer Amy now has two levels to her downline, to Bill (first
28   level), and Chris (second level). Should Chris then recruit someone, the established Life Changer
    Amy would have three levels to her downline.

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1  significantly limits Life Changers' marketing discretion.

2      50.    TLC also restricts Life Changers from using any platform other than TLC's website

3  to make online sales; in other words, they cannot sell the products directly to consumers on

4  Facebook Marketplace, eBay, Amazon, or similar sites. By making the Replicated Sites available

5  and performing the back-end work, Life Changers would be less likely to seek out other e-

6  commerce platforms to sell the products even if they were permitted.

7             **3. Life Changers' Work Is Not Outside TLC's "Usual Course of Business"**

8      51.    TLC views the work of the Life Changers to market the products online as central

9  to its business model. The primary benefit to TLC from the Life Changers' work is the way in

10  which they drive people to TLC's website and fuel engagement with the brand. TLC gets increased

11  visibility on social media, enabling it to compete in a saturated wellness and personal care market

12  more cheaply. For much the same reason that brands turn to influencers, TLC understands that

13  social media posts from friends may be more persuasive in driving interest and generating paying

14  customers than a paid advertisement.

15
16            **4. TLC Cannot Meet Its Burden to Show That Life Changers are "Customarily Engaged" in a Separate Business**

17      52.    TLC cannot meet its burden to show that Life Changers are "customarily engaged"

18  in an independently established sales and marketing business. Instead, most Life Changers are

19  recruited regardless of their skill or experience, only perform sales and marketing for TLC (using

20  TLC's approved platforms), and maintain no separate sales or marketing business.

21      53.    Life Changers are not required to have any background in sales, marketing, or

22  health and wellness prior to becoming a Life Changer. Life Changers are not required to have any

23  licensure or meet any educational requirements, either. For example, they do not need to be

24  licensed nutritionists or doctors, nor have any schooling, training, or prior employment in fields

25  relating to health and fitness, or nutrition. Nor does TLC require that they have schooling, training,

26  or prior employment in marketing, sales, or general business. Instead, TLC only requires that a

27  prospective Life Changer complete a short application asking for basic personal information and

28  make the requisite starter purchase. In fact, most Life Changers have little to no prior relevant

1    experience or training.

2        54.    Most Life Changers have never owned or operated their own separate sales business

3    outside of TLC. And most Life Changers do not maintain any registered or incorporated sales or

4    marketing business, for their work with TLC or otherwise. Life Changers generally do not hold

5    themselves out to others as sales or marketing professionals or maintain any office or business

6    address.

7        55.    Rather than rely on Life Changers' own business acumen or sales experience to

8    market products, TLC provides the instrumentalities of Life Changers' sales and marketing work.

9    These include the "i-Office" (a password-protected website that includes a tool for Life Changers

10   to send emails to customers and their downline Life Changers, as well as TLC sales aids and

11   support materials), the Replicated Site (the content of which is provided by TLC and does not

12   allow deviation from the standard template), the TLC app, and TLC scripts and graphics for use

13   in marketing.

14       56.    Ultimately, TLC intends for Life Changers to see TLC as an employer, not as a

15   client. In other words, regardless of whether a Life Changer maintains any kind of independent

16   business, TLC's policies and mandated instrumentalities of work make it so the Life Changer's

17   responsibilities are not those that are of the sort that would be performed by an independent and

18   trained professional. For example, TLC requires Life Changers to identify themselves by their

19   names and as an "Independent Life Changer" on any independent websites, forbidding the use of

20   an alias or business name. Ex. A, §7.7.1. The expectation is that the Life Changers are using TLC's

21   brand to sell, not their own business' identity. Likewise, TLC's policies promoting sales through

22   the Replicated Sites, restrictions on using other websites as a point of sale, and limitations on where

23   the products can physically be sold effectively prevent Life Changers from integrating the sale of

24   TLC products into any pre-existing business. And TLC prohibits Life Changers from using its

25   platforms to promote other businesses, including any other multi-level marketing companies.

26       57.    Similarly, those experienced in social media marketing are not allowed to use the

27   kinds of tools relied upon by professionals in the field; TLC requires Life Changers to use only

28   TLC produced sales aids and support materials. People with digital marketing experience cannot

1   leverage their skills because TLC does not allow Life Changers to use TLC names or trademarks
2   in search engine optimization, provide access to data collected from visitors to Life Changers'
3   Replicated Website, nor the ability to track them and target ads to them. Instead, TLC designs the
4   overall social media advertising campaign and supplies the Life Changers with hashtags, scripts,
5   promotional photos and video clips, and other strategic advertising directives for the Life Changers
6   to use to sell TLC's products on social media.

7        58.   Further, TLC actively limits Life Changers' ability to engage in sales or marketing
8   opportunities outside TLC. For example, TLC prohibits Life Changers from recruiting other Life
9   Changers to join other MLMs or even to market other MLM products to fellow Life Changers.

10        **5. TLC Life Changers Are Not "Direct Sellers"**

11        59.   Despite classifying the Life Changers as Independent Contractors, they are
12   employees under California law. As set forth below, while some MLM workers might meet the
13   narrow statutory exemption for those employed in "direct sales," Life Changers do not.

14        **a.   Background on MLMs and the Direct Sales Exemption**

15        60.   For many years, the MLM industry has enjoyed notoriety for its ability to carve out
16   loopholes from federal and state employment laws, permitting MLMs to treat its sales personnel
17   as independent contractors. These regulations were enacted in the 1970s and 1980s, and in
18   California, the exemption describes a different job than what Life Changers perform.

19        61.   When AB 5 was passed in 2019, it codified the opinion in *Dynamex Operations*
20   *West, Inc. v. Superior Court of Los Angeles County*, 4 Cal. 5th 903 (2018), in which it set forth a
21   new test for misclassification (the "Dynamex Test"). When the bill was being debated, many in
22   the MLM industry recognized that the Dynamex Test would require them to classify their workers
23   as employees. The Direct Selling Association ("DSA"), the industry lobbying group, pushed for
24   an exemption. As a result of those efforts, AB 5 exempts from the Dynamex Test any salesperson
25   "described in Section 650 of the Unemployment Insurance Code, so long as the conditions for
26   exclusion from employment under that section are met." ("Direct Sales Exemption") For such
27   workers who fall within the exemption, the old common law test (rather than the ABC test) would
28   govern the question of employee status.

62.     For an entity to be covered under the Direct Sales Exemption, the hiring entity must show that the work satisfies all three criteria set forth in the statute, namely that (a) the worker performs one of two specific types of work; (b) the worker's compensation is directly tied to sales or output, and not hours worked; and (c) the worker and business have an agreement that the worker will be treated as a contractor for tax purposes. If all three criteria are not met, then the exemption does not apply, and if the worker otherwise meets the Dynamex Test, they are misclassified. While the third of these criteria—services performed pursuant to a contract identifying the person as an independent contractor—is only facially met, and even if it were an enforceable contract, that factor is not dispositive. As discussed below, the Life Changer job does not satisfy the other criteria.

        **b.**   **TLC Life Changers Do Not Perform the Jobs Identified in the Direct Sales Exemption**

63.     First, for the Direct Sales Exemption to apply, the salesperson must be performing one of two narrowly defined jobs. Specifically, the Exemption requires that one be "engaged in the trade or business of primarily inperson [sic] demonstration and sales presentation of consumer products, including services or other intangibles, in the home or sales to any buyer on a buy-sell basis, a deposit-commission basis, or any similar basis, for resale by the buyer or any other person in the home or otherwise than from a retail or wholesale establishment." In other words, section (a) of the Direct Sales Exemption is best understood as identifying two specific categories of direct sales jobs, ***Primarily In Person Consumer Sales Work***, and ***Wholesale/Resale Work***, that could trigger the applicability of the Direct Sales Exemptions. The Life Changer does not fall under either of these categories.

64.     ***TLC Life Changers Are Not Engaged Primarily in In-Person Consumer Sales Work***. This job category covers those who are "engaged in the trade or business of primarily inperson [sic] demonstration and sales presentation of consumer products, including services or other intangibles, in the home." Thus, the exemption is limited to those who are *primarily* selling consumer products *in person* and *in the home*. These terms are significant, as they do not appear in the analogous job category of "direct sellers" under a later federal statute. *See* 26 U.S.C. §

1   3508(b)(2)(ii). Thus, the California exemption applies narrowly to jobs like door-to-door

2   salespersons, or the direct sellers who work almost exclusively through the home party circuit, i.e.,

3   people who sell consumer products by meeting with other consumers in their homes.

4        65.   As discussed throughout, Life Changers do not "primarily" sell "in person."

5   Moreover, to the extent any Life Changer in the TLC network was primarily conducting "in

6   person" sales after the purported TLC "digitization" the COVID pandemic would have pushed

7   more sales online.

8        66.   ***TLC Life Changers are not engaged in Wholesale/Resale Work.*** This job

9   category, which also has a federal parallel, 26 U.S.C. § 3508(b)(2)(i), covers those are engaged in:

10        [a]   "sales to any buyer"

11        [b]   "on a buy-sell basis, a deposit-commission basis, or any similar basis,"

           [c]   "for resale by the buyer or any other person", and

12        [d]   "in the home or otherwise than from a retail or wholesale establishment."

13   While California law does not define the terms buy-sell or deposit-commission in [b], federal law

14   does. The term "buy-sell basis" is one in which one buys the product to sell the product, and gets

15   paid for selling the product with the spread between the purchase price and the resale price, and

16   term "deposit-commission basis" applies where the buyer keeps as commission for a sale of a

17   product the deposit received from the buyer. *See* 26 U.S.C. 6041A(b)(2)(A) & (B).

18        67.   The "Wholesale/Resale Work" is even more narrow than "In Person Home Sales

19   Work," and does not apply to TLC. Rather, TLC's Agreement requires that Life Changers sell

20   only to themselves or to retail customers. Nowhere in the Agreement or in Total Life Change's

21   public materials does it state that compensation is on a buy-sell or deposit-commission basis.

22        68.   To illustrate what is meant by "Wholesale/Resale Work," a hypothetical upline Life

23   Changer Sue would be performing this work if [a] Sue was selling TLC products to her downline

24   Life Changer Bob [c] for Bob to resell, not to keep for his own use; and [b] Sue was compensating

25   Bob for his resale services by permitting Bob to keep the difference between the price he paid to

26   Sue and the product's selling price or by permitting Bob to keep the deposit he acquired. Life

27   Changers do not work in this way, selling products to Life Changers for Life Changers to re-sell.

28   If Bob directs a lead to his Replicated Site, and the lead purchases a product from TLC, both he

1   and his upline Life Changer (e.g., Sue) would receive a commission for sales from TLC. But as to

2   Sue, [a] is not met because Sue did not sell the products to Bob. Because Bob acquired the products

3   from TLC to sell at retail, not to someone to re-sell, [a] and [c] are not met. As to both, [b] is not

4   met, because neither sold the product on those terms. Rather, TLC takes the full payment at the

5   point of sale and sends the product directly to the consumer, and then separately pays the Life

6   Changer.

7      69.   ***The job descriptions in the Direct Sales Exemption predate significant changes***

8   ***to how MLMs now operate.*** By way of background, these two categories of jobs outlined in the

9   Direct Sales Exemption were how MLMs organized at the time the Direct Sales Exemption was

10   enacted. In the 1970s and 1980s, downline sellers hosted parties, traveled door to door, had booths

11   at local fairs, or visited friends and family in their homes to hand out samples, catalogs, and sales

12   sheets. They took orders and payment directly from the customer. Once the seller had enough

13   orders, the seller placed the order with the company, received the shipment from the company, and

14   then met with the customer again in person to deliver the product and if necessary, collect any

15   further payment that might be due. The direct seller engaged with consumers both directly and

16   personally; the consumers had little to no interaction with the company.

17      70.   In some instances, instead of placing the order with the company, the seller

18   performing "In Person Home Sales" would place the order with the person in their "upline," who

19   was engaged in "Wholesale/Resale Work." The upline seller acquired products from the company,

20   and sold them to the downline "In Person Home Sales" worker on a buy-sell or commission deposit

21   basis for them to sell to end consumers (or to their downlines). The seller was able to do

22   "Wholesale/Resale Work" because at the time, MLMs permitted direct sellers to fulfill their sales

23   quotas by either selling the product to retail consumers or selling it to downline sellers.

24      71.   Since the Direct Sales Exemption was enacted, various changes in the MLM

25   industry occurred to move away from this model. Most notably is the fact that over the last few

26   decades, MLMs have been forced to make changes to their operations in response to regulatory

27   actions and civil lawsuits by private litigants to enforce anti-pyramid scheme laws. Courts and

28   regulators have made clear that to avoid violating criminal and civil pyramid scheme laws, MLMs

---

18

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1    needed to conduct operations so as to ensure that real, meaningful sales were happening directly

2    to consumers—instead of primarily to sellers' own downlines. *See, e.g., Webster v. Omnitrition*

3    *Int'l*, 79 F.3d 776, 782 (9th Cir. 1996). It was not enough to simply have a policy that sales should

4    be at retail; the law has evolved so as to require MLMs to enforce that policy and to demonstrate

5    its effectiveness at ensuring participants were not merely stockpiling inventory and seeking to

6    recoup losses by recruiting new sellers to buy the product from them.

7        72.    These legal developments have prompted two important changes. First, because

8    MLMs must ensure retail sales are occurring, few if any MLMs permit sellers to perform

9    "Wholesale/Resale Work." Certainly, TLC does not. Second, the work undertaken by MLMs to

10    enforce policies as to sales at retail results in them exercising far more control than they might

11    have decades ago.

12        73.    Furthermore, by implementing platforms such as the Replicated Site, TLC can

13    better oversee Life Changers in their work to ensure they are not engaging in activities that could

14    run afoul of anti-pyramid scheme laws. TLC can oversee all retail sales, given the vast majority

15    occur on its website and on public social media pages. While this control may protect Life

16    Changers from being a victim of one kind of legal violation, they also remove much of the

17    discretion that other independent MLM contractors had.

18            c.    **TLC's Modern E-Commerce Business Is Unlike Past and Present**
                    **Direct Sales Companies**
19

20        74.    The Direct Sales Exemption and its inclusion in AB 5 was based on the MLM

21    industry's claim that it is needed to ensure the industry can continue to offer people the opportunity

22    to create and run their own businesses. Some MLM businesses do run operations that are

23    predominately based on around in-person sales, promoting home parties and sales at community

24    events, like Parent Teacher Association meetings or similar. Some do not allow consumers to buy

25    products via a company website or they use pricing and purchasing policies that give the seller

26    more control. In the primarily face-to-face, in-person sales context, the direct line between a

27    person's effort and a closed sale may still be one that can be drawn and may allow for the kind of

28    independent business operations contemplated by the statute.

75.     TLC's operations, however, are a stark departure. It is one of the few MLM businesses offering a video streaming service as a flagship product. And the way in which it operates its platforms, including the Replicated Sites, eliminates for the Life Changer nearly all the work associated with operating a business, as compared to MLMs of the past, and of some in the present. At the same time, by removing many of the functions performed by sellers in the past, Life Changers with expertise, skills, or a willingness to invest in certain areas are unlikely to realize a material change in their earnings prospects.

76.     For example, the use of Replicated Sites means that skills or investment in inventory management or distribution processes are not necessary, nor will they have a material impact on a Life Changer's outcome. When customers place orders on the Replicated Sites, TLC fulfills them. Unlike some MLMs, both current and historic, as well as in the traditional wholesale context, Life Changers do not need to plan to have products on hand or collect bulk orders.

77.     Similarly, expertise or support in accounting, finance, economics or pricing will not impact a Life Changer's outcome, because Life Changers are not able to alter prices at which the products are sold on their Replicated Site and must sell them at the rate that TLC has determined will cover TLC's expenses, regardless of whether the Life Changer's compensation is enough to cover the Life Changer's expenses. TLC calculates, collects, and remits sales taxes, and Life Changers do not need nor would benefit from experience in that area. Unlike some MLMs, both current and historic, as well as in the traditional wholesale context, TLC does not give a larger discount or increase the percentage basis for a commission if a Life Changer orders a larger amount of products for their customers.

78.     TLC also pays the Life Changer's upline and downline and determines any compensation owed to them, and thus, a Life Changer does not negotiate or set anyone else's rates of pay. TLC handles the payment interface, and thus Life Changers do not need expertise in electronic payments, data security and privacy, credit card processing regulations, or similar.

**6. The Terms and Conditions in the Life Changer Agreement are Unconscionable, Unfair, and Unlawful**

79.     The Agreement between TLC and Life Changers is a tool by TLC to exert control

1   while maximizing Total Life Change's profits. The Agreement is a take-it-or-leave it deal, with no

2   opportunity for negotiation. And many Life Changers discover that the arrangement is one in

3   which they will spend extraordinary amounts of time and money promoting the company with

4   little payoff.[21] Indeed, the effect of the Agreement, when considered in tandem with TLC's other

5   business practices, grossly restricts Life Changers' ability to profit from their work advertising

6   sales, and may cause Life Changers to turn attention to recruiting more Life Changers into a futile

7   business endeavor.

8        80.    Indeed, MLMs like TLC have been criticized for the fact that few of the sellers

9   manage to profit. At least one study concluded that 99% of MLM participants do not earn money;[22]

10   another found that only 25% earned a profit.[23] TLC's numbers are consistent with this low rate of

11   success; Life Changers rarely make any money. 76.8 percent of Life Changers received no

12   commission payment at all in 2023.[24] Those Life Changers who *did* receive a commission check

13   did not fare much better. TLC's 2023 Life Changer Income Disclosure statement presents

14   information on those Life Changers who were active with TLC during any portion of the calendar

15   year. Of those who did earn a commission, the majority (73.98%) made less than $250. The

16   average amount in commission earned by the paid Life Changers overall was $966, but that amount

17   is an average, and do not include Life Changers' expenses. As described throughout, Life Changers

18   themselves foot the bill for event registration fees, TLC-related travel, office supplies, insurance

19   premiums, products purchased for business purposes, marketing materials, and internet and phone

20   bills, inter alia.

21        81.    Moreover, TLC has structured its business operations and Agreements to benefit

22   from the addition of more Life Changers, while Life Changers lose. TLC benefits when tens of

23   thousands are active on social media but incurs no other expense unless the Life Changer generates

24

25   [21] *See* Abby Vesoulis et. al, *Pandemic Schemes: How Multilevel Marketing Life Changers Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, supra n.18.
[22] *Id.*

26

27   [23] Jean Chatzky, *Advice for Job Seekers Tempted by Multilevel Marketing Offers*, AARP Foundation (Aug. 13, 2020), https://www.aarp.org/aarp-foundation/our-work/income/multilevel-marketing/.

28   [24] *2023 Income Disclosure Statement, supra,* n.1.

1 a sale. While TLC benefits from an oversaturation of Life Changers, the individual Life Changers,
2 only have more competitors and a harder time setting themselves apart. And nowhere in the
3 Agreement does TLC promise to limit the number of Life Changers retained in any way.

4      82.      Given that Life Changers must compete with TLC and other Life Changers for retail
5 sales under such oppressive and onerous terms, it is no surprise that the overwhelming majority
6 never receive commission or struggle to break even. But because Life Changers receive
7 commission from the retail sales made by any Life Changers they recruit, TLC's own income
8 disclosures indicate that those who advance to higher levels through recruiting more Life Changers
9 on average earn more money. Thus, Life Changers have a financial incentive to advertise the
10 opportunity to work with TLC under these unfair, unconscionable, and oppressive terms. Those
11 new Life Changers in turn will pay TLC various fees discussed herein, buy merchandise from
12 TLC, promote TLC on social media, be subject to the same restrictions on selling as those who
13 recruited them, and like those before them, find profiting from selling to be futile and turn to
14 recruiting.

15      **C. TLC's Misclassification of Plaintiff and Life Changers Was Willful**

16      83.      TLC's decision to misclassify the Life Changers as independent contractors was
17 willful and intentional.

18      84.      *First,* as detailed above, TLC's Policies and Procedures set forth detailed codes of
19 conduct. TLC knew and intended for Life Changers to conform to these codes of conduct and
20 ensured adherence through its own platforms and other instrumentalities.

21      85.      *Second,* TLC knows and depends on the Life Changers and even the highest levels
22 of the company understand that the Life Changers play an essential role in TLC's growth and
23 business model. The management team, including the CEO and CFO, not only understand the
24 essential role the Life Changers play, but know they are classified as independent contractors, as
25 evidenced by their decision to operate the company as an MLM. Thus, the decision was not a
26 singular decision by a low-level employee, but a conscious and knowing choice endorsed by the
27 highest levels of the Company.

28      86.      *Third,* TLC further knows and understands as an MLM, few workers will make

1  money under a commission structure and repeatedly represent in publicly accessible documents
2  that its Life Changers only get paid if they make a sale.

3      87.    *Fourth,* TLC knew that its Life Changers were not engaged in either type of work
4  protected under the Direct Sales Exemption. It does not use terms like "buy-sell" or "deposit-
5  commission" in its compensation documents or Agreement. It also knows that its Life Changers
6  engage primarily in social media marketing on its behalf, and are rarely, if ever, engaging in person
7  sales or hosting parties in others' homes, particularly during and since the COVD pandemic. And
8  it designs platforms, such as the TLC Life Changer Sites to facilitate online sales and marketing.

9      88.    *Fifth,* TLC knew the Direct Sales Exemption was enacted years ago, and there was
10  no guarantee that all MLMs could enjoy its protection. Rather, TLC has been an MLM since 2003
11  and thus, should have or did know that the classification of MLM workers has for years been one
12  of the most critical legal and policy issues for the industry.

13      89.    For example, in 2018, the Oregon Supreme Court determined that an MLM had
14  misclassified its sales personnel as independent contractors. *See ACN Opportunity, LLC v.*
15  *Employment Department,* 362 Or. 824 (2018). The decision was based in part on the fact that the
16  statute exempted sales "in the home," and the legislative history indicated that this exemption was
17  narrowly tailored to apply to things like Tupperware parties. Notably, the concurrence made clear
18  that the direct sales laws on the books reflect outdated direct selling practices and may not reach
19  many modern MLMs. It is hard to imagine that TLC would not have learned of a decision by a
20  state supreme court, particularly given the decision's significance to its industry.

21      **D. TLC's Misclassification of Life Changers and Unfair Business Practices Harm the**
22         **California Public**

23      90.    TLC's misclassification of its workers and unfair and unconscionable business
24  model threatens the general public. Because TLC has no incentive to stop these practices, a public
25  injunction is necessary to stop these practices.

26         **1. TLC Uses Widespread Advertising Practices Directed at the General**
27            **Public to Recruit New Life Changers**

28      91.    TLC has eschewed traditional recruiting practices in lieu of widespread advertising.

1  Because of how TLC recruits, nearly everyone in the state of California is likely to be targeted for
2  recruiting and engagement in TLC's unfair and unlawful business model.

3      92.    Rather than market job opportunities to job seekers meeting certain criteria, TLC
4  uses its Life Changers to promote the Life Changer opportunities in the same way they advertise
5  its products. TLC has set up its compensation structure and business model to incentivize Life
6  Changers to turn to recruiting, and those Life Changers in turn will promote the opportunity to
7  their customers, as well as their family and friends. Thus, the public does not need to be
8  affirmatively seeking out job opportunities; merely buying a routine consumer good or having a
9  friend or family member working as a Life Changer may subject them to recruiting messaging,
10 and by extension, could lead them to accept the Agreement and become a Life Changer.

11     93.    Moreover, TLC's reliance on its existing Life Changer network to advertise the
12 Independent Consulting opportunity is likely to cause the message to reach the general public at
13 large, as its network is enormous. While precise numbers are not known, in 2021, TLC had over
14 105,000 Life Changers globally;[25] in 2023, it had over 30,000.[26] Numbers may have declined, but
15 it is likely there are more than 10,000 Life Changers nationwide. Life Changers need not respect
16 geographic boundaries when advertising the Life Changer opportunity, and thus, any member of
17 the California public who either personally knows a Life Changer or follows one on social media,
18 regardless of where the Life Changer lives, is likely to receive messages about the Life Changer
19 opportunity.

20     94.    Because of the financial incentives those Life Changers receive, members of the
21 public may sometimes repeatedly and consistently receive advertising about the Life Changer
22 opportunity over weeks or months at a time, and perhaps from multiple Life Changers. Indeed,
23 each newly recruited Life Changer presents the risk of an exponential increase of Life Changers.
24 Life Changers can maintain their status and receive additional compensation based on the sales

25

26 _____
27 [25] *U.S. Statement of Average Gross Compensation 2021*, Total Life Changes, https://cdn.totallifechanges.com/Resources/SAGC/SAGC_V03_20220524.pdf (last visited Feb. 27, 2025).
28 [26] 2023 *Income Disclosure Statement*, *supra*, n.1.

1    volume of the downline Life Changers that they recruited. The more Life Changers recruited into

2    their downline, the more likely it is that they will be able to generate more income.

3        95.    Because Life Changers are incentivized to aggressively recruit new Life Changers,

4    and TLC considers every customer to be a potential Life Changer, California's residents are

5    vulnerable to long-term consequences of TLC's rampant misclassification. Notably, To TLC is

6    not a selective employer; it requires little in the way of experience or other criteria. The

7    overwhelming majority of adults in the state of California are likely qualified for the job, and

8    millions of people in the state may seek out this opportunity. Indeed, it is estimated that one in

9    every thirteen Americans will participate in an MLM at some point in their lifetimes.[27] This could

10   translate into tens of thousands of Californians who are at risk of being recruited into an illegal

11   and unfair working arrangement.

12              **2.  TLC's Unfair and Unlawful Conduct Harms California in Other Ways**

13       96.    Beyond recruitment, TLC's misclassification of their Life Changers harms

14   Californians both economically and socially. When Life Changers lose money and accumulate

15   credit card debt, they and their families are harmed by the siphoning away of their uncompensated

16   time and lost money on business expenses. This results in them and their families having fewer

17   resources to invest in legitimate businesses and less time to spend working for real, guaranteed

18   wages. And instead of the opportunity being a "side hustle" that allows them to pay off mortgages

19   or student loan debt, cover costs of childcare, or otherwise advance financially, the loss of money

20   from Independent Consulting could cause them more economic hardship.

21       97.    This public harm intensifies during periods of crisis. It is well-documented that

22   MLMs, including TLC, profited from greater recruitment of participants during the COVID-19

23   pandemic.[28] TLC expects the same profit from future crises, such as financial recessions, because

24

25   _____
     [27] Marguerite DeLiema, et al., *AARP Study of Multilevel Marketing: Profiling Participants and*
     *their  Experiences  in  Direct  Sales*,  AARP  Foundation  (2018),  at  13,
26   https://www.aarp.org/content/dam/aarp/aarp_foundation/2018/pdf/AARP%20Foundation%20M
     LM%20Research%20Study%20Report%2010.8.18.pdf    [https://perma.cc/7T9E-QE5Y]    (last
27   visited Feb. 27, 2025).
     [28] *See* Abby Vesoulis et. al, *Pandemic Schemes: How Multilevel Marketing Life Changers Are*
28   *Using the Internet—and the Coronavirus—to Grow Their Businesses*, *supra* n.18.

1  it recruits new Life Changers under the guise that they will be able to grow their own business

2  with a sustainable income. TLC siphons potential workers away from legitimate opportunities with

3  the promises of building a personal business, when these individuals are under TLC's control with

4  none of the benefits of proper classification, and hurting California families.

5      98.    TLC's practices also harm competitors, such as legitimate companies in the health

6  and wellness space, who must and do pay wages and benefits at prevailing market rates to market

7  and sell their products. By misclassifying its workers, and paying them only for certain sales, TLC

8  incurs lower expenses, giving them a competitive advantage over other market participants.

9      99.    The California Legislature specifically considered harms like these in passing AB-

10  5. The legislature recognized "harm to misclassified workers who lose significant workplace

11  protections, the unfairness to employers who must compete with companies that misclassify, and

12  the loss to the state of needed revenue from companies that use misclassification to avoid

13  obligations such as payment of payroll taxes, payment of premiums for workers' compensation,

14  Social Security, unemployment, and disability insurance" and that "the misclassification of

15  workers as independent contractors has been a significant factor in the erosion of the middle class

16  and the rise in income inequality." TLC's continued misclassification of California workers will

17  exacerbate all these harms to the California public.

18      100.   Absent an injunction protecting the public from the negative impacts of

19  Defendants' illegal activities, including by and through their officers and/or entities in their

20  control, the California public remains at risk from TLC's deceptive recruitment strategies and the

21  economic and social harms created by their unlawful practices.

22      **E. Plaintiff's Experiences as a TLC Life Changer**

23      101.   Plaintiff acted as a TLC Life Changer from approximately February 26, 2020 to

24  present.

25      102.   When she signed up in 2020, Plaintiff indicated that she accepted TLC's Policies

26  and Procedures. Upon completion of the application, TLC required Plaintiff to be responsible for

27  adhering to the Agreement. Plaintiff was not engaged in an independently established trade,

28  occupation, or business as a sales professional and had limited sales experience.

103.    Around the time she signed up, Plaintiff created the Life Changer website and filled out her profile. This included providing her social media information to TLC, which they could access to monitor her compliance with the Agreement.

104.    TLC also provided Plaintiff with a personalized TLC website URL for her Replicated Website and "Referrer Code," and instructed her to provide it to prospective Life Changers.

105.    At no time was Plaintiff instructed to focus on in-person sales. As a general matter, Plaintiff understood from communications, directives, and practices of TLC that sales efforts were to be predominately online.

106.    In the course of her tenure as a Life Changer on behalf of TLC, Plaintiff predominately marketed TLC products on various social media platforms, including Instagram. To carry out this marketing work, Plaintiff performed the following tasks:

107.    Purchased, studied, and tested TLC products;

108.    Posted on Plaintiff's social media pages about TLC products, including brainstorming content, drafting and editing the text, and taking photographs and video recordings for each post, as well as incorporating TLC-approved messaging for many, if not all, of her posts;

109.    Developed and followed up with TLC sales leads;

110.    Regularly monitored the TLC app as well as Plaintiff's social media pages to engage further with customers, and replied to any direct messages from interested customers;

111.    Evaluated customer's needs, lifestyle, and goals to put together customized TLC product bundles for her customers;

112.    Participated in efforts to recruit, onboard, train, and/or mentor new Life Changers;

113.    Attending meetings with upline and downline Life Changers; and

114.    Tracked and reported her progress and sales using TLC products.

115.    Plaintiff performed all these tasks regularly throughout her tenure, typically spending about forty to fifty a week, often working for periods of more than eight to ten hours. Plaintiff performed these activities throughout the day, nearly every day, often in short increments adding up to eight to ten hours a day.

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1    116.    Plaintiff rarely, if ever, sold to customers in-person, and her advertising and
2  messaging was done online.

3    117.    Plaintiff, like all Life Changers, worked under TLC's pervasive control and
4  direction. Selling TLC products—the main responsibility of Life Changers—is work that is
5  precisely in line with TLC's usual course of business.

6    118.    Plaintiff paid the following fees and out-of-pocket, work-related expenses
7  throughout her tenure:

8         a)  An enrollment fee of $100;

9         b)  A starter kit for approximately $1,000;

10        c)  An annual fee of $100 since signing up;

11        d)  Approximately $80 per month in products since signing up;

12        e)  Approximately $2,000 in TLC-branded merchandise or other selling supplies; and

13        f)  A monthly bill of approximately $300 for her cell phone bill and internet access.

14    119.    During Plaintiff's tenure, TLC determined the prices at which all products could be
15  sold. She did not have the authority nor ability to sell or advertise prices for TLC products at a
16  different price. All sales by any customer that Plaintiff referred to TLC were made through TLC-
17  controlled platforms.

18    120.    During Plaintiff's tenure, including during the last five years, Plaintiff was not
19  compensated for her time doing any of the forementioned activities, nor paid any overtime.

20    121.    During Plaintiff's tenure, Plaintiff spent approximately $10,000.00 out of pocket.
21  Plaintiff was not compensated for out-of-pocket expenses.

22    122.    The commissions were paid via direct deposit. No paystub was provided that
23  identified hours worked, nor were any employment taxes withheld at any time.

24  **V.    CLASS ALLEGATIONS**

25    123.    Plaintiff incorporates and realleges the above paragraphs.

26    124.    Plaintiff brings this action on her own behalf, as well as on behalf of each and all
27  other persons similarly situated, and thus seeks class certification under California Code of Civil
28  Procedure section 382.

1      125.    All claims alleged herein arise under California law for which Plaintiff seeks relief

2   authorized by California law.

3      126.    Plaintiff's proposed class consists of and is defined as follows:

4           All current and former Life Changers who resided in the State of California
            or who performed marketing or sales activities in California during the
5           applicable statutes of limitations through the date a class is certified.

6      127.    Plaintiff also alleges the following subclass:

7           **The Above-Standard Minimum Wage Subclass**

8
            All current and former TLC Life Changers classified as independent
9           contractors who resided in California cities or counties with a minimum
            wage rate greater than the California minimum wage during the applicable
10          statutes of limitations through the date a class is certified. This subclass
            includes, but is not limited to, residents of Los Angeles (City and County),
11          San Francisco, San Diego, Oakland, and San Jose.

12     128.    Members of the Class will hereinafter be referred to as "Class Members." Plaintiff

13  reserves the right to redefine the Class and to add subclasses as appropriate based on further

14  investigation, discovery, and specific theories of liability.

15     129.    ***Ascertainable and numerous.*** The Class is ascertainable and numerous such that

16  joinder is impractical. The membership of the entire class is unknown to Plaintiff at this time.

17  However, the class will likely consist of thousands of members, the precise number which is within

18  the knowledge of and can be readily ascertained through TLC's records.

19     130.    ***Community of Interest.*** There is a well-defined community of interest amongst

20  Class Members. A class action is superior to all other available methods for the fair and efficient

21  adjudication of this lawsuit because the Class is both numerous and its membership is

22  geographically widespread across California. A class action will achieve economies of time, effort

23  and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the

24  same issues can be adjudicated in the same manner and at the same time for the entire class. In

25  addition:

26     131.    ***Predominating Common Questions.*** There are numerous questions of law and fact

27  common to the Class which predominate over any questions affecting only individual members of

28  the Class. Among the questions of law and fact common to the Class are:

29

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

a)  Whether TLC misclassified its Life Changers as independent contractors when in fact they were TLC employees;

b)  Whether TLC failed to pay Plaintiff and Class Members the legally mandated minimum wage for all hours worked;

c)  Whether TLC failed to pay Plaintiff and Class Members overtime wages;

d)  Whether TLC failed to timely pay wages due to Plaintiff and Class Members during their employment;

e)  Whether any misclassification by TLC was voluntary and knowing;

f)  Whether Life Changers' duties fall within the Direct Sales Exemption to AB5;

g)  Whether TLC controlled the manner and means of the Life Changers' work;

h)  Whether TLC failed to reimburse Life Changers' business expenses;

i)  Whether TLC failed to maintain accurate time records for its Life Changers;

j)  Whether TLC failed to provide complete and accurate wage statements to its Life Changers;

k)  Whether TLC failed to pay Life Changers their wages due at termination; and

l)  Whether TLC should be enjoined from continuing the practices described herein.

132.  **Typicality.** Plaintiff's claims are typical of the claims of Class Members because Plaintiff, like all members of the Class, worked as a Life Changer for TLC in California, was required to adhere to TLC's policies, and was paid on a commission basis. Furthermore, like all members of the Class, Plaintiff sustained damages from TLC's wrongful conduct. Accordingly, Plaintiff has no interests antagonistic to the interests of any other member of the Class.

133.  **Adequacy.** Plaintiff will fully and adequately assert and protect the interests of the Class and has retained counsel who are experienced in prosecuting class actions. Plaintiff acknowledges that she has an obligation to make known to the Court any relationship, conflicts or differences with any Class Member. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

//

1    **VI.    FACTS RELATING TO PLAINTIFF AS A PRIVATE ATTORNEY GENERAL**

2        134.    At all times set forth herein, PAGA was applicable to Plaintiff's employment by

3    Defendants.

4        135.    At all times set forth herein, PAGA provides that, notwithstanding any other

5    provision of law, any provision of law under the California Labor Code that provides for a civil

6    penalty, including unpaid wages and premium wages, to be assessed and collected by the

7    California Labor & Workforce Development Agency ("LWDA") for violations of the California

8    Labor Code may, as an alternative, be recovered through a civil action brought by an aggrieved

9    employee on behalf of the aggrieved employee and other current or former employees pursuant to

10    procedures set forth in California Labor Code section 2699.3.

11        136.    Pursuant to PAGA, a civil action may be brought by an "aggrieved employee," who

12    is any person that was employed by the alleged violator and against whom one or more of the

13    alleged violations was committed.

14        137.    Plaintiff was employed by Defendants and the alleged violations were committed

15    against her and she is, therefore, an aggrieved employee. Likewise, the other Life Changers who

16    worked within the relevant time are "aggrieved employees" as defined by California Labor Code

17    section 2699(c) in that they are current or former employees of Defendants and one of more of the

18    alleged violations were committed against them.

19        138.    Pursuant to California Labor Code sections 2699.3 and 2699.5, an aggrieved

20    employee, including Plaintiff, may pursue a civil action arising under PAGA after the following

21    requirements have been met:

22        a)    The aggrieved employee shall give written notice (hereinafter "Employee's

23            Notice") to the LWDA and the employer of the specific provisions of the Labor

24            Code alleged to have been violated, including the facts and theories to support the

25            alleged violations.

26        b)    The LWDA shall provide notice (hereinafter "LWDA Notice") to the employer and

27            the aggrieved employee that it does not intend to investigate the alleged violation

28            within sixty (60) calendar days of the postmark date of the Employee's Notice.

1         c)  Upon receipt of the LWDA Notice, or if the LWDA Notice is not provided within

2    sixty-five (65) calendar days of the Employee's Notice, the aggrieved employee

3    may commence a civil action pursuant to California Labor Code section 2699 to

4    recover civil penalties in addition to any other penalties to which the employee may

5    be entitled.

6        139.   Plaintiff has satisfied the statutory exhaustion requirements. On February 26, 2025,

7    Plaintiff provided notice by electronic submission to the LWDA and by certified mail to all

8    Defendants regarding the specific provisions of the Labor Code alleged to have been violated,

9    including the facts and theories to support the alleged violations, pursuant to Labor Code section

10   2699.3. A true and correct copy of that notice letter is attached as **Exhibit B**. The LWDA has not

11   expressly stated that it will intervene, investigate, or otherwise respond regarding Plaintiff's

12   asserted PAGA claims against Defendants herein.

13   **VII.**   **CAUSES OF ACTION**

14   

**FIRST CAUSE OF ACTION**

15   **(Failure to Pay Minimum Wages and Liquidated Damages)**

**Cal. Labor Code §§ 1182.12, 1194, 1197, 1197.1, 1198; IWC Wage Order 4-2001**

16   *Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; Jack Fallon; John*

17   *Licari; Scott Bania; Natalie Paramo; and Does 1–50, inclusive*

18       140.   Plaintiff realleges and incorporates by reference all preceding allegations as though

19   fully set forth herein.

20       141.   At all relevant times, California Labor Code sections 1182.12, 1194, 1197, 1197.1,

21   and 1198 have provided that the minimum wage for employees fixed by the Industrial Welfare

22   Commission is the minimum wage to be paid to employees, and the payment of a wage less than

23   the minimum so fixed is unlawful. California law provides employees in California must be paid

24   for all hours worked, up to 40 per week or eight (8) per day, at a regular time rate no less than the

25   mandated minimum wage. Compensable work time is defined by the applicable wage order as "the

26   time during which an employee is subject to the control of an employer and includes all the time

27   the employee is suffered or permitted to work, whether or not required to do so." Cal. Code. Regs.

28   tit. 8, section 11070(2)(G) (defining "Hours Worked").

1       142.    As alleged herein, during the relevant time period, TLC maintained and still

2   maintains a policy of requiring employees to work off-the-clock, without compensation. TLC only

3   compensates Life Changers, including Plaintiff, based on specific sales placed through the TLC

4   website, and does not pay wages for other hours worked. These hours include time spent doing the

5   following, inter alia:

6           a)  in training;

7           b)  making and responding to social media posts;

8           c)  purchasing inventory from TLC;

9           d)  communicating with other Life Changers about policies, practices, and sales

10              instructions and guidance;

11          e)  communicating with customers after their purchases were made to handle routine

12              customer service; and

13          f)  handling other responsibilities as needed.

14      Plaintiff and Class Members performed these activities throughout the day, nearly every

15  day, often in short increments adding up to eight to ten hours a day.

16      143.    TLC provided no way for Plaintiff and Class Members to log time spent and submit

17  to TLC.

18      144.    TLC's failure to pay Plaintiff and Class Members for work, and failure to pay

19  overtime wages owed, also resulted in failures to pay Plaintiff and Class Members the minimum

20  wage required, in violation of California Labor Code sections 1182.12, 1194, 1197, 1197.1, 1198.

21  In addition, TLC's failure to pay for hours worked is a violation of various municipal and county

22  codes across the state, including, but not limited to City of L.A. Cal. Code art. 7-7.5; County of

23  Los Angeles Code § 8.100.040, *et seq.*, San Francisco Cal. Code 12R.

24      145.    California Labor Code § 558.1 states that any employer or person acting on behalf

25  of an employer who causes a violation is liable, among other things, for minimum wage violations.

26  *See* Cal. Labor Code § 558.1. Defendants TOTAL LIFE CHANGES, LLC; TOTAL LIFE

27  CHANGES – EXPORT, INC.; JACK FALLON; JOHN LICARI; SCOTT BANIA; NATALIE

28  PARAMO and DOES 1–50, inclusive, failed to pay Plaintiff and other aggrieved employees the

1   minimum wage and all Defendants are liable for causing this violation under Labor Code § 558.1.

2        146.   As such, pursuant to California Labor Code section 1194.2, Plaintiff and Class

3   Members are entitled to recover liquidated damages in an amount equal to the wages unlawfully

4   unpaid and interest thereon. Pursuant to California Labor Code section 558(a), Plaintiff and Class

5   Members are also entitled to recover unpaid wages and statutory damages in the amount of $50

6   for any initial violation per employee for each pay period and $100 for each subsequent violation

7   per employee for each pay period and interest pursuant to California Labor Code section 218.6.

8   **SECOND CAUSE OF ACTION**

9   **(Failure to Pay Overtime Wages and Liquidated Damages)**
**Cal. Labor Code § 510; IWC Wage Order 4-2001**

10
11   ***Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; Jack Fallon; John
Licari; Scott Bania; Natalie Paramo; and Does 1–50, inclusive***

12        147.   Plaintiff realleges and incorporates by reference all preceding allegations as though

13   fully set forth herein.

14        148.   California Labor Code section 510 and Wage Order No. 4 require employers to pay

15   no less than one and one-half times the regular rate of pay of the employee for hours worked in

16   excess of eight (8) hours in one workday, for hours worked in excess of forty (40) hours in one

17   workweek, and for the first eight (8) hours worked on the seventh day of work in any one

18   workweek, and to pay no less than twice the regular rate of pay of the employee for hours worked

19   in excess of twelve (12) hours in one workday and for any work in excess of eight (8) hours on

20   any seventh day of a workweek. During the relevant time period, Plaintiff and other aggrieved

21   employees worked over 8 hours in a day and/or 40 hours in a week without overtime compensation

22   because TLC failed to pay them for their work duties, as described above. This was, in turn, due

23   to TLC's unlawful misclassification of Life Changers as independent contractors rather than as

24   employees. On occasions when Plaintiff and other aggrieved employees had already worked eight

25   hours in one day (performing all their work off-the-clock), TLC failed to pay them any overtime

26   compensation due. Therefore, Plaintiff and the other aggrieved employees were entitled to receive

27   overtime compensation from TLC that TLC failed to pay, violating Labor Code § 510 and Wage

28   Order No. 4. In addition, TLC's failure to pay overtime is a violation of various municipal and

34

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1    county codes across the state, including, but not limited to City of L.A. Cal. Code art. 7-7.5; County

2    of Los Angeles Code § 8.100.040, *et seq.*, San Francisco Cal. Code 12R.

3         149.    California Labor Code § 558.1 states that any employer or person acting on behalf

4    of an employer who causes a violation is liable, among other things, for overtime wage violations.

5    *See* Cal. Labor Code § 558.1. Defendants TOTAL LIFE CHANGES, LLC; TOTAL LIFE

6    CHANGES – EXPORT, INC.; JACK FALLON; JOHN LICARI; SCOTT BANIA; NATALIE

7    PARAMO and DOES 1–50, inclusive, failed to pay Plaintiff and other aggrieved employees

8    overtime wages and all Defendants are liable for causing this violation under Labor Code § 558.1.

9         150.    As such, pursuant to California Labor Code section 1194.2, Plaintiff and Class

10   Members are entitled to recover liquidated damages in an amount equal to the wages unlawfully

11   unpaid and interest thereon. Pursuant to California Labor Code section 558(a), Plaintiff and Class

12   Members are also entitled to recover unpaid wages and statutory damages in the amount of $50

13   for any initial violation per employee for each pay period and $100 for each subsequent violation

14   per employee for each pay period and interest pursuant to California Labor Code section 218.6.

15   **THIRD CAUSE OF ACTION**

16   **(Failure to Provide Rest Periods or Rest Break Premium Wages)**

    **Cal. Labor Code §§ 226.7, IWC Wage Order 4-2001**

17
     *Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; Jack Fallon; John*
18   *Licari; Scott Bania; Natalie Paramo; and Does 1–50, inclusive*

19        151.    Plaintiff realleges and incorporates by reference all preceding allegations as though

20   fully set forth herein.

21        152.    Cal. Lab. Code § 226.7 requires an employer to authorize or permit an employee to

22   take a rest period of ten net minutes for every four hours worked, or major fraction thereof, and

23   such rest periods must be in the middle of the four-hour period insofar as practicable. If the

24   employer fails to provide any required rest periods or fails to provide a fully compliant rest break

25   for a net ten minutes wherein the employee is fully relieved of all duties and all employer control,

26   the employer must pay the employee one hour of pay at the employee's regular rate of

27   compensation for each workday the employer did not provide a legally required and/or fully

28   compliant rest period.

153.   TLC failed to provide Plaintiff and the Class all required and/or fully compliant rest periods, or compensation in lieu thereof. TLC employed policies and procedures that ensured Plaintiff and the Class would not receive all legally required rest periods as TLC improperly classified Plaintiff and the Class as independent contractors rather than as employees and did not authorize nor permit all required rest periods in strict accordance with the timing requirements of all applicable Wage Orders. TLC similarly employed policies and procedures that rendered rest periods non-compliant with the requirements of California law by, inter alia, failing to relieve Plaintiff and the Class of all duties and all employer control. TLC further employed policies and procedures ensuring Plaintiff and the Class never received a rest period premium during employment.

154.   California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for rest period violations. *See* Cal. Labor Code § 558.1. Defendants TOTAL LIFE CHANGES, LLC; TOTAL LIFE CHANGES – EXPORT, INC.; JACK FALLON; JOHN LICARI; SCOTT BANIA; NATALIE PARAMO and DOES 1–50, inclusive, failed to provide Plaintiff and the Class all rest periods or compensation in lieu thereof and all Defendants are liable for causing this violation under Labor Code § 558.1.

155.   As a result, under Labor Code section 226.7, Plaintiff and the Class are entitled to one additional hour's pay for each day a rest break was missed, late or interrupted, all in an amount according to proof.

### FOURTH CAUSE OF ACTION
**(Failure to Provide Meal Periods or Meal Premium Wages)**
**Cal. Labor Code §§ 226.7, 512(a), 1198; IWC Wage Order 4-2001**
***Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; Jack Fallon; John Licari; Scott Bania; Natalie Paramo; and Does 1–50, inclusive***

156.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

157.   Under Cal. Lab. Code §§ 226.7, 512(a), 1198, and IWC Wage Order 4-2001, TLC was required to provide Plaintiff and Class Members with one thirty-minute meal break free from all duties for all shifts longer than five (5) hours, and a second thirty-minute meal break free from

FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

1    all duties for all shifts longer than 10 hours and a third thirty-minute meal break free from all duties

2    for all shifts longer than 15 hours. Employers covered by the Wage Orders have an obligation to

3    both (1) relieve their employees for at least one meal period for shifts over five hours, and (2) to

4    record having done so. If the employer fails to properly record a valid meal period, it is presumed

5    no meal period was provided. Cal. Lab. Code § 226.7 also requires an employer to pay mandated

6    premiums of an extra hour of wages to any employees who have not been provided with a timely

7    meal or rest break.

8        158.    As alleged herein, Plaintiff and the Class regularly worked periods of more than

9    five (5), ten and fifteen hours in a workday without being provided requisite mandatory timely,

10    thirty-minute, duty-free meal periods. TLC also failed to pay Plaintiff and the Class an additional

11    hour of wages at her regular rate for each workday a meal period and/or a legally compliant meal

12    period was not provided.

13        159.    TLC failed to provide Plaintiff or the other aggrieved employees with an

14    opportunity to take timely, uninterrupted meal periods of the requisite length, free from employer

15    control. TLC also failed to compensate Plaintiff and the other aggrieved employees properly for

16    the non-compliant meal periods including, inter alia, missed, short, late, and/or interrupted meal

17    periods. TLC also failed to pay premium wages for the many meals that Plaintiff and the aggrieved

18    employees were deprived of. Indeed, TLC did not provide any meal breaks or premium

19    compensation for missed breaks to Plaintiff or other aggrieved employees, since TLC improperly

20    classified its Life Changers as independent contractors who were not entitled to meal breaks.

21        160.    California Labor Code § 558.1 states that any employer or person acting on behalf

22    of an employer who causes a violation is liable, among other things, for meal period violations.

23    *See* Cal. Labor Code § 558.1. Defendants TOTAL LIFE CHANGES, LLC; TOTAL LIFE

24    CHANGES – EXPORT, INC.; JACK FALLON; JOHN LICARI; SCOTT BANIA; NATALIE

25    PARAMO and DOES 1–50, inclusive, failed to provide Plaintiff and other aggrieved employees

26    all meal periods or compensation in lieu thereof and all Defendants are liable for causing this

27    violation under Labor Code § 558.1.

28        161.    As a result, under Labor Code section 226.7, Plaintiff and the Class are entitled to

1  one additional hour's pay for each day a meal period was missed, late or interrupted, all in an

2  amount according to proof.

3  ### FIFTH CAUSE OF ACTION

4  **(Failure to Timely Pay Wages During Employment)**

**Cal. Labor Code § 204**

5  *Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; and Does 1–50,*

6  *inclusive*

7      162.    Plaintiff realleges and incorporates by reference all preceding allegations as though

8  fully set forth herein.

9      163.    At all relevant times herein set forth, Cal. Labor Code § 204 requires that all wages

10  earned by any person in any employment between the 1st and the 15th days, inclusive, of any

11  calendar month, other than those wages due upon termination of an employee, are due and payable

12  between the 16th and the 26th day of the month during which the labor was performed, and that

13  all wages earned by any person in any employment between the 16th and the last day, inclusive,

14  of any calendar month, other than those wages due upon termination of an employee, are due and

15  payable between the 1st and the 10th day of the following month.

16      164.    Cal. Labor Code § 204 also requires that all wages earned for labor more than the

17  normal work period shall be paid no later than the payday for the next regular payroll period.

18      165.    During the relevant period, TLC failed to pay Plaintiff and the Class, as well as all

19  other aggrieved employees, all wages due to them, including minimum wages, overtime wages,

20  and meal and rest period premium wages, within any time period specified by California Labor

21  Code section 204. Moreover, TLC failed to pay Plaintiff or other aggrieved employees earned

22  commissions in a timely and complete fashion.

23  ### SIXTH CAUSE OF ACTION

24  **(Failure to Keep Requisite Payroll Records)**

**Cal. Lab. Code § 1174(d)**

25  *Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; and Does 1–50,*

26  *inclusive*

27      166.    Plaintiff realleges and incorporates by reference all preceding allegations as though

28  fully set forth herein.

1      167.    Cal. Labor Code § 1174(d) requires an employer to keep, at a central location in
2   the state or at the plants or establishments at which employees are employed, payroll records
3   showing the hours worked daily by and the wages paid to, and the number of piece-rate units
4   earned by and any applicable piece rate paid to, employees employed at the respective plants or
5   establishments. These records shall be kept in accordance with rules established for this purpose
6   by the commission, but in any case, shall be kept on file for not less than two years.

7      168.    At all times herein set forth, Cal. Labor Code § 1174.5 has imposed a civil penalty
8   of $500 per aggrieved employee for each willful failure "to maintain . . . accurate and complete
9   records required by subdivision (d) of Section 1174[.]"

10     169.    TLC has intentionally and willfully failed to keep accurate and complete payroll
11  records showing the hours worked daily and the wages paid to Plaintiff. For example, any records
12  kept by TLC did not include the hours worked off-the-clock, the premium wages owed, and for
13  missed and non-compliant meal and rest breaks.

14     170.    Plaintiff has been injured by TLC's intentional and willful violation of Cal. Labor
15  Code § 1174(d) because they were denied both their legal right and protected interest, in having
16  available, accurate and complete payroll records pursuant to Cal. Labor Code § 1174(d).

17                          **SEVENTH CAUSE OF ACTION**
18                  **(Failure to Provide Timely and Accurate Wage Statements)**
                          **Cal. Lab. Code §§ 226(a), 226(e)**
19  ***Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; Jack Fallon; John***
20  ***Licari; Scott Bania; Natalie Paramo; and Does 1–50, inclusive***

21     171.    Plaintiff realleges and incorporates by reference all preceding allegations as though
22  fully set forth herein.

23     172.    At all relevant times herein set forth, Cal. Labor Code § 226(a) provides that, at the
24  time of each payment of wages, the employer must provide each employee with an itemized
25  statement showing gross wages earned, total hours worked, all deductions taken, net wages earned,
26  the inclusive dates for which the employee is being paid, the employee's name and last four digits
27  of their social security number, the name and address of the legal entity that is the employer, and
28  all applicable hourly rates in effect during the pay period and all hours worked at each rate.

1        173.    Cal. Labor Code § 1198 provides that the maximum hours of work and the standard

2  conditions of labor shall be those fixed by the Labor Commissioner and as set forth in the

3  applicable IWC Wage Orders. Section 1198 further provides that "[t]he employment of any

4  employees for longer hours than those fixed by the order or under conditions of labor prohibited

5  by the order is unlawful." Pursuant to the applicable IWC Wage Order, employers are required to

6  keep accurate time records showing when the employee begins and ends each work period and

7  meal period.

8        174.    At all times herein set forth, Cal. Labor Code § § 226.3 has imposed a civil penalty

9  in addition to any other penalty provided by law of two hundred fifty dollars ($250) per aggrieved

10  employee for the first violation of Cal. Labor Code § 226(a), and one thousand dollars ($1,000)

11  per aggrieved employee for each subsequent violation.

12        175.    As alleged herein, TLC knowingly and willfully failed to provide Plaintiff and the

13  Class with proper, itemized wage statements. Wage statements provided to Plaintiff and the Class

14  did not show total/actual hours worked and all applicable hourly rates in effect during the pay

15  period and all hours worked at each rate. The wage statements provided to Plaintiff and the Class

16  failed to reflect all time spent in training, making and responding to social media posts, making

17  business expenditures by stocking their own TLC inventory, and communicating with other Life

18  Changers about policies, practices, and sales instructions and guidance. TLC's refusal to properly

19  record this time, and to include it in its itemized wage statements, or to properly pay its employees

20  for this time was willful and intentional. As a result of these violations, Plaintiff and the Class

21  suffered injury because they were not paid for all hours worked.

22        176.    California Labor Code § 558.1 states that any employer or person acting on behalf

23  of an employer who causes a violation is liable, among other things, for wage statement violations.

24  *See* Cal. Labor Code § 558.1. Defendants TOTAL LIFE CHANGES, LLC; TOTAL LIFE

25  CHANGES – EXPORT, INC.; JACK FALLON; JOHN LICARI; SCOTT BANIA; NATALIE

26  PARAMO and DOES 1–50, inclusive, failed to provide Plaintiff and the Class accurate wage

27  statements and all Defendants are liable for causing this violation under Labor Code § 558.1.

28        177.    Pursuant to Cal. Lab. Code § 226(e), Plaintiff and the Class are entitled to a penalty

1    in the amount of fifty dollars ($50) for the initial pay period in which a violation occurred, and a

2    penalty of one-hundred dollars ($100) for each violation in a subsequent pay period, up to an

3    aggregate penalty of four-thousand dollars ($4,000), as well as costs of suit and attorneys' fees, all

4    in an amount according to proof.

### EIGHTH CAUSE OF ACTION

5

6    **(Failure to Reimburse Business Expenses)**

7    **Cal. Labor Code §§ 450, 2802; IWC Wage Order 4-2001**

     *Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; Jack Fallon; John*
8    *Licari; Scott Bania; Natalie Paramo; and Does 1–50, inclusive*

9         178.    Plaintiff realleges and incorporates by reference all preceding allegations as though

10   fully set forth herein.

11        179.    At all times herein set forth, Cal. Lab. Code § 2802 has provided and provides that

12   an employer must reimburse employees for all necessary expenditures and losses incurred by the

13   employee in the performance of his or her job. The purpose of Labor Code section 2802 is to

14   prevent employers from passing off their cost of doing business and operating expenses on to their

15   employees. *Cochran v. Schwan's Home Service, Inc.*, 228 Cal. App. 4th 1137, 1144 (2014). The

16   applicable wage order, IWC Wage Order 4-2001, ¶9(B) provides that: "When tools or equipment

17   are required by the employer or are necessary to the performance of a job, such tools and equipment

18   shall be provided and maintained by the employer, except that an employee whose wages are at

19   least two (2) times the minimum wage provided herein may be required to provide and maintain

20   hand tools and equipment customarily required by the trade or craft." Total Life Change's conduct,

21   in misclassifying their Life Changers as independent contractors and failing to reimburse them for

22   expenses Life Changers paid that should have been borne by their employer, constitutes a violation

23   of California Labor Code Sections 450 and 2802.

24        180.    TLC violates Labor Code section 2802 by having failed, and failing, to reimburse

25   Plaintiff and the Class for their business-related expenses. TLC charged Plaintiff and the Class a

26   annual renewal fee of approximately $100/year, which TLC did not reimburse. And during the

27   relevant period, TLC, required that Plaintiff and the Class use their own personal cellular phones

28   and/or cellular phone data to carry out TLC's business operations, but failed to reimburse them for

1   the full costs of their work-related cellular phone expenses. For example, Plaintiff and the Class

2   used a personal cellular phone to make social media posts and communicate with customers and

3   their upline. Plaintiff and the Class also incurred expenses associated with maintaining a home

4   internet connection. TLC did not reimburse Life Changers for these expenses.

5          181.    TLC's company-wide policy and/or practice of passing on their operating costs to

6   Plaintiff and the Class violates California Labor Code section 2802. At all times described herein,

7   TLC has acted willfully, and deliberately with oppression, fraud and malice to unlawfully deprive

8   their employees of the employees' own personal resources in furtherance of TLC's profits.

9          182.    California Labor Code § 558.1 states that any employer or person acting on behalf

10  of an employer who causes a violation is liable, among other things, for failure to reimburse

11  business expenses. *See* Cal. Labor Code § 558.1. Defendants TOTAL LIFE CHANGES, LLC;

12  TOTAL LIFE CHANGES – EXPORT, INC.; JACK FALLON; JOHN LICARI; SCOTT BANIA;

13  NATALIE PARAMO and DOES 1–50, inclusive, failed to reimburse business expenses to

14  Plaintiff and the Class and all Defendants are liable for causing this violation under Labor Code §

15  558.1.

16         183.    As a result of TLC's failure to reimburse Plaintiff and the Class for all business-

17  related expenses, pursuant to Cal. Lab. Code § 2802, Plaintiff and the Class are entitled to recover

18  unreimbursed business expenses, plus attorneys' fees and costs, in an amount according to proof.

**NINTH CAUSE OF ACTION**

**(Unfair Competition)**

**Bus. & Prof. Code § 17200 et seq.**

*Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; and Does 1–50, inclusive*

23         184.    Plaintiff realleges and incorporates by reference all preceding allegations as though

24  fully set forth herein.

25         185.    From a date unknown to Plaintiff and continuing to the present, TLC has and

26  continues to engage in business acts or practices that constitute unfair competition as defined in

27  the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business

28  acts and practices are unlawful and unfair within the meaning of that statute.

### Violation of the Unlawful Prong of the UCL

186.    TLC has violated section 17200's prohibition on unlawful conduct through the following violations:

    a) Failing to provide meal periods and/or pay associated premium wages, as set forth in the First Cause of Action;

    b) Denying rest periods and/or failing to pay rest break premium wages, as set forth in the Second Cause of Action;

    c) Failing to pay minimum wages, as set forth in the Third Cause of Action;

    d) Failing to pay overtime wages, as set forth in the Fourth Cause of Action;

    e) Failing to timely pay wages during employment, as set forth in the Fifth Cause of Action;

    f) Failing to keep requisite payroll records, as set forth in the Sixth Cause of Action;

    g) Failing to provide timely and accurate wage statements, as set forth in the Seventh Cause of Action; and

    h) Failing to reimburse business expenses, as set forth in the Eighth Cause of Action.

187.    Over the last four years, TLC has also violated California's laws relating to the recovery of unpaid overtime. Specifically, Cal. Lab. Code § 510 provides employees in California must be paid overtime, equal to 1.5 times the employee's regular rate of pay, for all hours worked in excess of 40 per week or eight (8) per day and must be paid double wages for all hours worked in excess of 12 per day, unless they are exempt. California law also provides that any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee. As alleged herein, Plaintiff often worked more than eight (8) hours per day or forty (40) hours per week, but was not paid all overtime wages, including but not limited to, "double time" wages, due and owing under California law.

188.    The forgoing unlawful conduct of TLC alleged herein constitutes unfair competition within the meaning of California Business and Professions Code section 17200 et seq.

### Violation of the Unfair Prong of the UCL

189.    TLC has violated section 17200's prohibition on unfair conduct by engaging in

1  each of the forgoing unlawful acts.

2      190.    Furthermore, as set forth in *supra* Section IV.B, TLC has violated section 17200's

3  prohibition on unfair conduct by unfairly and unconscionably structuring its Agreement and

4  business activities in a way that does not create meaningful opportunities for Life Changers earn a

5  fair wage and/or commission for their work. TLC used its superior bargaining power, superior

6  market power, and take-it-or-leave-it Agreement to prevent Life Changers from exercising

7  discretion and accessing tools and resources needed to market the products effectively and

8  competitively to generate profits. And TLC further undermined Life Changers' ability to earn

9  compensation by engaging in activities in competition with the Life Changers, by for example,

10  maintaining the exclusive right to disseminate online advertising to any customer sales leads

11  generated by the Life Changers and selling products via Amazon.com. By denying Life Changers

12  meaningful opportunities to earn fair commission, TLC also unfairly incentivized Life Changers

13  to divert time and attention away from marketing the sale of products to retail customers to

14  marketing the opportunity to become a Life Changer to unsuspecting members of the California

15  public. So long as Defendants continue these unfair practices, the California public remains at risk

16  for being recruited into TLC and similarly harmed.

17      191.    TLC's unfair acts were in contravention of public policy. California public policy

18  encourages the proper classification of workers to ensure that workers are fairly compensated and

19  provided the full benefits and protections of employment, competitors are operating in a fair and

20  honest marketplace, and the state is not deprived of tax revenue.

21      192.    TLC's unfair acts were immoral, unethical, oppressive, unscrupulous, and

22  substantially injurious to the Class and general public. TLC knowingly and willfully classified the

23  Life Changers as independent contractors. And it knowingly and willfully structured an unfair and

24  unconscionable Agreement that did not provide for meaningful opportunities to earn

25  compensation, while engaging in business activities that would further frustrate Life Changers'

26  efforts to earn compensation.

27      193.    The impact on the Class and general public is not outweighed by any countervailing

28  benefits. To the extent any benefits inured to Plaintiff, the Class, and the general public, those

1  benefits are outweighed by the impact of Defendants' unfair acts. Life Changers, including

2  Plaintiff, incurred substantial costs in working as Life Changers, and were not paid appropriately

3  and fairly for their time and efforts. They could have chosen other opportunities or invested that

4  time and money into other legitimate and fairly paying endeavors.

5      194.    As a result of TLC's unfair competition as alleged herein, Plaintiff and the Class

6  have suffered injury in fact and lost money or property, as described in more detail above. Pursuant

7  to California Business and Professions Code section 17200, *et seq.*, Plaintiff and the Class are

8  entitled to restitution of all wages and other monies rightfully belonging to them that TLC failed

9  to pay and wrongfully retained by means of its unlawful and unfair business practices, and and/or

10  all other equitable remedies that may be available.

11      195.    To prevent TLC from continuing to prey on the California public through their

12  misclassification of their Life Changers, and recruitment of new Life Changers under these false

13  pretenses, Plaintiff and the Class also seek a public injunction against Defendants enjoining TLC,

14  and any and all persons acting in concert with them, from engaging in each of the California Labor

15  Code violations set forth herein and from recruiting new Life Changers or authorizing others to

16  recruit new Life Changers, under a misclassified status, including making representations about

17  that status and the commission-based compensation structure.

18                              **<u>TENTH CAUSE OF ACTION</u>**

19                      **(Violation of Cal. Lab. Code §§ 2698-2699.8 and 226.8)**

20  ***Against Total Life Changes, LLC; Total Life Changes – Export, Inc.; Jack Fallon; John Licari; Scott Bania; Natalie Paramo; and Does 1–50, inclusive***

21      196.    Plaintiff realleges and incorporates by reference all preceding allegations as though

22  fully set forth herein.

23      197.    PAGA establishes that, notwithstanding any other provision of law, any provision

24  of the California Labor Code which provides for a civil penalty to be assessed and collected by the

25  LWDA, or any of its departments, divisions, commissions, boards, agencies or employees for a

26  violation of the California Labor Code, may be recovered through a civil action brought by an

27  aggrieved employee on behalf of himself or herself, and other current or former employees.

28

1    198.    Whenever the LWDA, or any of its departments, divisions, commissions, boards,

2  agencies, or employees has discretion to assess a civil penalty, a court in a civil action is authorized

3  to exercise the same discretion, subject to the same limitations and conditions, to assess a civil

4  penalty.

5    199.    Plaintiff and the other Distributor employees are "aggrieved employees" as defined

6  by California Labor Code § 2699(c) in that they are all current or former employees of Defendants,

7  and one or more of the alleged violations were committed against them.

8    200.    Defendants' conduct, as alleged herein, violates numerous sections of the

9  California Labor Code, including, but not limited to, the following:

10    a)  Failing to provide meal periods and/or pay associated premium wages, as set forth

11        in the First Cause of Action;

12    b)  Denying rest periods and/or failing to pay rest break premium wages, as set forth

13        in the Second Cause of Action;

14    c)  Failing to pay minimum wages, as set forth in the Third Cause of Action;

15    d)  Failing to pay overtime wages, as set forth in the Fourth Cause of Action;

16    e)  Failing to timely pay wages during employment, as set forth in the Fifth Cause of

17        Action;

18    f)  Failing to keep requisite payroll records, as set forth in the Sixth Cause of Action;

19    g)  Failing to provide timely and accurate wage statements, as set forth in the Seventh

20        Cause of Action;

21    h)  Failing to reimburse business expenses, as set forth in the Eighth Cause of Action;

22        and

23    i)  Willfully misclassifying Promoters as independent contractors, in violation of

24        California Labor Code §§ 226.8 and 2775.

25    201.    Pursuant to PAGA, and in particular California Labor Code §§ 2699(a), 2699.3,

26  and 2699.5, Plaintiff, acting in the public interest as a private attorney general, seeks assessment

27  and collection of civil penalties for Plaintiff, all other aggrieved employees, and the State of

28  California against Defendants, in fixed amounts for each aggrieved employee for every pay period

1 | in which there was a violation, per § 2699(f), in addition to other remedies, for violations of Labor

2 | Code sections set forth herein.

3 |     202.      Pursuant to California Labor Code § 2699(m), civil penalties recovered by

4 | aggrieved employees shall be distributed as follows: seventy-five percent (65%) to the LWDA for

5 | the enforcement of labor laws and education of employers and employees about their rights and

6 | responsibilities and twenty-five (35%) to the aggrieved employees.

7 | Further, and as authorized by the California Labor Code § 2699(k)(1), Plaintiff seeks recovery of

8 | her attorneys' fees and costs.

9 | **VIII.**   <u>**PRAYER FOR RELIEF**</u>

10 |     WHEREFORE Plaintiff and the Class pray for judgment and relief as follows:

11 | (1)    An order certifying that this action may be maintained as a class action, that
12 |     Plaintiff be appointed Class Representative, and that Plaintiff's counsel be appointed Class Counsel;

13 | (2)    Statutory penalties and compensatory damages as authorized under the California
14 |     Labor Code;

15 | (3)    Civil penalties pursuant to California's Private Attorneys General Act;

16 | (4)    Restitution and all other equitable remedies pursuant to California's Unfair
17 |     Competition Law;

18 | (5)    Public Injunctive relief, pursuant to California's Unfair Competition Law, prohibiting TLC, its officers, agents, employees, and attorneys, and all other
19 |     persons in active concert or participation with any of them, whether acting directly or indirectly, in connection with the management, hiring, or coordination of Life
20 |     Changers, or the advertising, promotion, or recruitment of new Life Changers, from:

21 |
22 |     a.  Engaging in the California Labor Code violations as alleged herein, including classifying Life Changers as non-employees or independent
23 |     contractors;

24 |     b.  Recruiting new Life Changers or authorizing others to recruit new Life Changers, under a misclassified status, including making representations
25 |     about that status and the commission-based compensation structure.

26 | (6)    Punitive damages against the individual officer, director or managing agent Defendants pursuant to Cal. Civil Code § 3294;
27 |

28 | (7)    Reasonable attorneys' fees pursuant to the California Labor Code, including

1    sections 226(e), and Code of Civil Procedure section 1021.5;

2    (8)    Costs of this suit per Labor Code section 226(e);

3    (9)    Pre- and post-judgment interest pursuant to Labor Code section 218.6; and

4    (10)   Such other and further relief as the Court may deem just and proper.

5

6  **IX.   DEMAND FOR TRIAL BY JURY**

7    Plaintiff and the Class hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

8

9  Date: May 7, 2025                    **CLARKSON LAW FIRM, P.C.**

10                          By:   */s/ Glenn A. Danas*
                                  Glenn A. Danas (State Bar No. 270317)
11                                *gdanas@clarksonlawfirm.com*
                                  Maxim Gorbunov (State Bar No. 343128)
12                                *mgorbunov@clarksonlawfirm.com*
                                  Cody Laux (State Bar No. 359748)
13                                *claux@clarksonlawfirm.com*
                                  22525 Pacific Coast Highway
14                                Malibu, CA 90265
                                  Telephone: (213) 788-4050
15                                Facsimile: (213) 788-4070
16
17                                Kristen G. Simplicio (State Bar No. 263291)
                                  *ksimplicio@clarksonlawfirm.com*
18                                1050 Connecticut Avenue NW, Suite 500
                                  Washington, DC 20036
19                                Telephone: (202) 998-2299

20                                *Attorneys for Plaintiff and the Putative Class*

21
22
23
24
25
26
27
28

48
FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT

# EXHIBIT B

## DECLARATION OF GIANSALVO "JOHN" LICARI

I, Giansalvo "John" Licari, make this declaration in support of Petitioners'
Total Life Changes, LLC, Total Life Changes-Export, Inc., Jack Fallon, John Licari,
Scott Bania, and Natalie Paramo (collectively, "Petitioners") Petition to Compel
Arbitration. Further, I declare under penalty of perjury that the following is true and
correct to the best of my knowledge, information, and belief.

1.      I am over the age of 18 and currently serve as the Chief Operating
Officer of Total Life Changes, LLC ("TLC"). I know all facts stated within this
declaration of my own personal knowledge, and if called as a witness, I could and
would testify competently as to its contents.

2.      I have served as the Chief Operating Officer of TLC since January 1,
2015. Before that, I served as the Senior Data Analyst from January 1, 2006 to
December 31, 2014. Before that, I served as Shipping and Customer Service
Associate from October 1, 2003 to December 31, 2005. In total, I have worked at
TLC for more than 22 years.

3.      My daily responsibilities include ensuring our operations and
infrastructure are working properly. I also have the responsibility of providing
mentorship and encouraging morale for our staff at TLC headquarters. Lastly, I am
responsible for identifying and creating efficiencies within our operations and
systems.

4.      TLC is a network marketing company, founded in 2003, that focuses on developing and marketing products for weight management, wellness, and skincare, which are promoted by a network of tens of thousands of independent contractors worldwide ("Life Changers"). TLC has Life Changers in all 50 U.S. states and likewise has fulfilled orders to every U.S. state within the past calendar year. TLC's warehouse located in Michigan fulfills any placed orders.

5.      TLC is a Michigan Limited Liability Company with its principal place of business in Fair Haven, Michigan. I am very familiar with both TLC's business operations and the network marketing industry generally, including the matters addressed in this declaration.

6.      Life Changers are independent contractors, not employees or agents of TLC. Each Life Changer interested in earning money can enroll other Life Changers and customers with TLC.  A Life Changer is eligible to earn money on sales of TLC products to (1) Life Changers or customers he or she personally enrolls, and (2) others within the Life Changer's TLC business organization.

7.      Life Changers are free to discontinue their contractual relationship with TLC at any time and for any reason.

## BASIS FOR DIVERSITY

8. TLC is a Michigan Limited Liability Company with its principal place of business in Fair Haven, Michigan. The sole member of TLC is Jack Fallon. Mr. Fallon resides in the state of Michigan.

9. My job responsibilities as Chief Operating Officer of TLC include maintaining knowledge and understanding of the corporate status of any entity affiliated with TLC. I am familiar with the corporate status of Total Life Changes – Export, Inc., a wholly owned subsidiary of TLC. Total Life Changes – Export, Inc., is a Michigan corporation with its principal place of business in Fair Haven, Michigan.

10. I am an individual residing in the State of Michigan. As part of my job duties, I regularly interact with Jack Fallon, who is the founder, Chief Executive Officer and Chief Visionary Officer of Total Life Changes; Scott Bania who is the Chief Communication Officer of Total Life Changes, LLC; and Natalie Paramo who is the Director of Customer and User Experience for Total Life Changes, LLC. As part of my job duties, I also have access to TLC employee's listed address(es) including each of the individual defendants listed above.

11. Before making this declaration, I reviewed the listed addresses for Jack Fallon, Scott Bania, and Natalie Paramo. Based on my review of these addresses,

Jack Fallon, Scott Bania, and Natalie Paramo are individuals residing in the State of Michigan.

## THE DISPUTE RESOLUTION AGREEMENT

12.     In my current role, I have access to copies of contracts entered into between TLC and its Life Changers, including application data for and distributor agreements with Life Changers such as respondent Tatiana Pope. I also have access to Life Changer and customer account activity through TLC's IT Department, which includes enrollment data, compensation data, and termination data, all of which are maintained by TLC in its ordinary course of business. I am familiar with the Policies and Procedures of TLC, which set out the terms and conditions for Life Changer distributor agreements with TLC. Included in TLC's Policies and Procedures are dispute resolution procedures.

13.     The dispute resolution procedures in the Policies and Procedures provide TLC and Life Changers with a mandatory system for settling disputes, including an agreement to resolve by final and binding arbitration any dispute or claim due to, related to, or arising out of the Life Changer's participation as a Life Changer, any transaction or relationship between the Life Changer and TLC resulting from the Life Changer's participation as a Life Changer and/or purchase of TLC products (hereinafter, the "Arbitration Agreement").  TLC does not, and has

not, entered into or maintained a contractual relationship with any Life Changer who did not agree to the Arbitration Agreement.

14.     Attached hereto as Exhibit 1 is a true and complete copy of TLC's 2022 Policies and Procedures and Arbitration Agreement signed by Tatiana Pope (also known as Tatiana Barnes) on January 12, 2024.

15.     At all times since including the Arbitration Agreement in the contractual documents between TLC and its Life Changers, including each of the revisions of those documents, TLC has made available the full, unabridged text of the agreement to all of its Life Changers. TLC does so through an online link on its website homepage which is publicly accessible and through its intranet site LC iOffice Portal Resource Library.

## TLC TERMS AND CONDITIONS ACCEPTANCE PROCESS

16.     Since 2018, TLC has utilized an electronic, online system that allows prospective Life Changers to electronically review and sign the TLC Policies and Procedures which sets forth the Terms and Conditions for Life Changer participation.

17.     To be eligible to become a Life Changer, an individual must review, complete, and accept the Terms and Conditions of all required materials and documents, including the Total Life Changes Policies & Procedures ("P&Ps"), the

Compensation Plan ("Compensation Plan"), TLC's Advertising Policy, and other applicable policies, agreements, or obligations as they exist at the time of the Life Changer's enrollment.[1] By becoming a Life Changer, a Life Changer agrees to abide by the then current Terms and Conditions.

18.     Through the online system, prospective Life Changers are notified of and agree to be bound by various company Terms and Conditions as part of their distributorship agreement with TLC. This includes the Arbitration Agreement. Prospective Life Changers access the online system by creating and utilizing a unique login name and password.  Complete, unabridged copies of these policies are available to applicants through TLC's publicly accessible homepage and through its intranet site LC iOffice Portal Resource Library, which applicants can access using their private login name and password.

19.     [intentionally omitted].

20.     In order to participate as a Life Changer, prospective Life Changers are required to affirmatively agree to be bound by TLC's Terms and Conditions set forth in the Policies and Procedures, including the Arbitration Agreement, as a condition of TLC considering their application to be enrolled as a Life Changer. During this portion of the enrollment process, the applicant is asked to affirmatively check a box

---

[1] TLC's Policies & Procedures contains a provision permitting the company, upon proper notification to amend the terms of its contract with distributors in its discretion and provides that Life Changers will be bound by the current version.

acknowledging their agreement to be bound by the Terms and Conditions. Specifically, the applicant is presented with the following option: "[c]lick here if you agree to the Terms and Conditions as presented here. You cannot continue without agreeing to the Terms and Conditions."

21.     There is no time limit or time restriction for a prospective Life Changer to complete their review of the Policies and Procedures (including the Arbitration Agreement), and the online system permits an applicant to exit and reenter the enrollment process. A prospective Life Changer can take as much time as they like to review TLC's Policies and Procedures, and seek advice before indicating their agreement and submitting an application.

22.     In order to submit their enrollment documents for TLC's consideration, the Life Changer, when signing into their TLC i-Office portal for the first time, must also electronically sign their name on the final page of TLC's Policies and Procedures, affirming the applicant's agreement to the Terms and Conditions of participation as a Life Changer (including the Arbitration Agreement). Following any amendments to the Policies and Procedures, TLC requests active Life Changers to reaffirm their consent to the updated P&Ps.

## <u>TATIANA POPE'S ACCEPTANCE OF THE TERMS</u>
## <u>AND CONDITIONS AND TENURE AS A LIFE CHANGER</u>

23.     Before making this declaration, TLC staff working under my direction and control reviewed the files of respondent Tatiana Pope, who is currently enrolled as a TLC Life Changer.

24.     Any such record, document, or compilation referred to within this declaration was prepared or maintained in the ordinary course of business of TLC by a person employed by TLC, who had personal knowledge of the event being recorded and who had a business duty to record such event.  The writings contained in the books, records, files, and accounting ledgers of TLC relating to Tatiana Pope are or were made at or near the time of the act, condition, or event to which it relates, and such records are maintained in the regular and ordinary course of business of TLC.

25.     I have reviewed the business records relating to Ms. Pope's tenure as a Life Changer with TLC.

26.     Ms. Pope first enrolled as a Life Changer on or about February 26, 2020.  However, from June 18, 2020, to October 12, 2020 when her account was suspended, Ms. Pope's account was dormant, and did not register any activity of any kind.  During this time period, Ms. Pope did not make any purchases and did not

enroll any new Life Changers or customers.  TLC accordingly noted her account as being inactive during that four month timeframe.

27.    On July 18, 2023, Ms. Pope registered a second account, using a different tax identification number than she had used with her previous Life Changer account.  As of the date of this Declaration, that second account is still carried by TLC as an active Life Changer account, and has been used by Ms. Pope to order TLC products. Products ordered by Ms. Pope through either of her two Life Changer accounts were shipped either to Ms. Pope's address in the state of California or, occasionally, to addressed in Nevada, Texas, and Mississippi.

28.    On or around January 12, 2024, Ms. Pope agreed to TLC's then current Policies and Procedures and Arbitration Agreement. In order to confirm her agreement, Ms. Pope was required to log into TLC's electronic system, utilizing her personally created password.

29.    Ms. Pope was presented with a complete, unabridged copy of TLC's Policies and Procedures, including the Arbitration Agreement, which asked for her consent to the terms.

30.    As part of her application to become a Life Changer, Ms. Pope clicked her confirmation of agreement to TLC's Policies and Procedures which stated "[c]lick here if you agree to the Terms and Conditions as presented here. You cannot continue without agreeing to the Terms and Conditions."

31.    Further, when signing into her TLC i-Office portal for the first time with respect to each of her two Life Changer accounts, Ms. Pope electronically affixed her signature on the final page of the TLC Terms and Conditions and Policies and Procedures, indicating her agreement to those contractual documents.

32.    After submitting her enrollment documents, Ms. Pope began placing orders with TLC and earned commissions over the course of her two tenures as a Life Changer with TLC.

33.    During the time periods that Ms. Pope had her active Life Changer accounts, Ms. Pope has had continuous access to the Arbitration Agreement through the Resource Library which is accessible through Ms. Pope's iOffice portal and/or on the publicly accessible TLC's website homepage.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 16, 2025, at Fair Haven, Michigan.

Giansalvo "John" Licari

{00136306.DOCX}                    10

# EXHIBIT B-1



# TERMS & CONDITIONS

☑ Click here if you agree to the Terms and Conditions as presented here. You cannot continue without agreeing to the Terms and Conditions.

# POLICIES AND PROCEDURES
October 2022

Total Life Changes, LLC ("TLC", "Total Life Changes" or the "Company") is a direct sales company dedicated to providing quality products and services that you can promote through your home-based business. We pride ourselves on our integrity in dealing with our independent distributors and customers. Our compensation plan is based on sales of our products to end-users. Anyone who wishes to promote and sell our products can be rewarded under that plan. TLC was founded on seven "Core Values" which guide how we operate and live every day.


We are always hungry for more.


Passion is our fuel.


Having fun we get more work done.


We love each other. Period.


Grateful is our mindset.


Our standard is giving more than what's expected.


We don't just do what's easy, we do what's right.

# Table of Contents

Page

**Section 1**
**Introduction** .................................................................................................................................... 1

    1.1 Purpose ...................................................................................................................... 1

    1.2 Policies and Procedures Incorporated By Reference .................................................. 1

    1.3 Amendments, Revisions and Changes ....................................................................... 1

    1.4 Delays and Force Majeure ......................................................................................... 1

    1.5 Severability ................................................................................................................. 1

    1.6 Waiver ........................................................................................................................ 2

**Section 2**
**Operating a TLC Distributorship** .................................................................................................. 2

    2.1 Eligibility ..................................................................................................................... 2

    2.2 Number of Positions ................................................................................................... 2

    2.3 Identification ............................................................................................................... 2

    2.4 Independent Contractor Status ................................................................................... 2

    2.5 Enrollment .................................................................................................................. 3

    2.6 Change of Sponsor ..................................................................................................... 3

    2.7 Change of Binary Placement ...................................................................................... 3

    2.8 Downline Activity Reports ........................................................................................... 3

    2.9 Business Entities ........................................................................................................ 3

    2.10 Addition of Co-Applicant/Partnership ....................................................................... 4

    2.11 Spousal Limitations .................................................................................................. 4

    2.12 Limitations on Distributorships Per Household ......................................................... 4

    2.13 Separation Due To Divorce or Dissolution ............................................................... 4

    2.14 Sale, Transfer or Assignment ................................................................................... 4

    2.15 Succession and Inheritance ..................................................................................... 4

    2.16 Qualifying Volume; Expenses; Debt Discouraged .................................................... 5

**Section 3**
**Responsibilities of a Life Changer** ............................................................................................... 5

    3.1 Appropriate Conduct .................................................................................................. 5

    3.2 Maintain Accurate Information With TLC .................................................................... 5

    3.3 Training and Communicating with Downline ............................................................... 5

    3.4 Protect Personal Information ...................................................................................... 6

    3.5 Protect Confidential Information .................................................................................. 6

    3.6 Income Taxes ............................................................................................................. 6

    3.7 Business Pursuits Insurance ...................................................................................... 6

    3.8 Communication Opt-in ................................................................................................ 6

**Section 4**
**Bonuses, Commissions, & Payments** ........................................................................................... 7

# Table of Contents
## (continued)

Page

4.1 Qualifications ................................................................................................................. 7

4.2 TLC Pay Portal .............................................................................................................. 7

4.3 Unclaimed Commissions ................................................................................................ 7

4.4 Commission Payment Minimums, Surcharge, and Rewards ............................................ 7

4.5 Adjustments and Clawbacks .......................................................................................... 7

4.6 Incentive Trips and Awards ........................................................................................... 7

4.7 Errors or Questions ....................................................................................................... 7

4.8 Consequences of Returned Products on Bonuses and Commissions .............................. 8

**Section 5**
**Product Ordering, Shipping & Returns** ............................................................................... 8

5.1 Purchasing Product ....................................................................................................... 8

5.2 General Ordering Policies .............................................................................................. 8

5.3 Shipping Delays and Back Orders .................................................................................. 8

5.4 Shipment Confirmation .................................................................................................. 8

5.5 No Customer Pre-Payment ............................................................................................. 8

5.6 Insufficient Funds for SmartShip Orders ........................................................................ 8

5.7 Third Party Credit Card Use .......................................................................................... 8

5.8 Sales and Use Tax ........................................................................................................ 9

5.9 Return Policy ................................................................................................................ 9

5.10 Return Procedure ........................................................................................................ 9

5.11 Business Opportunity Return Policy .............................................................................. 9

5.12 Inventory Repurchase .................................................................................................. 9

**Section 6**
**Prohibited Practices** ........................................................................................................ 10

6.1 Minors ........................................................................................................................ 10

6.2 Participation in Other Network Marketing Ventures ....................................................... 10

6.3 Non-solicitation and Non-Compete ............................................................................... 10

6.4 Targeting Other Direct Sellers ..................................................................................... 10

6.5 Cross-Sponsoring and Switching Binary Organizations .................................................. 10

6.6 Bonus Buying and Stacking ......................................................................................... 11

6.7 Inventory Loading ....................................................................................................... 11

6.8 Price Advertising ......................................................................................................... 11

6.9 Re-Packaging .............................................................................................................. 11

6.10 Telemarketing ........................................................................................................... 11

6.11 Reporting Policy Violations ......................................................................................... 11

6.12 Actions of Household Members or Affiliated Individuals ................................................ 12

6.13 Negative Content ....................................................................................................... 12

# Table of Contents
## (continued)

Page

**Section 7**
**Sales, Advertising & Promotion** ................................................................................................. 12
    7.1 General ................................................................................................................................ 12
    7.2 Product Claims ................................................................................................................... 12
        7.2.1   Product Defects Disclaimer ...................................................................................... 12
    7.3 Income Claims ................................................................................................................... 13
    7.4 LC Media and Likeness Use Consent and Release ........................................................... 13
    7.5 Trademarks and Copyrighted Material ............................................................................... 13
    7.6 Identification as Life Changer ............................................................................................. 13
    7.7 Independent Life Changer Websites .................................................................................. 13
        7.7.1   LCs Must Disclose Relationship with TLC ................................................................ 13
        7.7.2   Domain Names, Email Addresses, and Websites ...................................................... 13
        7.7.3   Hyperlinking and Associations .................................................................................. 14
        7.7.4   Third Party Advertisements on LC Websites ............................................................. 14
        7.7.5   International Business ............................................................................................... 14
        7.7.6   Website Privacy Statements ...................................................................................... 14
        7.7.7   Search Engine Advertising and Optimization ............................................................ 14
        7.7.8   LC Websites ............................................................................................................. 15
    7.8 E-Mail or Electronic Advertising ........................................................................................ 15
    7.9 No Online Retailing/E-Commerce ...................................................................................... 15
    7.10 Banner Advertising ........................................................................................................... 15
    7.11 "Spam Linking" ................................................................................................................ 15
    7.12 Use of Image, Celebrity Name or Likeness ...................................................................... 16
    7.13 No Contact with TLC Consultants ..................................................................................... 16
    7.14 International Marketing ...................................................................................................... 16
    7.15 Not-For-Resale (or NFR Jurisdictions) ............................................................................. 16
    7.16 "Pre-Market" International Marketing ................................................................................ 16
    7.17 Third-Party Intellectual Property ....................................................................................... 17
    7.18 Customer Privacy ............................................................................................................. 17
    7.19 Media ............................................................................................................................... 17
    7.20 Social Media .................................................................................................................... 17
    7.21 Other Internet Use ........................................................................................................... 17
    7.22 Inappropriate Advertising or Promotion ............................................................................ 17
    7.23 Implied Approval or Endorsement ..................................................................................... 18
    7.24 Commercial Outlets .......................................................................................................... 18
    7.25 Trade Shows and Exhibitions ........................................................................................... 18

**Section 8**
**Disciplinary Action, Dispute Resolution, Arbitration, Class-Action Waiver, and Jury Waiver** ............... 18

## Table of Contents
## (continued)

Page

8.1 Disciplinary Action ........................................................................................................................ 18

8.2 Dispute Resolution ....................................................................................................................... 18

8.3 Governing Law .............................................................................................................................. 20

8.4 Local Rules, Laws, Ordinances or Regulations ............................................................................ 20

8.5 Indemnification ............................................................................................................................. 20

8.6 Exclusion of Damages .................................................................................................................. 20

**Section 9**
**Inactivity and Termination of LC Agreement** .............................................................................. **20**

9.1 Termination .................................................................................................................................. 20

9.2 Voluntary Termination .................................................................................................................. 21

9.3 Non-Renewal ................................................................................................................................ 21

9.4 Inactivity ....................................................................................................................................... 21

9.5 Involuntary Termination ............................................................................................................... 21

9.6 Sponsor Correction Due to Termination of LC Agreement .......................................................... 21

9.7 Conflicts ....................................................................................................................................... 21

**Section 10**
**Definitions** ..................................................................................................................................... **21**

# Section 1
# Introduction

## 1.1     Purpose

Total Life Changes ("TLC") has developed these Policies and Procedures ("P&P"), to guide its Independent Life Changers ("LCs") in the successful promotion of TLC's products and services. These P&P will help provide the following benefits:

1. Protect the rights of all LCs by providing rules that require each LC to work in an ethical, effective and secure manner.
2. Provide an equal and level playing field of opportunity to all LCs. All LCs will be treated fairly, reasonably and professionally.
3. Clearly define the relationship between TLC and its LCs.
4. Inform LCs regarding compliance issues and regulatory requirements. TLC requires that all LCs understand and abide by these P&P as we work together to promote the TLC products and the opportunity. If any LC has any questions with respect to the P&P, they should contact the TLC Compliance Department, at tlccompliance@totallifechanges.com, for clarification.

TLC will apply these P&P fairly and equitably to all LCs but understands that there may be certain cases or circumstances that require special handling or consideration. TLC will make determinations about any potential exceptions or extenuating circumstances in its sole discretion.

## 1.2     Policies and Procedures Incorporated By Reference

These P&P, in their present form and as amended from time to time at the sole discretion of TLC, constitute the "LC Agreement" between you as an LC and TLC. By applying to become and continuing to serve as an LC, you agree to the LC Agreement, including these P&P and the following documents which are incorporated by reference into the LC Agreement in their current form and as may be amended from time to time:  the LC Application for Enrollment (paper or digital), the TLC Compensation Plan, the TLC LC Advertising Policy, the TLC SmartShip Agreement, the TLC Shipping Policy, the TLC Return Policy, the TLC Terms of Sale, the TLC Terms of Use and the TLC Business Entity Form (where applicable). By applying to become and continuing to serve as an LC, you also agree that you have read and understand the TLC Privacy Policy. Each LC must read, understand, adhere to and ensure that he or she is aware of and is operating under the most current version of these P&P and the LC Agreement. When enrolling a new LC, the Sponsor (as defined herein) is responsible for providing the most current version of these P&P and the LC Agreement to the applicant prior to his or her execution of the LC Agreement.

## 1.3     Amendments, Revisions and Changes

TLC reserves the right, in its sole discretion, to amend, revise or change the LC Agreement and TLC's prices and product offerings. TLC will notify LCs by posting any amendments, revisions or changes on the TLC website. The most current and controlling version will always be posted on www.TotalLifeChanges.com or another applicable website as notified to you. LCs are responsible for regularly reviewing the company website, and staying current on all notices given through the various communications between TLC and LCs. If an LC continues to use any TLC-related website, product or service, conduct any TLC-related business, or the accept any compensation under the TLC Compensation Plan, such actions indicate that the LC accepts the LC Agreement, including any published amendments, revisions or changes to any documents incorporated by reference therein. If an LC does not wish to be bound by the LC Agreement or such amendments, revisions or changes, the LC must resign in writing and will not be able to conduct any TLC business.

## 1.4     Delays and Force Majeure

TLC shall not be responsible for delays or failures in performance of its obligations when performance is made commercially impracticable due to a force majeure event or other circumstances beyond its reasonable control. This includes, without limitation, strikes, labor difficulties, acts of God, pandemics, severe weather, riot, war, fire, death, curtailment, reduction, limitation or unavailability of a source of supply, or government decrees or orders.

## 1.5     Severability

If any provision of the LC Agreement (including any documents incorporated by reference herein), in its current form or as may be amended, is found to be invalid or unenforceable for any reason, only the invalid or the unenforceable portion of the provision shall be severed and only in the applicable jurisdiction that requires it. The remaining terms and provisions shall remain in full force and

effect and shall be construed as if such invalid or unenforceable provision never comprised a part of the LC Agreement or the relevant document incorporated by reference therein.

## 1.6     Waiver

TLC reserves the right to demand compliance with all terms and conditions under the LC Agreement at any time. Neither TLC's failure to exercise any right or power under the LC Agreement or to insist upon an LC's strict compliance with any obligation or provision of the LC Agreement, nor a custom or practice of the parties at variance with the terms of the LC Agreement, shall constitute a waiver of TLC's right to demand strict compliance with the LC Agreement. TLC may only grant such a waiver in a writing signed by an authorized Company officer. TLC's waiver of any particular Breach by an LC on one occasion shall not affect or impair TLCs' rights with respect to any subsequent Breach, nor shall it affect in any way an LC's rights or obligations. Nor shall TLC's delay or omission to exercise any right arising from a Breach affect or impair TLC's rights as to that or any subsequent Breach. The allegation or existence of any claim or cause of action of an LC against TLC shall not constitute a defense to TLC's enforcement of any term or provision of the LC Agreement.

# Section 2
# Operating a TLC Distributorship

## 2.1     Eligibility

To become an LC, an individual must be a real person or corporate entity, but not a fictionalized individual. All LCs must be a minimum of 18 years of age or the legal age of majority in the state, country or jurisdiction in which they reside, whichever is higher, and must be legally capable of entering into a contract. An LC must be legally entitled to earn income in the United States or in the appropriate country or jurisdiction in which he/she intends to do business. An LC must submit a valid, complete and accurate LC Application for Enrollment to TLC and TLC must accept that application. TLC has sole discretion to determine whether to accept an LC Application for Enrollment.

## 2.2     Number of Positions

An individual may operate or have a legal or equitable ownership interest, as a sole proprietorship, partner, shareholder, member, owner or beneficiary as either an LC or Product Influencer, but not both. An individual cannot have more than one TLC distributorship or financial interest in more than one TLC distributorship, nor can an individual have any interest in multiple TLC distributorships whether individually or as part of an entity. An individual may serve as both an LC and a Preferred Customer.

## 2.3     Identification

All LCs residing in the United States or one of its controlled territories subject to the Internal Revenue Service reporting requirements are required to provide and certify the accuracy of their Social Security Number, Federal Employer Identification Number (US & Territory Residents), or equivalent government-issued identification number, to TLC on the LC Agreement Application for Enrollment. Such numbers are required for proper tax reporting. Upon acceptance of your Application for Enrollment, TLC will provide a unique Life Changer Identification Number ("LC Number") for identification purposes. TLC will use this number to place orders and track commissions and bonuses.

## 2.4     Independent Contractor Status

All LCs are independent contractors regardless of rank or level within the compensation plan. There are no franchises, exclusive territories, exclusive distributorships, partnerships, joint ventures or strategic alliances created between any LC and TLC. All LCs will have an equal opportunity to build their independent business based on sales, work ethic, hours put into promoting their business, dedication to building their business, etc.

Each LC shall be responsible for paying any and all local, state or federal taxes or fees, including, but not limited to, income taxes, social security, self-employment taxes and any social charges, if applicable, as set forth in Section 3.6. LCs are not entitled to employee benefits from TLC, including, but not limited to, unemployment benefits, worker's compensation or minimum wage. All LCs are responsible for their own fees, costs, expenses, supplies, tools or whatever is required, used or needed in building and promoting their business. No LC may bind TLC or any associated person or entity into any contract or agreement, nor may any LC imply that they are acting for or on behalf of the corporate entity. Further, no LC may contact any media, seek out media coverage or appear on or in any media for or on behalf of TLC, unless doing so with TLC's prior written consent. All LCs must properly identify themselves

as independent contractors when conducting business. Any conduct or behavior that in any way implies a corporate relationship or is confusing or misleading as to an LC's independent contractor status is strictly prohibited.

## 2.5    Enrollment

An existing LC must refer or sponsor any new LC, and LC applicants must identify such Sponsor or referral on the LC Application for Enrollment. Each LC is responsible for ensuring that he or she indicates the proper Sponsor when enrolling and ensuring that the new LCs the existing LC sponsors or refers indicate the proper Sponsor. LCs must notify TLC of any disputes or other issues regarding the LC Sponsor within seventy-two (72) hours of enrollment. In the event of a dispute over who has sponsored a new LC, TLC will make reasonable efforts to determine the actual sponsor, based on facts gathered. The final decision as to sponsorships and referrals shall be at TLC's sole discretion.

## 2.6  .  Change of Sponsor

If an LC lists the wrong name of his or her Sponsor when enrolling, that LC may request a correction within 72 hours of enrollment. The LC must submit the correction via webform from the LC's i-Office Portal. TLC will not permit any changes to sponsorship more than 72 hours from the enrollment date. The final decision as to an LC's placement shall be at TLC's sole discretion.

## 2.7    Change of Binary Placement

If a Sponsor incorrectly places a newly enrolled LC, that Sponsor may request a correction within 72 hours of enrollment. The Sponsor must submit the correction via webform from the Sponsor's i-Office Portal. No changes in binary placement will be permitted more than 72 hours from the enrollment date. The final decision as to an LC's placement shall be at TLC's sole discretion.

## 2.8    Downline Activity Reports

Downline Activity Reports are available for LC access and viewing through the secure LC i-Office Portal. All Downline Activity Reports and the information contained therein are confidential and constitute proprietary information and business trade secrets and are owned exclusively by TLC. TLC will not be responsible for any errors, incorrect or missing information that the reports may include or exclude. TLC provides Downline Activity Reports to LCs in strictest confidence and make such Reports available to LCs for the sole purpose of assisting LCs in working with their respective Downline organizations to develop LCs' businesses under the LC Agreement. LCs should use their Downline Activity Reports to assist, motivate and train their Downline LCs and support their customers. LC and TLC acknowledge and agree that, but for this agreement of confidentiality and nondisclosure, TLC would not provide Downline Activity Reports to the LC.

An LC shall not, on his/her own behalf, or on behalf of any other person or entity:

1. Directly or indirectly disclose any information contained in any Downline Activity Report to any third party;
2. Directly or indirectly disclose the password or other access code to his/her i-Office Portal or Downline Activity Report;
3. Use the information contained in a Downline Activity Report to compete with TLC or for any purpose other than promoting his/her LC business;
4. Recruit or solicit any LC or TLC Customer listed on any report, or in any manner attempt to influence or induce any LC, PC or Customer to alter his or her business relationship with TLC;
5. Use or disclose to any person or entity any information contained in any Downline Activity Report. Upon Company request, any current or former LC must return the original and all copies of any Downline Activity Reports to the Company.

## 2.9    Business Entities

A corporation, limited liability company, partnership, or local equivalent (collectively referred to in this section as a "Business Entity") may apply to be an LC. If an LC has enrolled online as a Business Entity, the LC must submit all required legal entity/company documents and registration forms issued by the relevant legal entity/company registry to TLC within thirty (30) days. If TLC does not receive the required documents within the 30-day period, the LC Application for Enrollment shall automatically terminate. All members, partners, shareholders or stakeholders of the relevant Business Entity are jointly and severally liable for any indebtedness, liability or other obligation to TLC. An entity cannot have more than one TLC distributorship or financial interest in more than one TLC distributorship nor can an individual have any interest in multiple TLC distributorships whether individually or as part of an entity. A Business Entity may only enroll as an LC using a legally-registered business name.

### 2.10    Addition of Co-Applicant/Partnership

When adding a co-applicant (either an individual or a Business Entity) to an existing LC, the existing LC must provide a written request to tlccompliance@totallifechanges.com, as well as a properly-completed LC Application for Enrollment containing the applicant and co-applicant's Social Security Numbers (or other valid government identification number) and signatures. To prevent the circumvention of Section 2.14, regarding the sale, transfers or assignment of a TLC distributor account, the original applicant must remain as the main party to the original LC Agreement.

### 2.11    Spousal Limitations

Married couples or common-law couples (collectively "Spouse(s)") may become an LC as partners or as individuals. Each Spouse shall be responsible for the acts of the other Spouse, whether or not the Spouse participates as an LC and whether or not the Spouse was aware of the other Spouse's conduct, if the Spouses enroll as LCs as partners. Both Spouses must comply with the LC Agreement. Spouses who wish to become separate LCs must sign a separate LC Agreement and must have the same Sponsor. One Spouse cannot sponsor the other Spouse. A Spouse may be "binary placed" under their Spouse's LC account as long as they have the same Sponsor.

### 2.12    Limitations on Distributorships Per Household

An additional family member that is not a Spouse, residing in the same household and otherwise eligible to become an LC, may become an LC under the sponsor of his/her choice, as long as there is no attempted or actual manipulation of the TLC Compensation Plan, including, but not limited to, falsifying volume or commission, or falsifying LC Applications for Enrollment using a family member's name.

### 2.13    Separation Due To Divorce or Dissolution

Under no circumstances will TLC be required to divide, break up or partially reassign an LC position or its Downline due to a divorce or separation between Spouses or dissolution of any entity. TLC will recognize the LC as he or she is registered with TLC and will pay any earned commissions or bonuses accordingly. TLC is under no obligation to take any actions to facilitate the Spouses' divorce, break up or dissolution, other than in the normal conduct of TLC business under the LC Agreement. The former Spouses will handle any split of commissions or bonuses after receiving the appropriate payment from TLC. If the former Spouses are unable to effectively conduct TLC business, come to an agreement regarding operating as LCs, or the divorce or dissolution has any adverse effect to TLC or other LCs, TLC reserves the right to terminate the LC Agreement. A Spouse or other party who gives up rights to an LC business as part of a divorce, breakup or dissolution must wait a period of twelve (12) months before enrolling as a new LC.

### 2.14    Sale, Transfer or Assignment

An LC may not sell, transfer or assign his/her independent business without TLC's express written consent at TLC's sole discretion. An LC may not use the sale, transfer or assignment of an LC business to effect a change of sponsorship, manipulate the TLC Compensation Plan, or negatively impact another LC under any circumstances. An existing LC may not purchase another LC's business. Any person or entity who has sold, transferred, or assigned his or her LC business must wait a period of twelve (12) months before enrolling as a new LC, assuming they are otherwise in good standing.

### 2.15    Succession and Inheritance

Upon the death or legally binding incapacitation of an LC, his/her LC business may be passed to his/her heirs, subject to applicable laws and regulations governing such interests. TLC must receive appropriate legal documentation, such as an original death certificate and notarized copy of an executed will, a court order or other instrument establishing the successor's rights, or any other documentation required in TLC's sole discretion to ensure that the transfer is proper.

Accordingly, an LC should consult an attorney to assist him or her in the preparation of a will or other testamentary instrument if they desire to pass the interest to a particular individual. Whenever a LC's independent business is properly transferred by a will or other testamentary process based on applicable law, the legal successor in interest acquires all rights the LC previously earned or held, but the successor must continue to meet all requirements and qualifications under the LC Agreement. The successor(s) in interest must: 1) Execute an LC Application for Enrollment; 2) Comply with terms and provisions of the LC Agreement; and 3) Meet all of the qualifications for the deceased LC's status. Bonus and commission checks of a LC transferred pursuant to this Section will be paid in accordance with any succession policy for TLC's third-party payment processor. TLC will issue all bonus and commission checks and a Form 1099 as required by the IRS. TLC will divide any distributorship among heirs and under no circumstances will TLC allow any LC or LC successor to operate in any way other than as normally prescribed under the LC Agreement.

4

Requests to cancel a deceased's LC business should be made directly to TLC.

## 2.16    Qualifying Volume; Expenses; Debt Discouraged

To become an LC, an individual must purchase a Business Starter Kit, which can be found here. In addition, as indicated in Section 9.4, LCs must maintain a specific qualifying volume ("Qualifying Volume") to remain active as an LC. The Qualifying Volume necessary to remain active depends on the LC's rank, and additional information is available in the TLC Compensation Plan. LCs may achieve Qualifying Volume either through retail sales or an LC's own purchases.

How much may be appropriate for an LC to spend on marketing or any other item related to TLC is entirely up to the LC based on his/her given situation. Unless specifically provided for under these P&Ps or through the TLC Compensation Plan, no LC is entitled to reimbursement from TLC for any general or administrative costs, fees or expenses of any type generated in as an LC with respect to TLC or the LC Agreement.

TLC discourages LCs from incurring debt or obtaining loans to pursue the TLC opportunity. Money loaned or granted for any purpose not specifically related to the TLC business may not be used in the operation of your LC business.

# Section 3
# Responsibilities of a Life Changer

## 3.1    Appropriate Conduct

In order to remain in good standing, an LC must comply with this LC Agreement. All LCs must conduct themselves honestly, ethically, morally and professionally with respect to their TLC business and all promotion and sales activity. LCs must not disparage, demean, or make negative remarks about TLC, other LCs, Preferred Customers ("PCs"), prospective customers, or TLC directors, officers, employees or other associated individuals or entities in any manner or on any forum. An LC's conduct or the conduct of anyone acting on the LC's behalf may not discredit or bring any harm to TLC or any associated person or entity.  No LC may take any action on behalf of TLC or that affects TLC in any way other than in the fulfillment of their LC Agreement (as defined under Section 1.3 below). LCs must not claim or imply that TLC provides them with any advantages or special privileges regarding their obligations or requirements as an LC. TLC will not permit conduct that negatively impacts the Company. TLC will not tolerate abusive or threatening language, high-pressure sales tactics or the use of any misleading, confusing, false or exaggerated statements or claims with respect to TLC or TLC products and services. LCs must comply with all applicable laws, codes, rules, regulations and/or statutes that may be in effect in any jurisdiction in which the LC resides or does business. Constructive criticisms, comments, and identified violations of this LC Agreement should be submitted in writing to the TLC Compliance Department at tlccompliance@totallifechanges.com. Any LC behavior in violation of this section may result in corrective action, including, but not limited to, termination as an LC.

## 3.2    Maintain Accurate Information With TLC

All LCs must immediately notify TLC of any changes from any information provided in the LC's original LC Application for Enrollment. This includes, but is not limited to, physical address, mailing address, telephone number, e-mail address, etc. LCs may make such updates in the i-Office Portal, in writing, or via email. Please allow for up to five business days for all changes to be fully implemented.

## 3.3    Training and Communicating with Downline

A Sponsor should take an active role to ensure that his or her Downline is properly operating his or her LC business consistent with all applicable laws and regulations and this LC Agreement. Sponsors should train and regularly communicate with the LCs in their Downline to facilitate success and compliance with the LC Agreement. Examples of such contact and supervision may include but are not limited to: newsletters, written correspondence, personal meetings, telephone contact, voicemail, social media, email, and accompanying Downline LCs to opportunity meetings, training sessions, and other TLC functions. Sponsors are also responsible for supporting, educating and training new LCs on TLC product knowledge, effective sales techniques, and the TLC Compensation Plan. Sponsors should also monitor the LCs in their Downlines to ensure they do not make improper product or income claims or engage in any illegal or inappropriate conduct. Upon request, every LC should be able to provide documented evidence to TLC of his or her ongoing fulfillment of the responsibilities of a Sponsor.

It is strictly prohibited for Sponsors to charge Downline LCs for training, business tools, or any other activities related to the TLC business.

### 3.4 Protect / Do not Sell Personal Information

Any LC who receives personal information from or about prospective LCs or customers must take all reasonable steps to maintain the security of such personal information. LCs should shred or irreversibly delete the personal information of others once the LC no longer requires such information. Personal Information is information that identifies, or permits someone to contact an individual or entity. It includes, but is not limited to, a potential, former, or active Customer or LC's name, address, email address, phone number, credit card information, social security or tax identification number and other information associated with these details.

The LC agrees not to share a customer's information (including any contact information or purchase information) with any third party for money or other valuable consideration. To the extent the LC needs to share the customer's information with a third-party vendor or service provider to assist the LC in providing some level of service or product to the customer, LC shall enter into a written agreement with that third-party vendor or service provider that restricts that third-party vendor or service provider from using the customer's information for any other purpose other than to provide the service to the LC. Under no circumstances may a LC sell a customer's personal information within the meaning of the term "sale" or "sell" under the California Consumer Privacy Act of 2018, as amended, and including its implementing regulations (collectively, the CCPA) and any other applicable law. Any transfer of customer information to a LC is also not intended to be a sale of personal information under the CCPA and any other applicable law.

### 3.5 Protect Confidential Information

"Confidential Information" includes, but is not limited to, the identity, contact information, and/or sales information relating to LCs and/or customers: (a) that is contained in or derived from any LC's respective i-Office Portal; (b) that is derived from any reports TLC issues to LCs to assist them in operating and managing their LC business; and/or (c) to which an LC would not have access or would not have acquired but for his/her affiliation with TLC. Confidential Information constitutes proprietary business trade secrets belonging exclusively to TLC and TLC provides such Confidential Information to LCs in strict confidence, solely for the purpose of promoting TLC in accordance with this LC Agreement. LCs shall not directly or indirectly disclose Confidential Information to any third party or use Confidential Information for any purpose other than for use in fulfilling the LC Agreement and in building and managing a TLC business. Any violation of this policy shall cause TLC irreparable harm for which there is no adequate remedy at law. The parties further agree that the harm to TLC should LC disclose Confidential Information outweighs any harm to the LC in not disclosing that information such that injunctive relief should be granted to TLC. TLC shall have the right to seek immediate and permanent equitable relief to prevent further violations of this policy and shall be able to obtain such relief in a court of law, notwithstanding the arbitration clause applying to disputes arising out of breach of the LC Agreement. It is a violation of the TLC LC Agreement and these P&P for an LC or any third party to access any data via reverse engineering, keystroke monitoring, hacking or by any other means.

### 3.6 Income Taxes

Each LC is responsible for declaring income and paying all applicable local, state, and federal taxes on any income generated as a result of his/her LC business. If an LC is tax exempt, the LC must provide the applicable federal tax identification number to TLC. Every year, as required, TLC will provide an IRS Form 1099 MISC (Non-employee Compensation) earnings statement to each U.S. distributor who: (1) had earnings of over $600 in the previous calendar year including TLC points; (2) made purchases during the previous calendar year in excess of $5,000; or (3) earned an incentive award trip.

### 3.7 Business Pursuits Insurance

LCs are responsible for, and may wish to acquire, appropriate insurance coverage for their LC business. While LCs must obtain independent advice on risk management, typically a homeowner's insurance policy does not cover business-related injuries or the theft of or damage to inventory or business equipment. Each LC should contact his or her insurance agent to make certain that his or her insurance policies adequately protect relevant property. In the U.S., this can often be accomplished with a simple "Business Pursuit" endorsement attached to their present homeowner's policy. TLC will not be responsible for any losses incurred or suffered by an LC in the conduct of their TLC business.

### 3.8 Communication Opt-in

LCs agree that TLC or a party acting on its behalf may contact you by any means available, including, but not limited to a landline or cellular telephone using automated technology (e.g., an auto-dialer or pre-recorded messaging), text messaging or email. You consent and agree to TLC contacting you in this manner at the address, telephone number(s) or email address that you provided or as updated. You understand that your carrier's standard rates may apply for calls and/or text messages. You understand that you may opt-out of receiving text messages at any time by replying "STOP." You understand that your consent is not a condition of purchase. You agree that you have read and understand the TLC Privacy Policy, which may be updated from time to time, when you agree and submit this LC Agreement.

6

# Section 4
## Bonuses, Commissions, & Payments

### 4.1    Qualifications

An LC is responsible for legitimately fulfilling all requirements and/or qualifications as stated in the TLC Compensation Plan. Aside from the requirements and qualifications in the TLC Compensation Plan, LCs must otherwise be in good standing and in compliance with the LC Agreement. TLC reserves the right in its sole discretion, to change, amend, modify or revise the TLC Compensation Plan as appropriate. TLC will have sole discretion to resolve any dispute as to whether an LC has met or achieved a given requirement or qualification.

### 4.2    TLC Pay Portal

All Active LCs will receive their commissions through the TLC Pay Portal which a third-party vendor operates. LCs understand that by accepting payment from TLC's third-party vendor, LCs are entering into a separate agreement with such third-party vendor to which TLC is not a party. Accordingly, TLC cannot intervene on an LC's behalf regarding any issues relating to the third-party vendor's actions or inactions. Each LC must activate their own TLC Pay Portal account through their LC i-Office Portal. The TLC Pay Portal provides LCs with flexibility to manage their commission payments. TLC will load commission payments to the TLC Pay account. LCs will receive payment of their earned commissions based on the preferences set within the TLC Pay Portal. The LC can find full details about the payment process, including any applicable fees, in his or her TLC Pay Portal. LCs will be able to manage, track and take advantage of the many benefits of their online account.

### 4.3    Unclaimed Commissions

The LC is responsible for registering for their TLC Pay Portal. Any pending commission, bonus or other payment TLC cannot pay due to the failure to register the TLC Pay Portal shall be void after six (6) months from the posted date. TLC may reinstate payments for a valid reason at TLC's sole discretion, but a $25 charge will apply.

### 4.4    Commission Payment Minimums, Surcharge, and Rewards

TLC will not pay any commission payments until the cumulative amount of the daily or weekly commission owed is more than twelve US dollars ($12.00). All commission payments are subject to a one dollar ($1.00) administration fee.

### 4.5    Adjustments and Clawbacks

TLC reserves the right to withhold, adjust or deduct commissions or bonuses from any LC as necessary. Such adjustments may be due to returned products, canceled orders, orders with invalid payments, orders determined to be invalid or inconsistent with this LC Agreement, product buybacks, chargebacks or qualification rollbacks (where an LC no longer achieves a certain level or rank based on returned, canceled or invalid orders). Deductions may continue for multiple periods until TLC has recovered the full amount.

### 4.6    Incentive Trips and Awards

TLC may, in its sole discretion, provide incentive trips and other awards to qualified LCs. TLC will determine the guidelines and criteria for such awards in its sole discretion. LCs cannot defer such awards, and such awards will have no cash value. If required, TLC will issue a 1099 for the applicable amount. Other than providing the applicable award, TLC will not be responsible for any additional costs, fees or expenses an LC incurs with respect to such award. The LC will indemnify, defend and hold TLC harmless from any claim, injury, loss or damages an LC or an LC's guest sustains with respect to participation in such trip or award.

### 4.7    Errors or Questions

If an LC has questions about or believes that any errors have been made regarding commissions or bonuses, the LC must notify TLC within 15 days of the purported error in question. TLC is not responsible for any errors, omissions or problems which are not reported to TLC within 15 days of TLC posting the payment.

**4.8     Consequences of Returned Products on Bonuses and Commissions**

TLC, in its sole discretion, may reverse, debit, or withhold from present or future commissions any previously-paid bonuses or commissions based on refunded products or amounts otherwise adjusted as a result of the returns, cancellations This policy applies to both the LC and any upline LC who received commissions or purchases based on such returned or adjusted product or sale.

# Section 5
# Product Ordering, Shipping & Returns

**5.1     Purchasing Product**

LCs should use his or her LC account to purchase products. TLC does not require LCs to purchase any specific amount of product or inventory, nor does TLC require LCs to carry an inventory of products or sales aids. Any decisions regarding how much inventory to maintain is up to the LC in his or her sole discretion. While TLC discourages LCs from purchasing more product than the LC can reasonably expect to sell in a given month and/or engaging in inventory loading, nothing in this section shall be construed to prevent LCs from maintaining reasonable product on hand to service their customers, in accordance with Section 6.7 Inventory Loading.

**5.2     General Ordering Policies**

The LC is responsible for ensuring that all Customer orders, through the mail, internet, telephone or otherwise, contain valid and proper payment. When there is improper or invalid payment, TLC will make reasonable attempts to obtain valid payment, but if TLC does not receive such payment within 5 business days, TLC will cancel the order. TLC will not accept payment plans, charge-on-delivery, C.O.D. or other deferred payment methods.

**5.3     Shipping Delays and Back Orders**

TLC always makes its best effort to expeditiously ship orders. If, however, an ordered item is out of stock, TLC will place the order on back order and will ship the product when received into TLC's inventory. TLC will notify LCs if there will be an unreasonable delay from the stated delivery date and if so, LCs will have the opportunity to cancel or revise their order. LCs will not receive volume credit, or be paid commissions, on canceled orders.

**5.4     Shipment Confirmation**

TLC takes pride in achieving the highest level of shipping efficiency. In the rare situation that there is an error in shipping, TLC will take all reasonable steps to resolve the problem. The LC is responsible, however, for confirming that a product shipment matches the shipping invoice and is undamaged. LCs must notify TLC of any shipping discrepancy or damage within five (5) calendar days from the delivery date. LCs who wait longer than five (5) calendar days to notify TLC will be deemed to have waived the right to any correction of a shipping problem.

**5.5     No Customer Pre-Payment**

LCs may not hold or accept monies from Customers to hold in anticipation of future orders.

**5.6     Insufficient Funds for SmartShip Orders**

LCs are responsible for ensuring that the LC maintains sufficient funds or points in his/her account to cover any monthly SmartShip order or subscription. If a SmartShip order declines due to insufficient funds, TLC will make one more attempt to process the SmartShip within twenty-four (24) hours of the order's decline. If the SmartShip declines on the second attempt, the order will be cancelled. TLC is not obligated to contact LCs for any scheduled SmartShip order or subscription that does not process due to invalid or insufficient payment. Cancelled or unprocessed SmartShip orders may result in failure to meet the activity requirements set forth in TLC Compensation Plan.

**5.7     Third Party Credit Card Use**

LCs shall, at all times, implement and maintain commercially reasonable security standards and procedures around the credit card or payment information of other LCs or Customers. LCs may not allow other LCs or Customers to use his/her credit card or another form of payment, nor shall any LC use or attempt to use another person's credit card or another form of payment. LCs must

8

immediately notify TLC if the LC becomes aware of any compromise of the integrity or safety of his/her credit card or other form of payment, or that of another LC or Customer.

## 5.8     Sales and Use Tax

TLC charges and collects all applicable domestic sales and use taxes according to the local tax authority. Product costs are considered Retail sales and subject to an "end-user" qualification. Shipping/Handling charges may be taxable in some jurisdictions.

TLC will also collect any applicable Value Added Tax on behalf of TLC foreign entities for purchases made by non-US LCs or Customers.

## 5.9     Return Policy

Total Life Changes is committed to providing our Customers with exceptional products, which is why the Company offers Customers a 30-Day Product Guarantee! If, for any reason, an LC or Customer is not completely satisfied with any product, the LC or Customer may request a full refund within thirty calendar (30) days from the date of delivery. If an LC or Customer returns product or marketing materials following our **Return Procedure**, explained in Section 5.10 of these P&P, within thirty (30) calendar days from the date of delivery, the Customer or LC shall receive a full refund, less shipping and handling costs. Products returned more than thirty (30) calendar days from the delivery date are not eligible for a refund.

Returns are subject to the following qualifications:

1.  TLC will only replace damaged products if the original product was damaged in transit. Notwithstanding the requirements listed above, the LC or Customer must notify TLC within five (5) days from the date of delivery in order to replace a product damaged in transit.
2.  Products ordered for the first time may be returned within thirty (30) days of delivery for a full refund, less shipping, and handling.
3.  For all other orders, only unopened and resalable products may be returned within thirty (30) days of delivery for a full refund, less shipping, and handling. Packages returned to an LC due to unsuccessful delivery attempts to the Customer (i.e., three (3) delivery attempts, customer moved, customer provided incorrect or incomplete address) may be subject to additional shipping and handling charges to have the product resent.
4.  TLC may terminate an LC's account if it determines that an LC is attempting to manipulate the compensation plan by making purchases and/or returns in violation of this Agreement.

## 5.10     Return Procedure

Any Customer or LC must return products by shipping the products to 6094 Corporate Dr, Ira, MI 48023 with a completed Return Merchandise Authorization ("RMA") form. If a Customer or LC returns a product without an RMA form, the LC or Customer must contact Customer Support at 888-TLC-9970 (888-852-9970) to clarify the reason for the return before TLC can process the return.

The RMA form can be found here.

## 5.11     Business Opportunity Return Policy

An LC who cancels his or her account within thirty (30) days of enrollment will be refunded for the LC Business Starter Kit and may return unused products in unopened and resalable conditions for a full refund, less shipping, and handling. LCs have thirty (30) calendar days from enrollment to notify TLC of his or her intention to cancel the account and thirty (30) calendar days from the date of product delivery to make any returns. All product returns must follow the procedures listed in Sections 5.9 and 5.10.

## 5.12     Inventory Repurchase

Separate from the Policy in Section 5.11 above, an LC in good standing who resigns may return product or marketing materials purchased within the last six (6) months prior to resignation, or longer if required by law, that are otherwise in good condition and resalable subject to TLC's determination. Upon compliance with all applicable requirements, TLC will issue a full refund, less a 10% restocking fee and shipping and handling costs. Any product that TLC cannot sell or is opened, used, damaged, expired, or within three (3) months of expiration, is not eligible for a refund. TLC may withhold or deduct any commissions, bonuses or other compensation earned as a result of qualifications involving products the LC later returns. TLC is under no obligation to process returns of any products received that do not meet the requirements of this Section.

# Section 6
# Prohibited Practices

## 6.1    Minors

Under no circumstances may anyone under the age of 18, or who is considered a minor in any applicable jurisdiction become an LC. There are no exceptions. Parents may not co-sign or operate an LC business on behalf of a minor. No existing LC may attempt to enroll or sponsor a minor as an LC.

## 6.2    Participation in Other Network Marketing Ventures

LCs may NOT participate as distributors in other direct selling, network marketing, affiliate marketing, or multilevel marketing ventures (collectively "Network Marketing Ventures"). Under no circumstances may any LC present TLC products or business along with any other company's products, services or opportunities.

## 6.3    Non-solicitation and Non-Compete

All active LCs agree not to own, manage, operate, consult, or serve any other network marketing venture or related business that sells comparable products to TLC. During the term of the LC Agreement and for a period of twelve (12) months after termination for any reason, an LC shall not engage in any actual or attempted recruitment or enrollment of any LC for other network marketing ventures, either directly, indirectly or through a third party. This includes, but is not limited to, presenting or assisting in the presentation of another network marketing venture to any LC, or implicitly or explicitly encouraging any LC to join another or do business with another company.

1. For a period of twelve (12) months following the termination or cancellation of an LC Agreement for any reason, the former LC is strictly prohibited from recruiting or attempting to recruit any LC for another Network Marketing Venture. By agreeing to the LC Agreement, each LC acknowledges and agrees that TLC is trying to protect legitimate business interests by this prohibition and such prohibition is reasonable in its scope and duration.
2. During the term of the LC Agreement and for a period of twelve (12) months after its termination or cancellation for any reason, an LC may not: (a) Produce, offer or transfer any literature, tapes, CDs, DVDs or other promotional material of any nature for another Network Marketing Venture which is used by the LC or any third person to recruit LCs for that or any other network marketing venture; (b) Sell, offer to sell, or promote any competing non-TLC products or services to LCs or PCs (any product in the same generic product category as a TLC product is deemed to be competing: e.g. any nutritional supplement is in the same generic category as TLC nutritional supplements, and is, therefore, a competing product, regardless of differences in cost, quality, ingredients or nutrient content); (c) Offer TLC products or promote the TLC Compensation Plan in conjunction with any non-TLC products, services, business plan, opportunity or incentive; or (d) Offer any non-TLC products, services, business plan, opportunity or incentive at any TLC meeting, seminar, launch, convention or other TLC function, or immediately following such event.
3. During the term of the LC Agreement and for a period of twelve (12) months after its termination or cancellation for any reason, the LC shall not contact any vendor, consultant, employee or agent of TLC for the purpose of starting a Network Marketing Venture or for the purpose of assisting or joining any existing Network Marketing Venture.
4. During the term of the LC Agreement and for a period of twelve (12) months after its termination or cancellation for any reason, LC shall not attempt to copy, manufacture, reverse engineer or produce for sale or distribution any product sold, manufactured by, or produced for TLC.

## 6.4    Targeting Other Direct Sellers

TLC does not encourage nor support LCs targeting the salesforce of another Network Marketing Venture to sell TLC products or to become LCs, nor does TLC encourage LCs to solicit or entice members of the salesforce of another Network Marketing Venture to violate the terms of their agreement with such other company. LCs will be responsible for their own conduct and TLC will not indemnify or defend an LC should another company bring any legal action alleging unethical or inappropriate business conduct by an LC.

## 6.5    Cross-Sponsoring and Switching Binary Organizations

TLC believes in maintaining the integrity of the businesses our LCs build. TLC strictly prohibits actual or attempted cross-sponsoring or switching Sponsors. "Cross-Sponsoring" is defined as the enrollment or attempted enrollment of an individual or entity which already has a current LC Agreement on file with TLC, or which has had such an agreement within the preceding twelve (12) calendar months (or six (6) calendar months following Section 9.2 of P&P), within a different line of sponsorship. "Switching Binary

10

Organizations" is defined as the re-enrollment of an individual or entity that has a current LC Agreement under a different Binary Organization and has not followed or completed TLC's resignation process. The use of a spouse or relative's name, trade names, DBAs, assumed names, corporations, partnerships, federal ID numbers, or fictitious ID numbers to circumvent this policy or any other provision of the LC Agreement is strictly prohibited. LCs must bring any Cross-Sponsoring or Switching Organizations to TLC's attention immediately. TLC may take enforcement action against the LC who switched Binary Organizations and/ or those LCs who encouraged or participated in the activity. If TLC finds that an LC has switched Binary Organizations, TLC will terminate the LC's newest position, and the LC may have all or part of his or her Downline moved to his or her original sponsoring Binary Organization if TLC, at its sole discretion, deems it equitable and feasible. LCs waive any and all claims and causes of action against TLC arising from or relating to the disposition of the LC's Binary Organization.

## 6.6    Bonus Buying and Stacking

Bonus Buying and/or LC Stacking is strictly prohibited and will not be tolerated under any conditions or circumstances. "Bonus Buying" is manipulating the compensation plan to generate any bonuses and/or commissions for other than a legitimate product sale and includes, but is not limited to: (1) enrolling individuals or entities without their knowledge and/or such individuals' or entities' execution of an LC Agreement; (2) fraudulently enrolling an individual or entity as an LC or PC; (3) enrolling or attempting to enroll non-existent individuals or entities as LCs or PCs; (4) the use of a credit card by or on behalf of an LC or PC when the LC or PC is not the account holder of such credit card; (5) purchasing TLC product on behalf of another LC or PC or under another LC number, or PC number to qualify for commissions, bonuses or incentives; and/or (6) creating any order or volume not the result of a legitimate sale transaction in the normal course of business. "Stacking" includes: (1) delaying an enrollment or order for an LC or PC for the purpose of manipulating and/or maximizing compensation pursuant to the Compensation Plan; (2) providing financial assistance to members, buying products, or drop shipping through another's account for the purpose of increasing the payout of the LC's sales organization; and/or (3) placing orders or volume so as to deprive an upline LC sponsor of commissions or bonuses he or she should otherwise be entitled to receive.

## 6.7    Inventory Loading

TLC reserves the right to limit LC orders and Customer orders within a one-month period in its sole discretion, regardless of payment method, to ensure that LCs are not engaged in inventory loading. TLC does not support or condone the practice of ordering large quantities of inventory for the sole purpose of qualifying for a rank in the TLC Compensation Plan. To protect against this, the Company monitors all account activity on a monthly basis and reserves the right to investigate or take disciplinary action should TLC believe that such practices may be taking place. If the Company finds that LCs have engaged in this practice, TLC will cancel the orders and put any rank promotions on hold until TLC reaches a resolution within a reasonable amount of time. Inventory consists of any products, starter kit and sales tools. No LC should purchase more than one starter kit.

## 6.8    Price Advertising

As independent distributors, LCs may not advertise TLC products or services at any price lower than the suggested retail price of the applicable product. Further, LCs may not advertise special offers or enticements beyond the normal TLC product offerings may be made or packaged with TLC products and/or services. Any offer to sell TLC products and/or services must be truthful and cannot contain misleading statements such as "lowest price available."

## 6.9    Re-Packaging

No LC may re-package, re-brand or otherwise alter packaging or labeling in any way, any TLC product or service. This includes the sale of pre-made products. LCs may give tasting samples at a TLC home party or meeting.

## 6.10    Telemarketing

LCs may not use automated systems, including, but not limited to robo-dialers, computer-assisted devices and pre-recorded messaging, nor may they conduct any telephone, fax, computer or other telemarketing activity that does not comply with the Federal Telephone Consumer Protection Act or any other federal and/or state laws pertaining to sales and solicitation via electronic devices.

## 6.11    Reporting Policy Violations

LCs who become aware of a policy violation by another LC should submit a written report of the violation directly to the attention of the TLC Compliance Department at tlccompliance@totallifechanges.com. LCs should include in the report details of the incidents such as dates, number of occurrences, persons involved and any supporting documentation.

**6.12    Actions of Household Members or Affiliated Individuals**

If any member of an LC's Immediate Household engages in any activity which, if the LC performed, would violate any provision of the LC Agreement, TLC will deem such activity a violation by the LC and TLC may take disciplinary action pursuant to the LC Agreement against the LC. Similarly, if any individual associated in any way with a Business Entity (collectively "Affiliated Individual") violates the Agreement, TLC will deem such action(s) a violation by the Business Entity, and TLC may take disciplinary action against the Business Entity and the Affiliated Individual, as applicable.

**6.13    Negative Content**

LCs must never, under any circumstances, post any false, misleading or unconfirmed information or statements about anyone, anything or any entity in any online forum or media. To the extent that that an LC identifies negative information about him- or herself, the LC should not engage or converse online in response to or with respect to negative posts about him- or herself. Instead, LCs may report such negative postings to the TLC Compliance Department at tlccompliance@totallifechanges.com.

# Section 7
# Sales, Advertising & Promotion

**7.1    General**

Any LC-disseminated advertising or promotion must safeguard the good reputation of TLC and demonstrate good business practice. Under no circumstances may an LC use unprofessional, discourteous, false, deceptive, misleading, unethical or immoral conduct, claims or practices to promote TLC and its products. LCs must take all reasonable care to ensure that any advertising, promotion or postings are professional, grammatically correct and non-offensive. LCs should only use TLC-produced sales aids and support materials. TLC reserves the right, at its discretion, to edit or discontinue previously approved TLC-produced materials. TLC further reserves the right to rescind approval for any sales tools, promotional materials, advertisements or other literature, and LCs waive all claims for damages or remuneration arising from or relating to such rescission. As these compliance policies are vital to the long-term stability of TLC and the preservation of the opportunity for all, TLC will strictly enforce these advertising policies. Using non-approved material or failing to obtain approval for marketing materials of any kind may result in disciplinary action including, without limitation, the following:

- A formal warning letter and/or probation;
- Suspension of LC account and/or commissions;
- Termination of the LC Agreement; and/or
- Possible legal action

**7.2    Product Claims**

LCs must not make any claims, including personal testimonials, as to therapeutic, curative or beneficial properties of any TLC products separate from those TLC has approved, as identified in the product fact sheet called "Facts You'll Feel" or "FYF". In particular, no LC may make any claim that TLC products are useful in the cure, treatment, diagnosis, mitigation or prevention of any diseases or signs or symptoms of a disease. Not only do such claims violate TLC policies, but they potentially violate applicable laws, including, but not limited to, the Federal Food, Drug, and Cosmetic Act and Federal Trade Commission Act. When speaking about TLC's products, an LC should always disclose his or her relationship with TLC through a hashtag (e.g., "#TLCLifeChanger"), or other statement.  LCs should be honest in their testimonial personal experience and assert that they are not claiming that their experience is the typical result experienced by consumers. Such testimonials should be accompanied by a disclaimer indicating that any claimed results are not typical, and disclosing the typical results with regard to the product as established in TLC's FYF. Unless specifically warranted in the FYF LCs must not guarantee any results from the use or consumption of TLC products and services.

7.2.1    Product Defects Disclaimer

**SOME JURISDICTIONS PROVIDE FOR CERTAIN WARRANTIES, LIKE THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. TO THE EXTENT PERMITTED BY LAW, TLC EXCLUDES ALL WARRANTIES AS RELATED TO TLC PRODUCTS.**

### 7.3    Income Claims

LCs may not make income claims, representations or imply that anyone will achieve any specific level of income or success aside from any such claims TLC has pre-approved. Further, LCs may not display commission checks, commission statements or other financial records to promote TLC. LCs may truthfully, accurately and fairly explain the TLC Compensation Plan and show the possible ways an LC can earn commissions or bonuses under the plan. However, guarantees, warranties or assurances that individuals will attain any specific amount or level of income are not permitted. Individual results will vary and no previous results should be stated or implied as typical. Hypothetical examples may not be unreasonable or exaggerated. Any claims related to earnings or income must comply with TLC's Advertising Policy.

### 7.4    LC Media and Likeness Use Consent and Release

By accepting the TLC LC Agreement, you authorize TLC to use your name, testimonials, and/or likeness in any TLC advertising or promotional materials in any media without remuneration. Additionally, you consent to and authorize TLC's use and reproduction of any photographs TLC obtains and further consent to TLC's use and reproduction of any quotes, testimonials, stories, conversations on social networking media for any print or electronic publicity, marketing or promotional purposes, without remuneration.

### 7.5    Trademarks and Copyrighted Material

TLC does not allow the use of its trademarks, trade names, designs, symbols or copyrighted material by any person or Business Entity, including LCs, unless the TLC Compliance Department (tlccompliance@totallifechanges.com) has specifically prepared or approved such content in writing  for TLC use. LCs may not produce for sale or distribution, any recorded TLC events, speeches and/or presentations without TLC's express written consent. Further, LCs may not use any name or portion of any name exactly like, similar to or a variation of any TLC product, service, associated person or entity in the title, address, domain name, URL, social media page, username, team names, heading, social-media handle or in any context that could be confusing, misleading or deceptive as to the origin or source of the given material or communication. Where an LC may use a TLC logo, TLC has provided LC versions of TLC logos in the relevant TLC i-Office Portal under the "Resources" tab.

### 7.6    Identification as Life Changer

Consistent with these P&P, an LC may only use the TLC name or other related material when the LC properly identifies his or herself as an LC and provides his or her assigned LC ID Number. An LC must only represent him or herself as an LC, and not as an individual acting on behalf of TLC as a corporate entity.

### 7.7    Independent Life Changer Websites

#### 7.7.1    LCs Must Disclose Relationship with TLC

LCs operating independent websites that use TLC trademarks must clearly and conspicuously display the LC's personal name, account number, and business address along with identification of the LC as an "Independent Life Changer":

- On the home page;
- As part of any contact information; and
- As part of any publicly accessible profile information.

The LC's business name may not be a substitute for the personal name of the individual LC, but may be included in addition to the LC's personal name. Anonymous postings or the use of an alias are prohibited.

#### 7.7.2    Domain Names, Email Addresses, and Websites

LCs may not use TLC Intellectual Property in their:

- Website domain name (URL);
- Titles for any pages on an LC's website (including, but not limited to, the home page);
- Email addresses; and
- Title tags, meta tags.

Examples of TLC Intellectual Property terms that may not be used:

13

- Total Life Changes
- Total Life Changes product names

Any LC violating this rule must transfer the domain name or email account to TLC on TLC request and at no extra cost to TLC. TLC reserves its other rights and remedies.

### 7.7.3    Hyperlinking and Associations

LCs may link their websites to:

- The homepage on totallifechanges.com (or any other website TLC produces or maintains);
- Any other website LC maintains to promote the TLC product and opportunity; and
- Any third-party website that will assist the LC in promoting the TLC products and opportunity, so long as such websites are compliant with Rule 7.7.4.

### 7.7.4    Third Party Advertisements on LC Websites

LCs may feature third-party advertisements on websites they use in connection with their LC business so long as the LC complies with all applicable law associated with those advertisements, and in the sole and absolute judgment of TLC, the advertisements DO NOT:

- Relate to any religious, political or commercial organization;
- Damage the reputation of TLC or its LCs;
- Misuse TLC Intellectual Property;
- Directly or indirectly promote any other:
  - Direct-selling or MLM company regardless of products offered; or
  - Products competitive with those sold by TLC, such as:
    - Meal replacements,
    - Nutritional supplements, or
    - Cosmetics.

### 7.7.5    International Business

LCs conducting or seeking to conduct business in international markets via their own or other websites may sell only products approved for sale in the country to which communications are directed.

### 7.7.6    Website Privacy Statements

LCs must post, in a prominent location, a "Privacy Statement" that, at a minimum:

- Informs consumers whether or not personal information is being collected about them and how such information will be used, stored, and shared; and
- Fulfills the privacy law requirements of each jurisdiction in which business is being conducted.

### 7.7.7    Search Engine Advertising and Optimization

TLC trade names and product names may not be used in search engine optimization, such as:

- Metadata
  - 25-word description; and
  - Keywords that make up a metatag
- Metatags
  - The URL;
  - Title tags;
  - Alt/image tags that describe the images of a site; and
  - Any other page-related factors used by search engines in determining website rankings.

LCs may not use any misleading or deceptive tactics to improve their index preference with search engines.

14

LC must comply with all rules and regulations of each country, including (but not limited to) laws related to:

- Confidentiality of consumer data;
- Privacy rights;
- Restrictions on telemarketing; and
- Restrictions on marketing over the Internet.

### 7.7.8    LC Websites

All LCs who use the Internet to sell products for delivery must do so exclusively through his or her LC account. In addition, the LC's name and current phone number must be clearly indicated on their LC account.

## 7.8    E-Mail or Electronic Advertising

All email messages LCs send regarding TLC must comply with all applicable law relating to e-mail communications and marketing, and at a minimum meet the following requirements:

- LCs must use accurate information regarding the origin of the email message, including an accurate "From" line, source, destination, and routing information.
- LCs must use an accurate, and not misleading "Subject" line for each message.

Emails that promote TLC products or services, must include the following information:

- The LC's valid physical postal address;
- A clear and conspicuous opt-out mechanism that works for at least 30 days from when the message was sent and that the LC complies with within 10 business days that complies with all applicable laws.

LCs must only send email messages to individuals with whom the LC has an existing business relationship with based on a prior purchase, or the LC is a friend, family, acquaintance, or someone who has requested that the LC send him or her an email message. LCs may not send or transmit unsolicited emails, text messages, or faxes related to TLC via telephone, facsimile, electronic mail or any similar method. LCs must not publish, post, upload, distribute or communicate through any media, any unprofessional, inappropriate, profane, obscene, defamatory, misleading, untrue, false, indecent, infringing or unlawful statements, claims, material, information or data.

An LC may only advertise or promote TLC or TLC products and services via email or other electronic media in accordance with TLC's Advertising Policy. Further, an LC may only use TLC trademarks and/or copyrighted material that are provided in the LC's i-Office Portal.

## 7.9    No Online Retailing/E-Commerce

Outside of an LC's Replicated Website, LCs may not list or sell TLC products or services on any online retail store, e-commerce site, or online auction site, including, but not limited to, Amazon, eBay, Craigslist, Poshmark. Additionally, LCs may not (1) enlist or otherwise allow a third party to sell TLC products through or on any online retail store, e-commerce site, or online auction site or (2) sell products to a third party that the LC has reason to believe will sell such products on any online retail store, e-commerce site, or online auction site, or other unauthorized methods.

## 7.10    Banner Advertising

LCs may place approved banner advertisements on third-party websites. LCs may only use TLC-approved templates and images available through the "Resources" section of their LC i-Office Portal. The LC cannot vary, alter, revise, or add any additional information such as pricing, discounts or promotions to the banner. The LC must use discretion in determining whether the third-party website is appropriate for posting.  TLC reserves the right to request that an LC remove a banner ad from a website that TLC, in its sole discretion, determines to be inappropriate.

## 7.11    "Spam Linking"

LC's must not provide multiple consecutive submissions of the same or similar content into blogs, wikis, guestbooks, websites or other publicly accessible online discussion boards or forums, also known as "spam linking." This includes blog spamming, blog comment spamming and/or spam-texting.

### 7.12    Use of Image, Celebrity Name or Likeness

You hereby grant TLC an irrevocable, sub-licensable, worldwide right and permission to use any work or product created by you as part of your participation as a LC. You authorize TLC to use your name, image, likeness and/or story in any TLC-related materials, advertising, promotion, websites or other media. You understand that you are not entitled to any compensation or remuneration for such use.

No LC may imply that TLC is associated with or endorsed by a particular person, entity or celebrity, including using digitally-altered photos. LCs must not publish any celebrity name or likeness that suggests a connection between TLC and such celebrity without the prior written approval of TLC. Celebrity includes individuals, groups (e.g., professional sports teams), or entities (e.g., professional trade organizations).

### 7.13    No Contact with TLC Consultants

TLC has established relationships with many preeminent scientific, marketing, public relations, business, legal and other professionals. LCs must refrain from contacting or attempting to contact any such professional or advisor unless TLC has provided specific authorization to do so in writing. No LC may claim or imply that he/she has any special relationship or privilege with any such professional or advisor.

### 7.14    International Marketing

LCs are authorized to sell TLC products or sponsor PCs or LCs only in countries in which TLC is authorized to conduct business as announced in official TLC materials or on the TLC corporate website. Selling or promoting TLC products or services in countries other than countries where TLC is authorized to conduct business could potentially have a detrimental effect on TLC's ability to market in such countries in the future.

### 7.15    Not-For-Resale (or NFR Jurisdictions)

There are certain countries or jurisdictions where residents of that jurisdiction are permitted to import TLC products for personal use only ("Authorized Countries"). TLC products may not otherwise be sold or re-sold in those jurisdictions. These jurisdictions are Not-For-Resale ("NFR") jurisdictions.

### 7.16    "Pre-Market" International Marketing

An LC, in preparing for the opening of a new country, prior to the official opening of a country, but after its announcement, may provide business cards and conduct, organize or participate in meetings with no more than five (5) attendees, including the LC. Other attendees must be personal acquaintances or acquaintances of personal acquaintances. These meetings must be held in a home or a public establishment but may not be held in a private hotel room. LCs are prohibited from any other Pre-Market conduct, including, but not limited to:

- All cold-calling techniques (soliciting persons who are not prior personal acquaintances of the contacting LC);
- Importing or facilitating the importation of, selling, gifting or distributing in any manner, TLC products, services or product sample(s);
- Placing any type of advertisement or distributing any promotional materials regarding TLC, its products or the opportunity, except for official TLC material specifically authorized for distribution in unopened markets as TLC designates;
- Soliciting or negotiating any agreement for the purpose of committing a citizen or resident of an unopened market to the opportunity, a specific enroller or specific line of sponsorship. Furthermore, LCs may not sign up a citizen or resident of unopened markets in an Authorized Country or by using the LC Agreement forms from an Authorized Country, unless the citizen or resident of the unopened market has, at the time of sign-up, permanent residence and the legal authorization to work in the Authorized Country. The Sponsor has the responsibility to ensure compliance with residency and work authorization requirements. Membership or participation in, or ownership of a corporation, partnership or other legal entity in an Authorized County may not by itself fulfill the residency or legal authorization to work requirements. If a new LC fails to provide verification of residency and work authorization upon TLC request, TLC may, at its election, declare the LC Agreement void from its inception;
- Accepting money or other consideration, or being involved in any financial transaction with any potential LC either personally or through an agent, for purposes relating to TLC products or the opportunity, including renting, leasing or purchasing facilities for the purpose of promoting or conducting TLC-related business;

16

- Promoting, facilitating or conducting any type of activity which exceeds the limitations set forth in the LC Agreement and these P&P or which TLC, in its sole discretion, deems to be contradictory to TLC's business or ethical interests in international expansion.

Such marketing as contemplated by this section is only permitted to the extent legally authorized in the jurisdiction in which the LC conducts the activities.

## 7.17    Third-Party Intellectual Property

LCs may not use a third party's intellectual property, including the trademarks, trade names, service marks or intellectual property of any third party in any promotional materials or online postings without proper license or authorization of the intellectual property's owner. When an LC uses third-party intellectual property with authorization, the LC must properly identify such intellectual property as the third party's property, and the LC must adhere to any restrictions and/or conditions that the intellectual property's rightful owner places on its use.

## 7.18    Customer Privacy

An LC must respect the privacy of others in any posting or promotion. TLC prohibits LCs from using the name, likeness, testimonial, story or information relating to any Customer without TLC's or the Customer's permission. LCs should never engage in gossip, rumors or speculation with respect to people, entities, products or services.

## 7.19    Media

LCs may not promote TLC or TLC products through interviews with the media, whether audio, video, printed or verbal, regardless of distribution or broadcasting method, unless TLC have given specific written authorization to do so. An LC should refer any media inquiry to TLC's Public Relations Department via email at publicrelations@totallifechanges.com. Further, unless otherwise authorized, LCs may not use any form of mass communication or mass advertising to promote TLC or TLC products. This includes, but is not limited to television shows, podcasts, news or promotional pieces on television, radio or the internet (outside of an LC's own social media postings or TLC website), etc.

## 7.20    Social Media

TLC maintains a public Facebook page and other public social media forums which it uses to invite potential Customers and LCs to learn more about TLC. LCs may not attempt to use such social media to otherwise promote, sell or advertise. TLC reserves the right at its sole discretion to remove any non-compliant postings or messages from TLC-controlled social media. TLC may also maintain private or closed social media forums for various purposes including education and open forum discussions. If TLC invites an LC to join these password- protected groups, the LC may not allow access or otherwise disseminate the information contained or obtained from such a private group.

## 7.21    Other Internet Use

LCs otherwise complying with these P&P may use the Internet, social networking sites, blogs, social media and applications and other sites with content based on user participation ("Social Media Sites") as a preliminary step to ultimately drive traffic to their TLC Replicated Website. LCs should not use Social Media Sites to close business, but should only use such Social Media sites to generate interest in finding out more about TLC or TLC products and services through the TLC Replicated Website or other TLC-approved material.

## 7.22    Inappropriate Advertising or Promotion

Under no circumstances may any LC ever publish, in writing or verbally, in any media or forum, post, state, distribute or provide any material or information that could be considered offensive sexually explicit, obscene, pornographic, profane, hateful, threatening, harmful, defamatory, libelous, harassing, racist, discriminatory based on race, ethnicity, creed, religion, gender, sexual orientation, physical disability or otherwise. Further, an LC may never publish graphically violent images, solicit unlawful behavior or engage in attacks on any individual group or entity. TLC has sole discretion in determining whether such material is inappropriate and the LC must immediately take down the non-compliant material or face disciplinary action up to and including termination.

### 7.23   Implied Approval or Endorsement

An LC may never state, imply or represent that TLC or TLC products are endorsed, approved or sanctioned by any agency or organization, including, but not limited to the Federal Trade Commission ("FTC") or the Food and Drug Administration ("FDA"). Government regulatory agencies do not approve or endorse any network marketing ventures or their products.

### 7.24   Commercial Outlets

Direct sales are based on personal relationships and TLC strongly encourages LCs to retail products and services through personal contact. Therefore, LCs may not display or sell TLC products or literature in general retail establishments. LCs may, however, promote TLC and TLC products through appointment-based establishments such as hair salons, spas or chiropractic offices. Notwithstanding the foregoing, a LC may request TLC's permission to promote TLC products through a "brick and mortar" storefront, pursuant to TLC's Guidelines for TLC LC Individual Storefronts, which will be provided to you upon request.

### 7.25   Trade Shows and Exhibitions

LCs may only display and/or sell TLC products at trade shows or professional expositions with prior approval from the TLC Compliance Department. LCs may submit a request to participate in a trade show or professional exposition to tlccompliance@totallifechanges.com. TLC reserves the right to determine, in its sole discretion, whether a particular trade show or exhibition is inappropriate for displaying any TLC products or material. Swap meets, garage sales, flea markets, and similar events are not appropriate venues for promoting TLC and/or its products.

# Section 8
# Disciplinary Action, Dispute Resolution, Arbitration, Class-Action Waiver, and Jury Waiver

### 8.1   Disciplinary Action

If TLC finds that any LC has violated or Breached any applicable term, condition, policy, procedure, law or regulation pertaining to the LC Agreement, TLC, at its discretion, may take one or more of the following actions:

1.  Issuing a warning or admonition;
2.  Directing the LC to implement immediate corrective measures;
3.  Holding back, in whole or in part, one or more bonus or commission payments or rank advancement;
4.  Reversing, in whole or in part, one or more bonus or commission payments or rank advancement;
5.  Suspending all rights and privileges of an LC to conduct TLC business pending a final decision;
6.  Canceling or re-assigning one or more LCs or Customers that TLC determines an LC has not legitimately acquired;
7.  Revoking an LC's rights and privileges with respect to being able to conduct TLC business;
8.  Terminating the LC Agreement of the relevant LC(s) and/or associated LC(s), and closing the TLC account of the relevant LC(s) and/or associated LC(s);
9.  Seeking of monetary and/or equitable relief in accordance with the dispute resolution provided for in Section 8.2;
10. Any other measure or action required to provide an appropriate remedy for injuries caused partially or exclusively by the conduct of the relevant LC(s).

### 8.2   Dispute Resolution

Although we hope that any dispute with you will not occur, we believe that when these disputes do arise it is in the mutual interest of all involved to handle them promptly and with minimal disturbance. Accordingly, to provide for more expeditious resolution of "Claims" between you and TLC, you agree to the following dispute resolution procedures.

      a.      A "Claim" is any dispute or claim due to, related to, or arising out of your participation as an LC, any transaction or relationship between you and us resulting from your participation as an LC and/or purchase of products, including the purchase of TLC products as an LC, the information provided in connection with your participation as an LC, and including, without limitation, tort and contract claims, claims based on any international, federal, state, or local statute, law, order, ordinance, or regulation made between you and TLC against one another's agent, employee, subsidiary, affiliate, predecessor in interest, successor, assign, parent, affiliate, subsidiary, or related company.

b. **Informal Resolution**. Except where prohibited by law, or unless otherwise provided in this Agreement, you and TLC agree that as a prerequisite to proceeding with a Claim you and TLC agree to make a good faith effort to at informally resolving any Claim. To initiate this process, the party asserting the Claim must provide the other party with written notice of the Claim by registered or certified mail (or other method as agreed to between the Parties), and shall describe in such notice, with reasonable particularity, the nature and basis of the Claim and the total amount of the Claim, if known at the time. Within thirty (30) calendar days of receipt of such notice, the party receiving the notice shall provide a written response which, with reasonable particularity, sets forth its position concerning the Claim. If the Parties are unable to resolve the Claim by good faith negotiations to be conducted within thirty (30) calendar days of the noticing party receiving the opposing party's response statement, the Parties shall proceed to negotiate for a nonbinding mediation pursuant to this Agreement.

c. **Nonbinding Mediation**. Except where prohibited by law, or unless otherwise provided in this Agreement, if informal resolution efforts fail, a Claim must first be submitted for nonbinding mediation before a neutral third party (a single mutually agreed mediator). Unless otherwise agreed to between you and TLC, the mediation shall take place in Oakland County, Michigan. Selecting the mediator, the appropriate terms for mediation, and a date for mediation shall be negotiated in good faith between you and TLC. If you and TLC cannot agree to appropriate terms concerning the mediation after a good faith effort, you and TLC shall be entitled to proceed to arbitration.

d. **Arbitration**. Except where prohibited by law, or unless otherwise provided in this Agreement, all Claims that fail to resolve in nonbinding mediation, as described above, shall be resolved by a final and binding arbitration.

e. If the arbitration is between TLC and a US resident, the arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA") and will be administered by the AAA. The arbitration shall be conducted in the English language by one arbitrator. The AAA Rules are available online at www.adr.org. Unless otherwise agreed to between the Parties, the arbitration shall take place in Oakland County, Michigan.

f. If the arbitration is between TLC and a non-US resident, then the arbitration will be governed by the rules of the International Chamber of Commerce ("ICC") and will be administered by the ICC. The arbitration shall be conducted in the English language by one arbitrator. The ICC Rules are available online at www.iccwbo.org. Unless otherwise agreed between the Parties, the arbitration shall take place in Oakland County, Michigan.

g. YOU AND TLC ACKNOWLEDGE AND AGREE THAT ANY SUCH CLAIMS SHALL BE BROUGHT SOLELY IN THE PARTY'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE PROCEEDING. YOU AND TLC FURTHER AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. YOU AND TLC VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL. ANY CONTROVERSY CONCERNING WHETHER A DISPUTE IS ARBITRABLE SHALL BE DETERMINED BY THE ARBITRATOR AND NOT BY THE COURT. JUDGMENT UPON ANY AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED BY A MICHIGAN STATE OR FEDERAL COURT HAVING JURISDICTION THEREOF. THIS ARBITRATION CONTRACT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND ITS INTERPRETATION, APPLICATION, ENFORCEMENT AND PROCEEDINGS HEREUNDER SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT ("FAA").

h. BY AGREEING TO THIS ARBITRATION AGREEMENT, YOU ARE GIVING UP YOUR RIGHT TO GO TO COURT, INCLUDING YOUR RIGHT TO A JURY TRIAL.

i. **Confidentiality.** You also agree to keep any arbitration procedures confidential and agree not to disclose any aspect of any arbitration proceedings, except as required by law.

j. **Emergency Relief in Court**. Notwithstanding the Parties' agreement to submit all disputes to binding, individual arbitration, the Parties may seek emergency relief (such as a temporary restraining order or preliminary injunction) pursuant to the procedures set forth in the AAA Rules or ICC Rules (as applicable) or, in accordance with the AAA rules or ICC Rules (as applicable), before a court of competent jurisdiction.

k. **Class Waiver / Agreement**. Separate and apart from the dispute resolution procedures set forth above, you agree to waive any right to bring or participate in any class action in any way related to, or arising from, this Agreement. You acknowledge that this class action waiver is material and essential to the arbitration of any disputes between you and TLC, and is non-severable from the Agreement to arbitrate claims. **YOU UNDERSTAND THAT BY AGREEING TO THIS AGREEMENT, WHICH CONTAINS THIS CLASS ACTION WAIVER, YOU MAY ONLY**

19

BRING CLAIMS AGAINST TLC, ITS AGENTS, OFFICERS, SHAREHOLDERS, MEMBERS, EMPLOYEES, SUBSIDIARIES, AFFILIATES, PREDECESSORS IN INTEREST, SUCCESSORS AND/OR ASSIGNS IN AN INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR REPRESENTATIVE PROCEEDING. IF YOU DO NOT AGREE TO THIS AGREEMENT AND CLASS ACTION WAIVER, YOU MUST TELL US IN WRITING AND NOT PARTICIPATE AS A CUSTOMER AND/OR PURCHASE OUR PRODUCTS.

l.      **Attorney's Fee.** Each party shall bear its own attorneys' fees and any other costs and expenses incurred in the resolution of any dispute without regard to the outcome.

m.      **Statute of Limitations.** Both TLC and LC agree that any action pursuant to this LC Agreement shall be brought within the shorter of one (1) year of the accrual of that action or the applicable statute of limitations for that action. It is further agreed that any cause of action will accrue on the date that the relevant goods or services were delivered or the relevant action occurred

## 8.3   Governing Law

Any dispute arising out of or related to the LC Agreement shall be governed by and shall be construed and interpreted in accordance with the laws of the State of Michigan, without giving effect to conflicts of law principles.

## 8.4   Local Rules, Laws, Ordinances or Regulations

Aside from complying with TLC's LC Agreement, LCs are responsible for complying with all applicable laws, rules, regulations, statutes, requirements or ordinances that may apply to their LC business in any applicable jurisdiction, which may be any local area, town, city, county, state or country in which they reside or conduct business. The LC is responsible for knowing any such laws or regulations that may apply to them and/or their business.

## 8.5   Indemnification

All LCs agree to indemnify, defend and hold harmless TLC, its owners, directors, employees, consultants, agents, vendors and associated persons or entities from and against any and all claims, demands, liabilities, losses, costs or expenses arising from the conduct of the LC in the conducting of any TLC business and/or business or conduct arising out of the LC Agreement or Breach of the LC Agreement. This includes, but is not limited to, arbitration costs, attorney's fees, regulatory proceeding costs, regulatory fines or penalties asserted against, suffered by or incurred by TLC by reason of, directly or indirectly, arising out of or in any way related to or connected with, allegedly or otherwise, LC's activities, LC's Breach of any terms of the Agreement or LC's violation or failure to comply with any applicable federal, state or local law, statute, code, regulation or ordinance. This provision shall survive the termination of the LC Agreement.

## 8.6   Exclusion of Damages

TLC, its owners, directors, employees, affiliates, consultants and associated persons or entities shall not be liable under any circumstances to any LC for any exemplary, indirect, consequential, special or punitive damages for any and all claims, demands or actions resulting or arising from the LC Agreement, the function, operation or lack of function or any equipment, website software, delay of any shipment or an act or omission of any TLC related party, whether based in contract, tort, negligence, strict liability or any other cause of action. Damages will be limited to compensatory damages which shall not exceed the amount of legitimately obtained unsold TLC product owned by an LC or the actual amount of legitimately earned commissions or bonuses that may be due (after any permitted setoffs by TLC).

# Section 9
# Inactivity and Termination of LC Agreement

## 9.1   Termination

If an LC Agreement is terminated, whether voluntarily or involuntarily, as of the date of notice of termination, the relevant LC (i) shall no longer have any rights or privileges as an LC; (ii) shall not promote or sell TLC products and/or services, (iii) shall no longer receive any compensation, commissions or bonuses under the TLC Compensation Plan; (iv) shall forfeit any available points (including earned, purchased, or transferred points) and product sample credits; (v) may not represent or misrepresent in or

on any forum that he/she is still associated with TLC; and (vi) may not utilize any TLC materials, trademarks, trade names, service marks or copyrighted material.

## 9.2    Voluntary Termination

An LC has the right to terminate the LC Agreement at any time. The LC must submit notice of termination via email to TLC Compliance Department at tlccompliance@totallifechanges.com from the email address on file with TLC. If an LC does not have access to email, the LC may submit the notice of termination via regular mail to TLC's current business address or faxed to TLC's current fax number, Attn: TLC Compliance. The notice of termination must include the LC's account number, full name, address, and statement of termination. An LC who resigns shall receive commissions and/or bonuses only for the last full commission period they were active and qualified for prior to cancellation.

An LC may enroll as a new LC after six (6) months of complete inactivity with TLC, following the date of the resignation notice.

## 9.3    Non-Renewal

LCs must review and agree to TLC's LC Agreement on or about the anniversary upon which they joined as an LC annually. Any LC who fails to complete the renewal process in effect at the appropriate time will be deemed to have terminated their LC Agreement, and the consequences of termination set forth in Section 9.2 of the P&P shall apply. An LC who has not renewed his/her LC Agreement in accordance with this clause, but who was otherwise in good standing and who has remained inactive for at least six (6) months following the renewal date, may apply to enroll as a new LC under the sponsor of their choice, pursuant to a new LC Agreement.

## 9.4    Inactivity

If an LC has not fulfilled his or her Qualifying Volume requirement for a period of twelve (12) consecutive calendar months, TLC shall terminate the LC Agreement for inactivity. The termination will become effective on the first day of the first month after the twelfth month of inactivity. LCs may enroll as a new LC after a six (6) month period has elapsed from the day of cancelation.

## 9.5    Involuntary Termination

An LC's Breach of any of the terms of the LC Agreement may result in any of the actions discussed in Section 8.1 Disciplinary Action, including involuntary termination of the LC Agreement. Unless otherwise provided for in the termination notice, termination shall be effective on the date on which TLC emails the written notice to the email address on file or mails, faxes or delivers by express courier to the LC's last known address (or fax number), or to his or her attorney, as required by law, whichever occurs first.

If TLC involuntarily terminates an LC's LC Agreement, such LC may not ever re-enroll with TLC as a new LC, either as an individual or as part of a Business Entity.

## 9.6    Sponsor Correction Due to Termination of LC Agreement

When TLC terminates an LC account for any reason, any LC that such terminated LC sponsored or Customer of such terminated LC may submit a request to TLC's Compliance Department at tlccompliance@totallifechanges.com, to be moved to the next Active LC within their current sponsor tree. Such movement does not occur automatically and TLC's Compliance Department will have sole discretion to make any sponsor corrections.

## 9.7    Conflicts

To the extent of any conflict between this LC Agreement and the Customer Agreement, this LC Agreement will prevail.

# Section 10
# Definitions

**Acceptance** – means TLC's acceptance of an LC Enrollment Application after the applicant has completed an LC Agreement and has submitted or delivered such LC Agreement to TLC via online submission or another delivery service. "Acceptance" shall occur when TLC receives and approves an LC Agreement by assigning an LC account number and officially placing the new LC in the TLC computer database system. However, TLC may revoke Acceptance at its sole discretion at any time within the first 30 days.

**Active or Active LC** – means an LC who satisfies the minimum QV, as set forth in the TLC Compensation Plan, to ensure that he/she is eligible to receive rebates, bonuses and/or commissions. To remain qualified to earn ongoing commissions on PC and LC purchases requires you to personally achieve at least 40 QV by the monthly anniversary date of your previous qualification, which may vary from 28–31 days depending on the month. A minimum qualification of 40 QV qualifies you to earn commissions from the retail, fast start, and binary pay bonuses. For higher ranks, there is an 80 QV or 120 QV requirement within the TLC compensation plan.

**Binary Organization** – means the organization within which an LC joins via a Sponsor, or that an LC starts through becoming a Sponsor.

**Breach** – "Breach," "Default" and "Violation" mean an actual or alleged transgression or violation of any part of the Agreement.

**Company** – means "Total Life Changes, LLC" and may also be referred to as "TLC".

**Customer or Preferred Customer** ("PC")– means a TLC retail customer. Customers may purchase a product only for personal use and may not resell the product. An LC participating in the TLC Compensation Plan is not a customer.

**Downline** – means the network of LCs and Customers who exist under an LC account.

**Downline Activity Report** – which may also be referred to under different names including but not limited to genealogy reports, team reports, Downline reports etc., means a report generated from an LC's i-Office Portal, that provides critical data relating to the identities of LCs, customers, sales information and enrollment activity of each LC's Downline. This report contains confidential and trade secret information which is proprietary to TLC and is owned solely by TLC.

**LC Agreement** – means the contract between TLC and each LC that all LCs must agree to in order to transact business with TLC, as defined in Section [1.3] of the P&P.

**Qualifying Volume** - means the volume that is credited to the LC personally when the LC purchases a product or generates retail sales. This is also known as personal qualification volume.

**SmartShip Agreement** – means the optional TLC program that automatically ships product to LC's. SmartShip offers convenience but is not required as long as the LC otherwise meets applicable requirements and qualifications.

**Sponsor** – means the LC who enrolls or sponsors a new LC or customer into TLC.

**TLC-Replicated Website** – means the online platform TLC provides for LCs to market and sell TLC products.

TLC Headquarters (HQ)
6094 Corporate Dr, Fair Haven, MI 48023

Contact Information
Toll Free: 888-TLC-9970 (888-852-9970)
Domestic Number: (810) 471-3812

Date Signed:Fri, Jan 12 2024
IBO Name: TATIANA BARNES
IBO Number: 46124435
IP Address: 174.134.152.228
Unique Session ID: 1705073995